1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Sedgwick LLP

Exhibit "3"

11:56:07  1        AND THAT'S RELEVANT BECAUSE MR. MOUA IS LAOTIAN, AS WAS

11:56:13  2    THE MAJORITY OF THE PEOPLE WHO LEFT WITH HIM.

11:56:16  3        BEA WILL DESCRIBE THE BEGINNING OF THE MASS DEPARTURE FROM

11:56:19  4    FIRST FINANCIAL TO FREEDOM EQUITY GROUP.  SHE WILL EXPLAIN ON

11:56:25  5    THE WEEKEND OF MAY 9TH, SHE HAD TRAVELLED TO MINNESOTA FOR A

11:56:31  6    MEETING WITH THE TOP SALES PEOPLE OF THE TEAM.  THAT MEETING

11:56:33  7    WAS SCHEDULED FOR THE AFTERNOON OF THE MAY 10TH, BUT THAT

11:56:37  8    MEETING NEVER HAPPENED.

11:56:38  9        INSTEAD, THAT MORNING SHE RECEIVED A CALL FROM ANOTHER

11:56:41  10   TEAM LOADER NAMED NONEI VORASANE.  BEA WAS INSTRUCTED TO GO TO

11:56:50  11   GILLES MOUA'S HOUSE, WHICH IS LOCATED NEAR SAINT PAUL,

11:56:53  12   MINNESOTA.  WHEN SHE ARRIVED AT AROUND 9:55 A.M., SHE WAS TOLD

11:56:58  13   THAT SHE NEEDED TO SIGN A DOCUMENT STATING SHE HAD NOT BEEN

11:57:02  14   SOLICITED BY GILLES MOUA AND THAT HIS "NEW FIRM" HAD NOT

11:57:06  15   RECRUITED HER.

11:57:08  16        AS YOU WILL HEAR, EVERYONE ARRIVING AT GILLES MOUA'S HOUSE

11:57:12  17   THAT MORNING WAS REQUIRED TO SIGN THIS FORM.

11:57:17  18        AFTER SIGNING THE FORM, BEA WAS INSTRUCTED TO HEAD TO THE

11:57:21  19   BASEMENT.  THERE, MR. MOUA GAVE A PRESENTATION ON FREEDOM

11:57:27  20   EQUITY GROUP AND A GROUP OF FREEDOM EQUITY GROUP BUILDERS WHICH

11:57:33  21   FEG CREATED SPECIALLY FOR MOUA'S TEAM.

11:57:36  22        AFTER PRAISING FEG AND CLAIMING IT WAS BETTER THAN FEG,

11:57:41  23   MOUA INFORMED BEA AND THE OTHER AGENTS THAT IF THEY ENROLLED

11:57:44  24   WITH FEG WITHIN THE NEXT SEVEN DAYS, MEMBERS OF MOUA'S TEAM

11:57:49  25   WOULD NOT HAVE TO PAY THE CUSTOMARY $125 ENROLLMENT FEE AT

| | | |
|---|---|---|
| 11:57:56 | 1 | FREEDOM EQUITY GROUP. |
| 11:57:57 | 2 | FACED WITH THE POSSIBILITY OF LOSING HER TEAM ON WHICH SHE |
| 11:58:01 | 3 | RELIED FOR HER COMMISSIONS, AND UNDER PRESSURE FROM OTHERS IN |
| 11:58:04 | 4 | THE TEAM, SHE RESIGNED. |
| 11:58:07 | 5 | MOUA'S TRUSTED LEADERS SET UP LAPTOPS IN THE BASEMENT. |
| 11:58:12 | 6 | MOUA'S SON, CHARLES MOUA, OPERATED ONE OF THE LAPTOPS AND |
| 11:58:16 | 7 | ENROLLED BEA WITH FREEDOM EQUITY GROUP AFTER HELPING HER TO |
| 11:58:20 | 8 | RESIGN FROM FFS. |
| 11:58:21 | 9 | AFTER REALIZING THAT SHE HAD MADE A MISTAKE, SHE CAME BACK |
| 11:58:25 | 10 | TO FIRST FINANCIAL, BUT HER TEAM WAS EVISCERATED IN THE |
| 11:58:29 | 11 | DEPARTURE AND SHE HAS BEEN REBUILDING IT EVER SINCE. |
| 11:58:33 | 12 | YOU WILL ALSO HEAR FROM SAVENG VONGKHAMSENE.  HE IS |
| 11:58:46 | 13 | ANOTHER FIRST FINANCIAL AGENT WHO RESIGNED FROM FFS, BUT HAS |
| 11:58:50 | 14 | SINCE RETURNED.  HE TOO WAS IN MINNESOTA THE MORNING OF |
| 11:58:55 | 15 | MAY 10TH.  HE HAD TRAVELLED THERE FROM HIS HOME IN TEXAS AT THE |
| 11:59:01 | 16 | INVITATION OF ANDRE MOUA, ANOTHER OF GILLES'S CHILDREN. |
| 11:59:07 | 17 | SAVENG AND HIS TEAM HAD BEEN TOLD THERE WOULD BE A |
| 11:59:10 | 18 | TRAINING IN ANDRE'S OFFICE NEAR SAINT PAUL.  INSTEAD, SAVENG |
| 11:59:14 | 19 | RECEIVED A TEXT MESSAGE FROM NONEI VORASANE, THE SAME AGENT WHO |
| 11:59:19 | 20 | HAD CALLED BEA ABOUT GOING TO MOUA'S HOUSE, THE TEXT MESSAGE TO |
| 11:59:24 | 21 | SAVENG SAID THE FOLLOWING, "COME TO GILLES'S HOUSE QUIETLY." |
| 11:59:32 | 22 | SAVENG WENT TO THE HOUSE AND ENCOUNTERED MANY OF THE SAME |
| 11:59:35 | 23 | THINGS THAT BEA DID.  HE WAS REQUIRED TO SIGN A |
| 11:59:38 | 24 | NON-SOLICITATION FORM.  WHEN HE DID, HE WAS TOLD THAT HE NEEDED |
| 11:59:43 | 25 | TO RESIGN FROM FFS AND ENROLL WITH FEG.  DESPITE REQUESTING |

DIRECT EXAMINATION OF MS. JONES BY MR. DAVIDSON

12:32:35  1   YOU JUST DESCRIBED, AND YOU LET ME KNOW IF IT'S ACCURATE,

12:32:39  2   PLEASE.

12:32:42  3   A.   I SEE IT.  YES.  SO YOU'VE GOT THE HUNDRED DOLLAR PREMIUM.

12:32:50  4   YES.  THAT'S ACCURATE.

12:32:51  5        MR. DAVIDSON:  MAY I HAVE PERMISSION, YOUR HONOR, TO

12:32:53  6   PUBLISH THIS TO THE JURY?

12:32:55  7        THE COURT:  YES.

12:32:56  8        MR. DAVIDSON:  THANK YOU.

12:33:05  9   Q.   ALL RIGHT.  YOU HAVE THE INSURANCE CARRIER, THEN THE FLOW

12:33:09  10  OF CASH THAT YOU WERE DESCRIBING.

12:33:14  11  A.   YES, SO THE $120 WAS THE TOTAL.  SO THE DOLLAR GETS PAID

12:33:19  12  TO FIRST FINANCIAL SECURITY.  WE THEN PAY $98.25 TO THE SALES

12:33:24  13  TEAM.  $1.75 GOES INTO THE MONTHLY BONUS POOL, AND THEN I CAN'T

12:33:31  14  SEE IT, BUT I'M ASSUMING BELOW THAT IS THE -- NO THEN THE $20

12:33:36  15  LEFT OVER, THAT STAYS WITH FIRST FINANCIAL.

12:33:39  16  Q.   SO THE EXAMPLE YOU DISCUSSED IS ABOUT THE FIRST YEAR OF A

12:33:49  17  POLICY.  DO YOU RECEIVE ANY MONEY FROM THE CARRIER IF THE

12:33:53  18  POLICY REMAINS IN FORCE?

12:33:54  19  A.   YES, THOSE ARE CALLED RENEWAL COMMISSIONS.

12:33:56  20  Q.   OKAY.  AND HOW DOES THE RENEWAL COMMISSION COMPARE TO THE

12:34:00  21  FIRST YEAR COMMISSION?

12:34:01  22  A.   IT IS SIGNIFICANTLY LESS THAN FIRST YEAR COMMISSION.

12:34:04  23  Q.   AND DOES THE SALES FORCE SHARE IN THAT COMMISSION AS WELL?

12:34:08  24  A.   YES.

12:34:10  25  Q.   SO USING THE SAME EXAMPLE, HOW MUCH WOULD GO TO THE SALES

```
12:34:15   1   FORCE?
12:34:16   2   A.   USING THAT SAME HUNDRED DOLLAR IUL EXAMPLE?
12:34:20   3   Q.   RIGHT.
12:34:21   4   A.   THE RENEWAL COMMISSION WOULD BE A TOTAL OF $4 PAID TO FFS
12:34:29   5   AND OUT OF THAT $4 WE PAY $3 OUT TO THE WRITING AGENT AND THE
12:34:32   6   TEAM.
12:34:34   7   Q.   NOW, ARE THERE ANY CIRCUMSTANCES UNDER WHICH FIRST
12:34:42   8   FINANCIAL HAS TO E FUND MONEY?
12:34:43   9   A.   THOSE ARE CALLED CHARGEBACK.
12:34:45  10   Q.   AND WHAT IS A CHARGEBACK?
12:34:46  11   A.   A CHARGEBACK IS WHEN THE INSURANCE COMPANY ASKS FOR THE
12:34:51  12   MONEY BACK.  WHEN THEY PAY COMMISSIONS ON THESE POLICIES, THEY
12:34:55  13   ARE EXPECTING THAT THEY WILL STAY IN FORCE.  AND IF A CUSTOMER
12:34:59  14   WERE TO CANCEL OR STOP PAYING A POLICY AND THE INSURANCE
12:35:06  15   COMPANY GETS THEIR MONEY BACK, SO THEY WOULD THEN COLLECT THEIR
12:35:09  16   MONEY BACK FROM FFS.
12:35:11  17        AND AS A PRACTICAL MATTER, WE ARE PAID WEEKLY, AND THE
12:35:15  18   PRACTICAL MATTER, THEY WOULD THEN DEDUCT THOSE CHARGEBACK
12:35:18  19   AMOUNTS FROM ANYTHING THAT WOULD BE DUE AS A POSITIVE AMOUNT
12:35:21  20   THAT WEEK.
12:35:22  21   Q.   DO YOU HAVE A TERM THAT YOU USE FOR MEMBERS OF THE SALES
12:35:26  22   FORCE?
12:35:27  23   A.   WE USUALLY REFER TO THEM AS AGENTS.
12:35:29  24   Q.   DOES SELLING A POLICY OR HAVING A POLICY RENEWED, THE ONLY
12:35:37  25   WAY AN AGENT CAN GET PAID?
```

DIRECT EXAMINATION OF MS. JONES BY MR. DAVIDSON

| | | |
|---|---|---|
| 12:35:39 | 1 | A.   NO. |
| 12:35:39 | 2 | Q.   HOW ELSE CAN THEY GET PAID? |
| 12:35:42 | 3 | A.   THEY ALSO CAN EARN OVERRIDES BASED ON THE PEOPLE THAT THEY |
| 12:35:45 | 4 | RECRUIT INTO THEIR TEAM.  IF THAT PERSON IS LICENSED AND SELLS |
| 12:35:51 | 5 | A POLICY, THE PERSON ABOVE THEM THAT RECRUITED THEM IN AND |
| 12:35:54 | 6 | HELPED TRAIN THEM CAN EARN A SMALL PORTION THAT'S CALLED AN |
| 12:35:58 | 7 | OVERRIDE. |
| 12:36:00 | 8 | Q.   AND YOU MENTIONED COMMISSION ON RENEWALS OF INSURANCE |
| 12:36:03 | 9 | POLICIES. |
| 12:36:04 | 10 | FOR HOW LONG DOES AN FFS AGENT CONTINUE TO RECEIVE |
| 12:36:08 | 11 | COMMISSIONS ON THE RENEWALS OF POLICIES THAT THAT AGENT SOLD? |
| 12:36:11 | 12 | A.   FOR POLICIES THAT PAY RENEWALS, IT WOULD BE AS LONG AS THE |
| 12:36:17 | 13 | POLICY IN FORCE WHICH MEANS THE CUSTOMER CONTINUES MAKING |
| 12:36:20 | 14 | PAYMENTS. |
| 12:36:23 | 15 | THEY CONTINUE RECEIVING RENEWALS AS LONG AS THE POLICY |
| 12:36:28 | 16 | STAYS IN FORCE, AS LONG AS THEY HAVE NOT BREACHED THEIR SALES |
| 12:36:33 | 17 | CONTRACT OR AGREEMENT THAT THEY AGREED TO WHEN THEY ENROLLED |
| 12:36:37 | 18 | WITH US. |
| 12:36:38 | 19 | Q.   AND HOW ABOUT OVERRIDES, HOW LONG DO THEY CONTINUE TO |
| 12:36:44 | 20 | RECEIVE THOSE? |
| 12:36:44 | 21 | A.   THAT WORKS THE SAME WAY, AS LONG AS THE POLICY IS IN FORCE |
| 12:36:48 | 22 | AND THEY HAVEN'T BREACHED THEIR CONTRACT. |
| 12:36:50 | 23 | Q.   ARE THERE SOME MEMBERS OF THE SALES FORCE WHO ONLY EARN |
| 12:36:54 | 24 | COMMISSIONS BASED ON OVERRIDES? |
| 12:36:56 | 25 | A.   YES. |

DIRECT EXAMINATION OF MS. JONES BY MR. DAVIDSON

| | | |
|---|---|---|
| 12:58:35 | 1 | COMPETITORS OF FFS NOW OR HERE AFTER ACQUIRED OR DISCLOSED TO |
| 12:58:40 | 2 | SALES CONTRACTOR." |
| 12:58:42 | 3 | Q.   AND FINALLY, DOES THE SC AGREEMENT SAY ANYTHING ABOUT |
| 12:58:45 | 4 | INDUCING OTHER FFS CONTRACTORS TO BREACH THEIR CONTRACTS? |
| 12:58:49 | 5 | A.   YES.   THAT IS SIX. |
| 12:58:53 | 6 | Q.   ALL RIGHT.   COULD YOU PLEASE READ THAT ALOUD FOR THE JURY? |
| 12:58:56 | 7 | A.   "COVENANTS OF OTHER SALES CONTRACTORS AND HARM TO FFS. |
| 12:59:05 | 8 | SALES CONTRACTOR ACKNOWLEDGES THAT ALL MEMBERS OF FFS'S |
| 12:59:08 | 9 | NETWORK OF CONTRACTURALLY AFFILIATED SALES CONTRACTORS OR |
| 12:59:12 | 10 | REPRESENTATIVES HAVE EXECUTED AGREEMENTS WITH FFS CONTAINING |
| 12:59:15 | 11 | COVENANTS IDENTICAL OR SIMILAR TO THE COVENANTS, AND THAT ANY |
| 12:59:18 | 12 | ACT BY SALES CONTRACTOR TO INDUCE OR ATTEMPT TO INDUCE ANY |
| 12:59:24 | 13 | MEMBER TO BREACH ANY PORTION OF HIS OR HER AGREEMENT WITH FFS, |
| 12:59:27 | 14 | WOULD CONSTITUTE WRONGFUL INTERFERENCE WITH THE CONTRACTURAL |
| 12:59:30 | 15 | RIGHTS OF FFS WITH SUCH MEMBER. |
| 12:59:34 | 16 | SALES CONTRACTOR ACKNOWLEDGES THAT FFS WOULD SUFFER |
| 12:59:38 | 17 | EXTREMELY COSTLY AND IRREPARABLE HARM, LOSS AND DAMAGE, IF |
| 12:59:44 | 18 | DURING THE TERMS OF THE COVENANTS, SALES CONTRACTOR SHOULD |
| 12:59:47 | 19 | VIOLATE ANY OF SAID COVENANTS. |
| 12:59:51 | 20 | Q.   NOW, YOU MENTIONED EARLIER THAT AGENTS ARE ELIGIBLE TO |
| 12:59:56 | 21 | RECEIVE RENEWALS AND OVERRIDES SO LONG AS THEIR POLICIES REMAIN |
| 01:00:01 | 22 | IN EFFECT AND SO LONG AS THEY HAVEN'T BREACHED THIS AGREEMENT. |
| 01:00:06 | 23 | DOES THAT POLICY OF FFS COME FROM THIS CONTRACT? |
| 01:00:10 | 24 | A.   YES, IT DOES. |
| 01:00:11 | 25 | Q.   AND WHERE DO YOU SEE THAT? |

01:00:13  1    A.   THAT IS A LITTLE FURTHER DOWN, I BELIEVE.

01:00:19  2    Q.   I GUESS I LIED.  COULD YOU PLEASE READ THIS ALOUD TO THE

01:00:22  3    JURY.

01:00:23  4    A.   OH, YES.

01:00:26  5         "COLLATERAL CONSEQUENCES.

01:00:27  6         IN ADDITION TO THE RIGHTS FFS HAS TO ENFORCE THE

01:00:30  7    COVENANTS, SALES CONTRACTOR AGREES AND UNDERSTANDS THAT IN THE

01:00:33  8    EVENT OF ANY BREACH BY HIM OR HER OF ANY OF THE COVENANTS OR

01:00:37  9    THE PROVISIONS OF THIS SECTION C, WHETHER DURING THE TERM OR

01:00:41  10   AFTER TERMINATION OF THIS AGREEMENT, NO FURTHER COMPENSATION

01:00:45  11   SHALL ACCRUE OR BE PAYABLE TO SALES CONTRACTOR BY FFS OR ANY

01:00:49  12   FFS AFFILIATE.

01:00:52  13        COMPLIANCE WITH EACH OF THE COVENANTS IS AN EXPRESS

01:00:55  14   CONDITION FOR THE ACCRUAL, EARNING OR PAYMENT OF ANY

01:01:00  15   COMMISSIONS AND OVERRIDE COMPENSATION BY FFS OR ANY FFS

01:01:03  16   AFFILIATE.  AND THE PARTIES DO NOT INTEND FOR ANY PAYMENT

01:01:07  17   PROVISIONS UNDER THIS AGREEMENT TO BE ENFORCEABLE BY SALES

01:01:09  18   CONTRACTOR INDEPENDENT OF HIS OR HER OBSERVANCE OF THESE

01:01:13  19   COVENANTS."

01:01:14  20   Q.   THANK YOU FOR ALL THAT READING.

01:01:17  21        WHY DOES FIRST FINANCIAL HAVE THESE POLICIES?

01:01:21  22   A.   OH, WELL, WE HAVE THESE POLICIES TO PROTECT BOTH OUR

01:01:24  23   INTERESTS AND THE INTERESTS OF OTHER TEAM MEMBERS IN THE EVENT

01:01:31  24   SOMETHING LIKE THIS WOULD HAPPEN WHERE A LARGE GROUP OF

01:01:37  25   INDIVIDUALS WOULD LEAVE, IT WOULD BE VERY DISRUPTIVE TO OUR

DIRECT EXAMINATION OF MS. JONES BY MR. DAVIDSON

| | | |
|---|---|---|
| 01:26:01 | 1 | MAINTAIN A VERY SIMILAR OVERRIDING COMPENSATION SYSTEM THAT |
| 01:26:08 | 2 | THEY HAD WITH OUR COMPANY.  IT WOULD APPEAR IT WOULD BE QUITE |
| 01:26:13 | 3 | SIMILAR. |
| 01:26:14 | 4 | Q.  HAS ANYONE COME BACK TO FFS FROM FEG? |
| 01:26:17 | 5 | A.  YES.  WE'VE HAD ABOUT 45 PEOPLE COME BACK. |
| 01:26:21 | 6 | Q.  HAS FFS BEEN HARMED BY MOUA'S LEAVING? |
| 01:26:26 | 7 | A.  MOST DEFINITELY.  IT WAS INCREDIBLY DISRUPTIVE AND STILL |
| 01:26:33 | 8 | IS, NOT ONLY TO OUR COMPANY AS A WHOLE, BUT TO THE AGENTS WHO |
| 01:26:39 | 9 | STAYED BEHIND. |
| 01:26:39 | 10 | BECAUSE WHILE THE NUMBERS ARE BIG, NOT EVERYONE LEFT.  BUT |
| 01:26:42 | 11 | IT LEFT BIG HOLES IN THE TEAM, BOTH IN LEADERSHIP AND IN |
| 01:26:47 | 12 | PRODUCTION.  THERE WERE FINANCIAL HARDSHIPS.  WE HAD LARGE |
| 01:26:53 | 13 | NUMBERS OF CHARGEBACKS IN THE EARLY MONTHS, AND ONGOING, |
| 01:27:00 | 14 | ACTUALLY, SO THERE WAS FINANCIAL HARM.  DISRUPTION TO THE |
| 01:27:08 | 15 | TEAMS, THE STRUCTURE, THE LEADERSHIP, ALL OF THAT. |
| 01:27:11 | 16 | Q.  WERE THERE PEOPLE IN MOUA'S TEAM WHO STAYED AT FFS? |
| 01:27:15 | 17 | A.  YES. |
| 01:27:17 | 18 | MR. DAVIDSON:  NO FURTHER QUESTIONS FROM ME. |
| 01:27:20 | 19 | THE COURT:  ALL RIGHT.  THIS IS A GOOD TIME TO STOP, |
| 01:27:22 | 20 | I THINK. |
| 01:27:25 | 21 | LADIES AND GENTLEMEN, PLEASE REMEMBER MY ADMONITION NOT TO |
| 01:27:28 | 22 | DISCUSS THE CASE WITH ANYBODY OR LET ANYBODY DISCUSS IT WITH |
| 01:27:32 | 23 | YOU, NOT TO DO ANY RESEARCH ABOUT IT OR TO BE EXPOSED OR |
| 01:27:35 | 24 | RECEIVE ANY INFORMATION ABOUT THE CASE, ABOUT THE LAW OR |
| 01:27:39 | 25 | ANYTHING ELSE. |

DIRECT EXAMINATION OF MR. GERLICHER BY MR. DAVIDSON

11:44:43  1    A.   THIS WAS NOVEMBER 19TH, 2013.

11:44:46  2    Q.   COULD YOU READ THE E-MAIL FROM GILLES IN THIS THREAD OUT

11:44:56  3    LOUD, PLEASE.

11:44:57  4    A.   OH, YES.

11:44:58  5        "HI DEBBIE AND PHIL.  THANK YOU SO MUCH FOR YOUR BEAUTIFUL

11:45:02  6    GIFT.  WE LOOKED AT THIS ARTIST PORTFOLIO AND WE LIKED THE RED

11:45:06  7    HILLS OF DUNDEE.  THE COLORS ARE SO BEAUTIFUL.  IF POSSIBLE, A

11:45:10  8    60 WIDE BY 48 TALL WOULD BE PERFECT.

11:45:15  9        THANK YOU FOR YOUR LEADERSHIP, FRIENDSHIP AND YOUR

11:45:18  10   GENEROSITY, WE WILL NEVER FORGET WHAT YOU AND PHIL DO FOR US.

11:45:23  11       MAI AND GILLES."

11:45:24  12   Q.   NOW DO YOU KNOW HOW MUCH FFS PAID TO GILLES MOUA IN

11:45:29  13   COMMISSIONS IN 2013?

11:45:36  14   A.   IT WAS JUST SHORT OF 1.7 MILLION.

11:45:39  15   Q.   AND WHY WERE YOU AND DEBBIE COMMISSIONING A PIECE FOR HIM,

11:45:42  16   GIVEN HOW MUCH HE WAS EARNING?

11:45:43  17   A.   WELL, IT HAD LESS TO DO WITH MONEY AND MORE TO DO WITH OUR

11:45:47  18   RELATIONSHIP.  LIKE I SAID, WE HAD DEVELOPED A RELATIONSHIP

11:45:53  19   OVER TIME, WE WANTED TO SHOW OUR APPRECIATION TO THEM, AND IT

11:45:57  20   JUST SEEMED, IT'S SOMETHING WE JUST WANTED TO DO.

11:46:00  21   Q.   NOW DID YOU FREQUENTLY E-MAIL WITH MAI LEE?

11:46:07  22   A.   YES.  I HAD SOME DIRECT FROM HER THAT SHE WOULD ROUTINELY

11:46:15  23   USE GILLES'S MOUA'S E-MAIL AND SOMETIMES I WOULD GET AN E-MAIL

11:46:20  24   THAT SAID GILLES MOUA BECAUSE IT WAS FROM HER, SHE WOULD SIGN

11:46:23  25   IT FROM HER.

11:57:27  1      MEETINGS WHEN THEY ARE AT THESE EVENTS.

11:57:30  2          AND NOW HE DID ONE TIME DOWN IN LA, WE HAVE ANOTHER ONE OF

11:57:34  3      OUR TOP LEADERS OF THE COMPANY'S HUSBAND OWNED A CULINARY

11:57:40  4      INSTITUTE.  HE COULD TAKE YOUNG MEN THAT HE PULLED OUT OF GAINS

11:57:45  5      IN THE LA AREA AND HE WOULD TEACH THEM THE ART OF BEING A CHEF.

11:57:49  6          AND BECAUSE WE HAD THE BOAT WE WERE ABLE TO TAKE OVER THE

11:57:52  7      GALLEY AND HE DID A SPECIAL DINNER WITH THE CHEF ON THE BOAT,

11:57:55  8      GILLES WAS INVITED, ALONG WITH MAI, AT A SPECIAL TABLE.  AND AT

11:58:00  9      THE LAST MINUTE, HE CANCELLED BECAUSE OF A MEETING.

11:58:05  10     Q.   DO YOU HAPPEN TO REMEMBER DURING THE CRUISE WHEN THAT

11:58:08  11     CANCELLATION HAPPENED?  TOWARD THE END, TOWARD THE BEGINNING?

11:58:16  12     A.   THAT WAS PROBABLY RIGHT SMACK DAB IN THE MIDDLE.

11:58:19  13     Q.   OKAY.  DID THAI THAO'S PROMOTION BECOME EFFECTIVE MAY 1ST?

11:58:27  14     A.   I BELIEVE IT DID, YES.

11:58:29  15     Q.   CAN YOU TURN TO EXHIBIT 12.  DO YOU RECOGNIZE THIS E-MAIL?

11:58:51  16     A.   I DO.

11:58:52  17     Q.   WHAT IS THE DATE ON THE E-MAIL?

11:58:56  18     A.   MAY 8TH, 2014.

11:59:00  19     Q.   OKAY.  AND WHAT'S THE SUBJECT LINE?

11:59:02  20     A.   2014 STRATEGY.

11:59:04  21     Q.   ALL RIGHT.  COULD YOU PLEASE READ IT OUT LOUD FOR THE

11:59:08  22     JURY, PLEASE?

11:59:08  23     A.   SURE.

11:59:09  24          "GILLES, I HOPE THIS FINDS YOU WELL AND BACK IN THE U.S.

11:59:12  25          FOLLOWING UP ON OUR RECENT CONVERSATIONS AND E-MAILS, I

```
12:00:40   1        ZONE.

12:00:40   2        Q.   IF YOU WOULD LOOK AT EXHIBIT 14, PLEASE.  DO YOU RECOGNIZE

12:00:58   3        THIS?

12:00:58   4        A.   I DO.

12:01:13   5        Q.   SO DO YOU SEE A MESSAGE HEADING AT THE BOTTOM OF THE PAGE?

12:01:20   6        A.   YES.

12:01:21   7        Q.   AND WHAT'S THE DATE ON THAT?

12:01:22   8        A.   MAY 10TH, 2014.

12:01:24   9        Q.   AND WHAT TIME DOES IT SAY?

12:01:26  10        A.   7:09 AND 30 SECONDS A.M., EASTERN DAYLIGHT TIME.

12:01:32  11        Q.   ALL RIGHT.

12:01:35  12             WAS THIS HIS RESIGNATION E-MAIL.

12:01:43  13        A.   YES.

12:01:44  14        Q.   COULD YOU PLEASE READ IT OUT LOUD TO THE JURY?

12:01:47  15        A.   SURE.

12:01:48  16             "DEAR PHIL AND DEBBIE, FIRST OF ALL, I WOULD LIKE TO THANK

12:01:51  17        YOU FOR GIVING ME THE FFS OPPORTUNITY.  I MADE A GOOD USE OF IT

12:01:56  18        FOR THE PAST SIX YEARS.  I ENJOYED A WONDERFUL RISE IN THE

12:02:00  19        BUSINESS.

12:02:01  20             I APPRECIATE THE LEADERSHIP SUPPORT AND FRIENDSHIP FROM

12:02:03  21        YOU AND DEBBIE.  I WILL ALWAYS REMEMBER YOU BOTH.

12:02:06  22             I WOULD LIKE TO PERSONALLY LET YOU KNOW THAT I AM

12:02:07  23        RESIGNING FROM FFS TO PURSUE MY DREAM.  I BELIEVE THAT YOU WILL

12:02:12  24        TAKE GOOD CARE OF FFS.

12:02:14  25             SINCERELY, GILLES MOUA."
```

DIRECT EXAMINATION OF MR. CAINE BY MR. DAVIDSON

| | | |
|---|---|---|
| 12:34:48 | 1 | **DIRECT EXAMINATION** |
| 12:34:48 | 2 | BY MR. DAVIDSON: |
| 12:34:49 | 3 | Q.   WHERE DO YOU WORK? |
| 12:34:49 | 4 | A.   FIRST FINANCIAL SECURITY. |
| 12:34:51 | 5 | Q.   AND WHAT IS YOUR POSITION THERE? |
| 12:34:52 | 6 | A.   I AM THE MANAGER OF THE COMMISSIONS DEPARTMENT. |
| 12:35:01 | 7 | Q.   AND WHAT ARE YOUR RESPONSIBILITIES IN THAT ROLE? |
| 12:35:04 | 8 | A.   TO ENSURE EACH MEMBER OF THE SALES FORCE IS PAID |
| 12:35:07 | 9 | ACCURATELY AND TIMELY. |
| 12:35:09 | 10 | Q.   AND DO YOU WORK AT THE HOME OFFICE? |
| 12:35:12 | 11 | A.   YES. |
| 12:35:13 | 12 | Q.   DOES FFS TRACK THE COMMISSIONS PAID BY INSURANCE CARRIERS? |
| 12:35:18 | 13 | A.   YES. |
| 12:35:19 | 14 | Q.   AND HOW DOES IT DO THAT? |
| 12:35:21 | 15 | A.   WE ARCHIVE ALL OF OUR COMMISSION STATEMENTS INSIDE OF OUR |
| 12:35:25 | 16 | DATABASE, AND WE TRACK EVERY CHARGEBACK AND COMMISSION PAID OUT |
| 12:35:29 | 17 | FOR EACH CARRIER. |
| 12:35:31 | 18 | Q.   AND DO YOU OVERSEE THE PAYMENT OF AGENTS? |
| 12:35:35 | 19 | A.   YES. |
| 12:35:35 | 20 | Q.   HOW OFTEN IS PAYDAY FOR AGENTS? |
| 12:35:37 | 21 | A.   WE GET PAID COMMISSIONS EVERY FRIDAY.  FOR ANY COMMISSIONS |
| 12:35:43 | 22 | THAT WERE GENERATED FOR WEEKS PRIOR. |
| 12:35:45 | 23 | Q.   DID THAT INCLUDE MAY 9TH, 2014? |
| 12:35:48 | 24 | A.   YES. |
| 12:35:48 | 25 | Q.   DOES PAYDAY DIFFER, DEPENDING ON THE TYPES OF COMMISSION |

DIRECT EXAMINATION OF MR. CAINE BY MR. DAVIDSON

| | | |
|---|---|---|
| 12:35:55 | 1 | WE ARE TALKING ABOUT? |
| 12:35:56 | 2 | A.   DEPENDING ON THE CARRIER.   SOME CARRIERS PAY WEEKLY, SOME |
| 12:36:00 | 3 | CARRIERS PAY MONTHLY. |
| 12:36:01 | 4 | Q.   AND AS AMONG COMMISSIONS OR OVERRIDES, IS THERE ANY |
| 12:36:06 | 5 | DISTINCTION IN TERMS OF WHEN THOSE GET PAID? |
| 12:36:08 | 6 | A.   NO, COMMISSIONS ARE PAID EVERY FRIDAY TO THE FIELD AND SO |
| 12:36:13 | 7 | ANY DOLLAR THAT COMES DOWN IS PAID OUT. |
| 12:36:16 | 8 | Q.   DOES THAT PERTAIN TO BOTH ACTIVE AND FORMER AGENTS? |
| 12:36:21 | 9 | A.   YES. |
| 12:36:22 | 10 | Q.   ARE YOU FAMILIAR WITH SOMEONE NAMED ART COBB? |
| 12:36:26 | 11 | A.   YES. |
| 12:36:26 | 12 | Q.   AND WHO IS HE? |
| 12:36:27 | 13 | A.   HE'S A CERTIFIED PUBLIC ACCOUNTANT WHO, I BELIEVE, WILL BE |
| 12:36:32 | 14 | TESTIFYING LATER. |
| 12:36:33 | 15 | Q.   DID YOU PROVIDE HIM WITH INFORMATION ABOUT FIRST FINANCIAL |
| 12:36:37 | 16 | SECURITY'S COMMISSIONS? |
| 12:36:37 | 17 | A.   YES. |
| 12:36:38 | 18 | Q.   AND WHAT DID YOU PROVIDE TO HIM? |
| 12:36:42 | 19 | A.   I PROVIDED TO HIM ALL OF OUR COMMISSION RECORDS, ALL OF |
| 12:36:47 | 20 | OUR HISTORICAL DATA, AND I GATHERED ALL OF THAT TOGETHER FOR |
| 12:36:51 | 21 | HIM, ORGANIZED IT FOR HIM AND GAVE IT OVER TO HIM. |
| 12:36:54 | 22 | Q.   AND WHEN DID YOU PROVIDE HIM THAT INFORMATION? |
| 12:36:56 | 23 | A.   LATE 2015.   AND MOST RECENTLY, TO UPDATE ALL OF OUR CHARTS |
| 12:37:03 | 24 | AND GRAPHICS THAT WE GAVE TO HIM PRIOR. |
| 12:37:06 | 25 | Q.   AND HOW RECENTLY WAS THAT? |

DIRECT EXAMINATION OF MR. COBB BY MR. DAVIDSON

12:49:30   1    COMPANIES, TO LOOKING AT SOME OF THE FINANCIAL MEASURES.  WHAT

12:49:33   2    ARE THE COMMISSIONS BEFORE AND AFTER EARLY 2014.  WHAT ARE THE

12:49:41   3    VARIOUS AMOUNTS, HOW DID THE BUSINESS CHANGE.

12:49:43   4        WE LOOKED AT THE DOLLARS AND CENTS, WE LOOKED AT THE

12:49:47   5    FINANCIAL RELATIONSHIPS, AND WE FOUND CHANGES IN THE COMMISSION

12:49:53   6    PAYMENTS, VARIOUS AMOUNTS.

12:49:57   7        WE ALSO LOOKED AT CONVENTIONS, WE LOOKED AT CONVENTION

12:50:01   8    BUSINESSES AND OTHER SETTINGS AS WELL.  SO WE LOOKED AT THE

12:50:05   9    CONVENTION REVENUE.

12:50:07   10       THAT GAVE US THEN, A BUSINESS AND A FINANCIAL BACKGROUND

12:50:10   11   TO START TO ANALYZE THE COMPANY AND TO MAKE SOME CALCULATIONS

12:50:15   12   AND ESTIMATIONS OF THE DAMAGES.

12:50:17   13       AND THERE'S SOME AREAS OF THE DAMAGES THAT ARE MUCH MORE

12:50:20   14   SOLID THAN OTHERS, AND WE WANTED TO LOOK AND KEEP OUR ANALYSIS

12:50:27   15   AS FACTUAL AS WE COULD.

12:50:30   16   Q.   AND AFTER YOU CONSIDERED ALL OF THAT, DID YOU FORM AN

12:50:33   17   OPINION AS TO FFS'S DAMAGES?

12:50:35   18   A.   I DID.

12:50:36   19   Q.   AND WHAT IS THAT OPINION?

12:50:39   20   A.   I WILL GIVE YOU THE UPDATED OPINION BECAUSE WE UPDATED OUR

12:50:43   21   ANALYSIS OVER THE PASSAGE OF TIME UPON RECEIVING ADDITIONAL

12:50:47   22    INFORMATION.

12:50:47   23       WE LOOKED AT THE DAMAGES IN TWO PIECES.  WE LOOKED AT

12:50:50   24   DAMAGE PERIODS, HOW LONG WOULD A DAMAGE PERIOD BE.

12:50:54   25       AND A DAMAGE PERIOD OFTEN IS MANY, MANY, MANY, MANY, MANY

DIRECT EXAMINATION OF MR. COBB BY MR. DAVIDSON

01:10:59  1          SO WE CALCULATE THE PRESENT VALUES.  YOU CAN SEE THE

01:11:02  2     CUMULATIVE TOTALS THEN WE HAVE ROUNDED THEM.  SO WE ROUNDED

01:11:06  3     4,145,000 DOWN TO 4 MILLION.  WE ROUNDED 6,179,000 DOWN TO 6

01:11:11  4     MILLION.

01:11:13  5     Q.   NOW YOU SAID THAT YOU CONSIDERED CONVENTION FEES; IS THAT

01:11:17  6     RIGHT?

01:11:17  7     A.   YES.

01:11:17  8     Q.   CAN YOU DESCRIBE WHAT THOSE CONVENTION FEES ARE AND WHAT

01:11:21  9     THE AMOUNTS WERE?

01:11:25  10    A.   ALL RIGHT.  MARKETING ORGANIZATIONS VERY FREQUENTLY HAVE

01:11:28  11    CONVENTIONS THAT THEY DRAW AS MANY PEOPLE IN, INDEPENDENT

01:11:32  12    BUSINESS OPERATORS, AGENTS, WHAT HAVE YOU.

01:11:36  13         AND THERE'S AN EX CHANGE OF FACTUAL INFORMATION, HERE'S

01:11:40  14    WHAT'S GOING ON IN THE INDUSTRY, HERE ARE THE PLANS WE HAVE.

01:11:43  15    AND THERE'S A LOT OF SUPPORT, ESPECIALLY TO A SALES TEAM, RARA,

01:11:46  16    SELL, AND WHAT'S GOING ON.

01:11:48  17         AND WE FOUND THAT FFS HAS A SERIES OF CONVENTIONS THAT

01:11:53  18    THEY'VE HELD, AND TWO OF THEM ARE A JUMP START CONVENTION HELD

01:11:56  19    IN JANUARY OF EACH YEAR AND A LEADER'S CONVENTION THAT'S

01:11:59  20    GENERALLY HELD IN THE SUMMER.

01:12:01  21         WE FOUND THAT FOR 2015, IT WAS HELD IN JULY, LATE JULY

01:12:07  22    OVER THE COURSE OF TWO OR THREE DAYS.

01:12:09  23         SO WE LOOKED HISTORICALLY AND SEE SOME OF THE HISTORICAL

01:12:13  24    INFORMATION THAT YOU HAVE PUT UP, THE NUMBER OF MOUA TEAM

01:12:18  25    ATTEND ATTENDEES, WE ALSO LOOKED AT MOUA TEAM ATTENDEES IN

01:12:23  1    TOTAL, AND WE LOOKED AT PRE-REGISTRATION AND WALK-UPS.

01:12:26  2         THERE'S NOT AN ABILITY IN THE DATA TO KNOW WHICH OF THE

01:12:30  3    WALK UPS WERE MOUA TEAM VERSUS ONE OF THE OTHER TEAMS.  BUT FOR

01:12:33  4    THE PRE-REGISTRATIONS.

01:12:36  5         SO WE TOOK ACTUAL NUMBERS FOR 2015, 2012, 2013 AND 2014,

01:12:42  6    BECAUSE IT OCCURRED IN JANUARY.  AND THEN WE ESTIMATED NUMBERS

01:12:47  7    FOR 2015.  AND YOU CAN SEE WE ESTIMATED 21.  WE ESTIMATED 21

01:12:53  8    BECAUSE 33 PEOPLE HAD BEEN REINSTATED.

01:12:56  9         SO WE LOOKED AT THE PROPORTION OF MOUA TEAM ATTENDEES TO

01:13:01  10   TOTAL MOUA TEAM, AND WE FOUND OUT THAT ABOUT 65 PERCENT OF MOUA

01:13:06  11   TEAM PEOPLE WERE PREREGISTERING.

01:13:09  12        SO WE SAID THE 33 THAT CAME BACK BY JANUARY, WE THINK

01:13:14  13   ABOUT 65 PERCENT OF THEM WOULD SHOW UP.

01:13:16  14        SIMILAR ANALYSIS FOR THE LEADERS CONVENTION, BUT BY THE

01:13:19  15   TIME OF THE LEADER'S CONVENTION IN JULY, THREE MORE PEOPLE HAD

01:13:24  16   BEEN REINSTATED AND WE LOOKED AT THE PARTICIPATION RATE AT THE

01:13:30  17   LEADER'S CONVENTION AND WE ESTIMATED THE NUMBERS WE THINK WOULD

01:13:33  18   COME THROUGH.

01:13:34  19        AND THEN WE LOOKED AT THE EXPECTED AMOUNTS.  AND YOU CAN

01:13:38  20   SEE FOR THE EXPECTED 909 CAME AND 909 WERE EXPECTED FOR 2014.

01:13:46  21   21 CAME AND 909 WERE EXPECTED.

01:13:51  22        SO WE HELD IT CONSTANT.  WE HELD IT CONSTANT EVEN THOUGH

01:13:54  23   MOUA TEAM HAD BEEN GROWING AND SIGNIFICANTLY.  AND WE PAID

01:13:59  24   ATTENTION TO THE FACT THAT THE GROWTH THAT FFS ENJOYED, MOUA

01:14:06  25   TEAM AND OTHERWISE, HAPPENED EVEN WITH AGENTS LEAVING.  THERE'S

DIRECT EXAMINATION OF MR. COBB BY MR. DAVIDSON

01:14:09  1    AN ONGOING COMING AND GOING OF AGENTS AS THERE IS WITHIN ANY

01:14:13  2    BUSINESS.  SO WE WERE CAREFUL TO PAY ATTENTION TO THAT.

01:14:16  3         SO WE SAID 909 IS STILL GOING TO BE 909.  AND THEN THE

01:14:21  4    TOTAL, AND FOR THE CONVENTION BUSINESS, WE JUST WENT OUT AS YOU

01:14:25  5    CAN SEE TO THE END OF 2015.  SO THAT GAVE US THE NUMBER OF

01:14:29  6    INDIVIDUALS THERE AND THEN LOSS.

01:14:35  7         WE THEN LOOKED AT THE REVENUE THAT WAS GENERATED FOR 2921

01:14:42  8    PEOPLE, AND THE PROFIT ON THAT TO FFS WAS ABOUT $100 EACH.

01:14:49  9    THAT'S WHAT THEY ENJOYED HISTORICALLY WHEN THEY WENT BACK AND

01:14:53  10   LOOKED AT THEIR RECORDS OF PROFITABILITY.

01:14:54  11        THE FEE IS ACTUALLY IN THE RANGE OF 100 TO 135, WE USED

01:14:58  12   THE 100.  AND THAT GAVE US A MEASURE OF THE LOSS RELATED TO

01:15:03  13   CONVENTIONS OF MULTIPLYING BY 100, $292,100 AND WE ROUNDED THAT

01:15:15  14   DOWN AS WELL.

01:15:16  15   Q.   NOW YOU TALKED ABOUT CONSIDERING MITIGATION OF FIRST

01:15:18  16   FINANCIAL'S DAMAGES.  THAT'S A REDUCTION OF THE TOTAL LOST

01:15:23  17   PROFITS, CORRECT?

01:15:24  18   A.   IT IS.

01:15:25  19   Q.   HOW DID YOU GO ABOUT DOING THAT?

01:15:27  20   A.   WE DID THE PROJECTION ACROSS FOR THE LOST PROFITS AND WE

01:15:34  21   REALLY REVISITED THAT.  WE FOUND THAT 45 MOUA TEAM MEMBERS HAD

01:15:38  22   COME BACK.  AND WE RECEIVED FROM FFS THEIR INTERNAL RECORD OF

01:15:45  23   THE COMMISSIONS GENERATED BY EACH OF THOSE 45.

01:15:49  24        SO SOME OF THEM CAME BACK RELATIVELY QUICKLY, SOME OF THEM

01:15:53  25   CAME BACK MUCH LATER.  SO WE HAD TO DETERMINE A MEASURE OF

09:20:15  1    A.   IN 2013, MY TEAM PRODUCED 17 MILLION, AND THE REST OF THE

09:20:23  2    COMPANY PRODUCED 3 MILLION.

09:20:24  3    Q.   ALL RIGHT.  AND DURING THAT TIME, WHAT WAS YOUR BASIC

09:20:34  4    LEVEL OF SATISFACTION WITH FFS?

09:20:38  5              MR. DAVIDSON:  VAGUE AND AMBIGUOUS.

09:20:39  6              THE COURT:  YEAH.  DURING WHAT TIME, COUNSEL?

09:20:41  7    BY MR. SISCO:

09:20:42  8    Q.   DURING THE PERIOD OF TIME FROM 2011 TO 2013, HOW DID YOU

09:20:47  9    FEEL ABOUT THE COMPANY THAT YOU WERE WORKING FOR AND THE

09:20:50  10   RELATIONSHIP THAT YOU HAD?

09:20:51  11   A.   I WAS MOSTLY VERY HAPPY WITH THE COMPANY UNTIL, UNTIL THE

09:20:58  12   OWNER, PHIL, START TO GET INVOLVED IN MY INTERNAL STRUCTURE OF

09:21:05  13   THE TEAM AND WHICH ME AND HIM, FOR THE FIRST TIME AFTER WE

09:21:12  14   MEET, WE AGREED TOGETHER, IT WAS AGREED THAT HE WILL TAKE CARE

09:21:20  15   ONLY THE HOME OFFICE AND THE TRACKING SYSTEM, AND THE FIELD

09:21:27  16   FORCE, I SHOULD BE ABLE TO TAKE CARE OF MYSELF.

09:21:31  17        AND WE WAS AGREED ON THAT ONE, AND UNTIL 2013, THEN HE

09:21:36  18   START TO COME AND WANT TO PROMOTE MY TEAM TO THE SAME POSITION

09:21:43  19   LIKE I HAVE, WHICH AFFECT MY INCOME, BUT DOESN'T AFFECT HIS

09:21:48  20   INCOME AT ALL.

09:21:50  21        AND THAT'S WHERE I HAVE PROBLEM WITH HIM.

09:21:53  22   Q.   OKAY.  AT THAT TIME, DID YOU HAVE AN UNDERSTANDING WITH

09:21:58  23   MR. GERLICHER THAT YOU WOULD HANDLE YOUR TEAM AND HE WOULD

09:22:03  24   STICK TO HANDLING THE BUSINESS OF FFS?

09:22:06  25              MR. DAVIDSON:  LEADING QUESTION.

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO                    450

| 09:22:07 | 1 | THE COURT:  SUSTAINED. |
|---|---|---|

09:22:07  2  BY MR. SISCO:

09:22:09  3  Q.   DID YOU HAVE AN UNDERSTANDING WITH MR. GERLICHER?

09:22:12  4  A.   YES.

09:22:13  5  Q.   WHAT WAS THAT UNDERSTANDING AS TO THE WAY YOU RAN YOUR

09:22:17  6  TEAM?

09:22:17  7  A.   THE UNDERSTANDING IS STILL THE SAME.  UNDERSTANDING HE

09:22:20  8  DON'T TOUCH THE FIELD, I DON'T TOUCH THE HOME OFFICE.

09:22:24  9      BUT HE COULDN'T LEAVE IT, HE KEEP TALKING TO MY NUMBER ONE

09:22:30  10  GUY, AND THEY HAVE SOME KIND OF AN UNDERSTANDING TO EACH OTHER

09:22:38  11  TOGETHER.  AND THAT'S WHERE EVERYTHING, THE RELATIONSHIP START

09:22:42  12  TO ESCALATING NOW, AND WE START TO SEE A LOT OF DIFFERENCE

09:22:47  13  BETWEEN ME AND PHIL.

09:22:52  14  Q.   ARE YOU TALKING ABOUT THAI THAO?

09:22:55  15  A.   YES, I'M TALKING ABOUT THAI THAO, BUT I NEVER HAVE A

09:22:59  16  PROBLEM UNTIL PHIL GET INVOLVED.  HE WAS VERY GOOD DOWNLINE, HE

09:23:03  17  DO A VERY GOOD JOB UNTIL PHIL GET INVOLVED.  THAT'S WHERE I

09:23:08  18  START TO HAVE A PROBLEM WITH PHIL AND WITH THAI.

09:23:11  19  Q.   OKAY.  AND WHAT HAPPENED TO -- WHAT DID MR. GERLICHER DO

09:23:19  20  TO GET INVOLVED THAT WAS UPSETTING TO YOU?

09:23:21  21  A.   WELL, ONE OF THOSE DAY, HE JUST E-MAILED ME THAT WE SHOULD

09:23:26  22  FIND THE TIME AND TALK ABOUT THAI THAO'S PROMOTION, WHICH EARLY

09:23:35  23  PROMOTION SHOULD BE COMING FROM THE FIELD FORCE, NOT FROM THE

09:23:39  24  HOME OFFICE, AND THEY APPROVE OR DON'T APPROVE.  IT'S UP TO

09:23:42  25  THEM, BUT IT SHOULD BE COMING FROM US.  NOW SUDDENLY, HE

09:23:45  1   PROPOSED TO LOOK AT THE PROMOTION OF MY NUMBER ONE GUY.

09:23:50  2   Q.   AND DID YOU RESPOND TO MR. GERLICHER?

09:23:54  3   A.   I RESPONDED, LET ME LOOK AT THE NUMBERS TO SEE IF HE MEET

09:23:58  4   THE REQUIREMENT OF A PROMOTION.  AND I LOOK AT, I SAY NO, AND

09:24:04  5   WE GO DOWN TO THE HOME OFFICE, AND ME AND MAI, AND

09:24:09  6   MICHAEL HARDIN, GO TO HOME OFFICE, AND MICHAEL HARDIN PULL UP

09:24:15  7   THE NUMBER.

09:24:15  8   Q.   OKAY.  LET ME STOP YOU THERE.  WAIT FOR MY QUESTIONS.  I

09:24:19  9   KNOW YOU ARE EXCITED AND YOU WANT TO GET YOUR STORY OUT, BUT

09:24:21  10  WAIT FOR MY QUESTIONS.

09:24:23  11        WHO IS MICHAEL HARDIN?

09:24:25  12  A.   MICHAEL HARDIN IS THE VP OF SALES AT THE TIME.

09:24:30  13  Q.   OKAY.  AND IS HE RESPONSIBLE FOR LOOKING AT PRODUCTION

09:24:35  14  LEVELS AND KEEPING EVERYTHING IN ORDER?

09:24:37  15  A.   YES, SIR.  AND HE'S THE ONE WHO TAKE CARE OF BOTH THOSE

09:24:42  16  THINGS.  AND HE LOOK AT A NUMBER, AND --

09:24:45  17        MR. DAVIDSON:  MOVE TO STRIKE THIS PART AS

09:24:48  18  NONRESPONSIVE.

09:24:50  19        THE COURT:  SUSTAINED.  STRIKE THAT AS NONRESPONSIVE.

09:24:55  20  BY MR. SISCO:

09:24:55  21  Q.   WHEN YOU VOICED YOUR CONCERNS ABOUT WHAT MR. GERLICHER WAS

09:24:58  22  DOING, WHAT DID MICHAEL -- I'M SORRY, I HAVE FORGOTTEN HIS NAME

09:25:08  23  ALREADY, MICHAEL HARDIN, WHAT DID HE DO TO LOOK INTO THIS

09:25:14  24  SITUATION?

09:25:14  25  A.   HE CHANGED IT TO THE SYSTEM, THE TRACKING SYSTEM THAT HELP

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO

```
09:25:21   1    HOW MANY POINT THAI HAVE, AND THAI DOES NOT MEET THE

09:25:25   2    REQUIREMENT, HE DOESN'T MEET THE REQUIREMENT FOR THE PROMOTION.

09:25:35   3    Q.   OKAY.  NOW YOU SPOKE OF REQUIREMENTS FOR PROMOTION, HOW IS

09:25:40   4    THAT SET UP?  WHAT SORTS OF GUIDELINES FOR PROMOTION ARE --

09:25:45   5    A.   WELL, THEY --

09:25:45   6            THE COURT:  WAIT, WAIT, WAIT.  DON'T START TALKING

09:25:48   7    UNTIL HE FINISHES.

09:25:51   8            THE WITNESS:  THANK YOU.

09:25:52   9    BY MR. SISCO:

09:25:53  10    Q.   WHAT KIND OF -- HOW DOES HE LOOK INTO AN ISSUE THAT WAS

09:26:00  11    RAISED WITH THAI THAO?

09:26:02  12            MR. DAVIDSON:  HOW "DOES" HE OR HOW "DID" HE?

09:26:05  13            MR. SISCO:  HOW "DOES" HE.

09:26:07  14            MR. DAVIDSON:  CALLS FOR SPECULATION.

09:26:09  15            THE COURT:  WELL, THAT'S TRUE.  CHANGE IT TO WHAT

09:26:11  16    "DID" HE DO.

09:26:13  17    BY MR. SISCO:

09:26:13  18    Q.   WHAT DID MICHAEL HARDIN DO TO CHECK INTO THIS SITUATION

09:26:16  19    WITH THAI THAO?

09:26:18  20    A.   HE CHECK IN ONLINE AND HE PULL OUT A NUMBER FROM THAI AND

09:26:25  21    HIS ENTIRE TEAM PRODUCTION, AND HE SAID THAT THAI DOESN'T MEET

09:26:29  22    THE QUALIFICATION.

09:26:31  23    Q.   OKAY.  AND I ASKED A DIFFERENT QUESTION AND I GOT OFF

09:26:35  24    TRACK, IT WAS MY FAULT.

09:26:38  25            I BELIEVE I HAD ASKED YOU IF THERE IS A SYSTEM FOR
```

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO                    453

09:26:41   1    DECIDING WHO GETS PROMOTED.  AND YOU ARE NODDING YOUR HEAD, I

09:26:53   2    TAKE IT THAT'S A YES ANSWER?

09:26:54   3    A.   YES.

09:26:55   4    Q.   WHAT IS THAT SYSTEM FOR A PROMOTION?

09:26:57   5    A.   $2 MILLION.  I JUST PUT IN THE POINT.  AND I DON'T RECALL

09:27:04   6    THE NUMBER OFF THE DIRECT -- YEAH, I DON'T RECALL THE NUMBER OF

09:27:11   7    THE DIRECT PEOPLE OF THE RMD, IT MUST BE -- I CAN SAY JUST

09:27:21   8    GUESSING, I'M NOT SURE, AROUND EIGHT DIRECT QUALIFY FOR RMD,

09:27:34   9    REGIONAL MARKETING DIRECTOR.

09:27:37   10   Q.   OKAY.  AND DID HE -- DID HE CHECK INTO THE FIGURES ON

09:27:45   11   THAI THAO?

09:27:45   12   A.   YES, HE DID.

09:27:46   13          MR. DAVIDSON:  THAI THAO.

09:27:49   14          MR. SISCO:  THAI THAO.  THANK YOU.

09:27:51   15   Q.   WHAT DID HE FIND WITH RESPECT TO MR. THAI THAO?

09:27:55   16          MR. DAVIDSON:  CALLS FOR SPECULATION -- OR LACKS

09:27:57   17   FOUNDATION.

09:27:57   18          THE COURT:  HE CAN SAY WHAT MR. HARDIN SAID.

09:28:07   19   BY MR. SISCO:

09:28:07   20   Q.   WHAT DID MR. HARDIN SAY?

09:28:09   21   A.   WHEN HE WALK IN, MICHAEL JUST SAY NO.

09:28:12   22   Q.   OKAY.  WE LEFT A FEW STEPS OUT THERE.

09:28:20   23          I TAKE IT YOU MET WITH MR. GERLICHER; IS THAT CORRECT?

09:28:22   24          THE COURT:  WHEN?

09:28:23   25          MR. DAVIDSON:  VAGUE AND -- THANK YOU.

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO                454

| | | |
|---|---|---|
| 09:28:27 | 1 | THE WITNESS:  BECAUSE PHIL TELL MICHAEL AND US TO GO |
| 09:28:31 | 2 | TO CHECK, AND HE'S IN THE HOME OFFICE TOO, SO IF HE CHECK, HE |
| 09:28:34 | 3 | JUST -- |
| 09:28:35 | 4 | MR. DAVIDSON:  MOVE TO STRIKE AS NONRESPONSIVE. |
| 09:28:37 | 5 | THE COURT:  YEAH.  I LOST TRACK OF THE QUESTION. |
| 09:28:39 | 6 | WHAT'S THE QUESTION? |
| 09:28:41 | 7 | BY MR. SISCO: |
| 09:28:43 | 8 | Q.  I THINK WE LEFT OFF WHERE YOU FLEW TO THE HOME OFFICE TO |
| 09:28:46 | 9 | MEET WITH PHIL GERLICHER; IS THAT RIGHT? |
| 09:28:48 | 10 | MR. DAVIDSON:  THAT'S LEADING, AND IT'S NOT WHERE WE |
| 09:28:50 | 11 | LEFT OFF. |
| 09:28:51 | 12 | THE COURT:  THAT'S NOT WHAT HE SAID.  WHERE WE LEFT |
| 09:28:54 | 13 | OFF IS HE WAS STANDING WITH MR. HARDIN WHO IS LOOKING AT |
| 09:28:59 | 14 | NUMBERS. |
| 09:29:00 | 15 | MR. SISCO:  OKAY. |
| 09:29:01 | 16 | Q.  DID YOU HAVE A MEETING WITH MR. HARDIN AND MR. GERLICHER |
| 09:29:14 | 17 | AT THE HOME OFFICE TO DISCUSS THAI THAO'S NUMBERS? |
| 09:29:19 | 18 | MR. DAVIDSON:  VAGUE AND AMBIGUOUS. |
| 09:29:20 | 19 | THE COURT:  OVERRULED. |
| 09:29:27 | 20 | BY MR. SISCO: |
| 09:29:27 | 21 | Q.  IS THAT A YES? |
| 09:29:28 | 22 | A.  YES. |
| 09:29:29 | 23 | Q.  OKAY.  AND WAS THERE ANYBODY ELSE PRESENT AT THAT MEETING? |
| 09:29:33 | 24 | A.  MAI LEE. |
| 09:29:36 | 25 | Q.  MAI LEE? |

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO

| | | |
|---|---|---|
| 09:29:38 | 1 | A.   YES. |
| 09:29:39 | 2 | Q.   AND -- DID MR. GERLICHER ASK MR. HARDIN AS TO THAI THAO'S |
| 09:29:50 | 3 | PRODUCTION LEVELS? |
| 09:29:51 | 4 | A.   HE DID NOT ASK THAT, BUT HE SAID DID HE QUALIFY AND |
| 09:29:59 | 5 | MICHAEL JUST SAY NO. |
| 09:30:01 | 6 | Q.   ALL RIGHT.  SO WHAT HAPPENED THEN? |
| 09:30:02 | 7 | A.   THEN -- |
| 09:30:04 | 8 |       MR. DAVIDSON:  CALLS FOR A NARRATIVE. |
| 09:30:05 | 9 |       THE COURT:  WELL, WHAT HAPPENED NEXT.  HOW ABOUT |
| 09:30:09 | 10 | THAT? |
| 09:30:10 | 11 | BY MR. SISCO: |
| 09:30:11 | 12 | Q.   WHAT HAPPENED NEXT? |
| 09:30:12 | 13 | A.   THEN THAT IS WHEN WE COME BACK HOME, AND LATER ON -- |
| 09:30:18 | 14 |       THE COURT:  OKAY.  THAT'S WHAT HAPPENED NEXT.  HE |
| 09:30:20 | 15 | WENT HOME. |
| 09:30:22 | 16 | BY MR. SISCO: |
| 09:30:23 | 17 | Q.   WHEN WAS THE NEXT -- DID YOU HEAR FROM MR. GERLICHER |
| 09:30:26 | 18 | AGAIN? |
| 09:30:26 | 19 | A.   YES, SIR. |
| 09:30:28 | 20 | Q.   AND WHAT DID YOU HEAR FROM HIM? |
| 09:30:30 | 21 | A.   INVITE ME AND MAI AND HE AND HIS WIFE, MEE-CHA, TO GO TO |
| 09:30:40 | 22 | HOME OFFICE TO DISCUSS ABOUT THE NUMBER OF QUALIFICATIONS FOR |
| 09:30:44 | 23 | THEM. |
| 09:30:50 | 24 | Q.   AND DID YOU GO? |
| 09:30:52 | 25 | A.   YES. |

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO                456

```
09:30:53   1    Q.   WHAT WAS THE SUBSTANCE OF THAT DISCUSSION?

09:30:55   2    A.   THE SUBSTANCE OF THE DISCUSSION IS THAT WE GO AND FOUND

09:30:58   3    OUT THAT THEY LOSE SOME BUSINESS THAT IS NOT VERY ETHICAL.

09:31:03   4         HE TEACH HIS TEAM HOW TO WRITE ONE POLICY TO SAY THAT --

09:31:20   5    THERE'S ONLY ONE APPLICATION TO NATIONAL LIFE, AND FOR THE SAME

09:31:25   6    CUSTOMER THEY ARE SELLING IT TO ANICO, AND BY SELLING IT TO

09:31:32   7    ANICO, THEY STATE THAT IT GIVES MORE -- GIVES GILLES MORE.

09:31:38   8         SO THEY PUT IT IN SO THAT IT LOOKS LIKE TWO DIFFERENT

09:31:42   9    PEOPLE.  AND THEY SELLING THAT TO HELP THE POINTS.  SO BECAUSE

09:31:53  10    EVERY TIME THEY SUBMIT AN APPLICATION, THE COMPANY ADVANCE THE

09:32:00  11    POINT AT SUBMISSION.  AND THEY PAY ALSO, THAT SUBMISSION, YOU

09:32:05  12    KNOW.

09:32:06  13         AND WHEN WE HAVE THAT DONE, THEN WE BRING UP ALL THOSE

09:32:13  14    PEOPLE, HOW THEY DO BUSINESS, TO PHIL.  WE SHOW TO PHIL AND WE

09:32:18  15    FOUND OUT THAT THOSE NUMBER, THAT NOT ONLY IS NOT THERE, BUT IS

09:32:26  16    NOT GOOD.

09:32:30  17    Q.   WHAT DID YOU SHOW TO PHIL?

09:32:32  18    A.   I SHOWED A PRINTOUT OF THE PEOPLE OF THAI THAO'S TEAM THAT

09:32:35  19    SUBMIT APPLICATION IN SEVERAL APPLICATIONS FOR ONE SINGLE

09:32:41  20    CUSTOMER.

09:32:41  21    Q.   AND WHERE DID YOU GET THAT INFORMATION?

09:32:44  22    A.   I GOT IT, BECAUSE EVERY TIME THAT -- I CAN PRINT OUT OR I

09:32:49  23    CAN SEE EVERYBODY'S INTERNAL APPLICATION, HOW MANY PEOPLE

09:32:55  24    THERE, HOW MUCH MONEY THEY MAKE, THE SYSTEM ALLOW ME TO DO

09:32:59  25    THAT.
```

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO                457

| | | |
|---|---|---|
| 09:32:59 | 1 | Q.   DOES IT ALLOW YOU TO SEE EVERYONE OR JUST YOUR TEAM? |
| 09:33:02 | 2 | A.   JUST MY TEAM. |
| 09:33:03 | 3 | Q.   SO YOU COULD LOOK AT THAI THAO'S PRODUCTION AND WHAT HE |
| 09:33:07 | 4 | HAD BEEN DOING AND SO FORTH? |
| 09:33:08 | 5 | A.   YES. |
| 09:33:09 | 6 | Q.   OKAY.  AS I UNDERSTOOD YOUR TESTIMONY, YOU WERE SAYING |
| 09:33:15 | 7 | THAT THAI THAO WAS DOUBLE SUBMITTING INSURANCE POLICIES.  DID I |
| 09:33:23 | 8 | UNDERSTAND THAT CORRECTLY? |
| 09:33:24 | 9 | MR. DAVIDSON:  MISCHARACTERIZES THE TESTIMONY. |
| 09:33:26 | 10 | THE COURT:  WELL, IT IS LEADING. |
| 09:33:36 | 11 | MR. DAVIDSON:  I BELIEVE IT WAS A COMPLAINT ABOUT |
| 09:33:38 | 12 | TEAM MEMBERS. |
| 09:33:39 | 13 | THE COURT:  YOU WHAT? |
| 09:33:40 | 14 | MR. DAVIDSON:  I BELIEVE IT WAS A COMPLAINT ABOUT |
| 09:33:42 | 15 | TEAM MEMBERS, AND NOT NECESSARILY THAI THAO. |
| 09:33:44 | 16 | THE COURT:  THAT'S TRUE.  YES.  SUSTAINED. |
| 09:33:46 | 17 | THE WITNESS:  YES, TWO.  BOTH CASE, THAI THAO, HIS |
| 09:33:52 | 18 | TEAM DO IT TOO. |
| 09:33:54 | 19 | BY MR. SISCO: |
| 09:33:55 | 20 | Q.   HIS DOWNLINE TEAM? |
| 09:33:56 | 21 | A.   YES.  HE DID IT TOO. |
| 09:33:59 | 22 | Q.   EXACTLY WHAT DID THEY DO? |
| 09:34:01 | 23 | A.   I CAN SAY EXACTLY WHAT THAI THAO DO IS HE WRITE A POLICY |
| 09:34:08 | 24 | FOR HIS ACCOUNT THAT HAVE HIS WHOLE FAMILY, HAVE HIS OWN |
| 09:34:14 | 25 | ADDRESS, AND WHEN HE WRITE A MILLION DOLLAR POLICY FOR THAT |

```
09:34:17   1   GUY, HE, HIS NAME IS SORENSON, AND SORENSON HAS HIS OWN FAMILY

09:34:31   2   AND ADDRESS, BUT HE TOLD HIM HE STAY IN THAI THAO'S HOUSE AND

09:34:35   3   HE PUT HIS DAUGHTER AS THE BENEFICIARY.

09:34:39   4   Q.   SO ESSENTIALLY, HE WAS DOUBLE SUBMITTING?

09:34:43   5   A.   IN THAT CASE, I WOULD SAY THAT --

09:34:45   6           MR. DAVIDSON:  LEADING QUESTION.

09:34:45   7           THE COURT:  I BEG YOUR PARDON?

09:34:47   8           MR. DAVIDSON:  LEADING QUESTION.

09:34:49   9           THE COURT:  YEAH, STOP ASKING LEADING QUESTIONS, MR.

09:34:52  10   SISCO.  SUSTAINED.

09:34:52  11   BY MR. SISCO:

09:34:54  12   Q.   WHAT WAS THE RESULT OF THE WAY THAT THEY WERE SUBMITTING

09:34:57  13   THEIR APPLICATIONS FOR INSURANCE POLICIES?

09:35:00  14           MR. DAVIDSON:  CALLS FOR A NARRATIVE.  VAGUE AND

09:35:03  15   AMBIGUOUS.

09:35:03  16           THE COURT:  OVERRULED.

09:35:07  17           MR. SISCO:  YOU CAN ANSWER.

09:35:10  18           THE WITNESS:  BY THAT, THEY CAN HAVE A POINT TO

09:35:14  19   QUALIFY FOR THE PROMOTION.  AND THE MONEY AND EVENTUALLY THEY

09:35:19  20   CAN HAVE THE POINTS THAT ARE IN THERE.

09:35:22  21   Q.   AND WHAT HAPPENS TO THOSE POLICIES WHEN -- ONCE THEY ARE

09:35:29  22   SUBMITTED, WHAT HAPPENS TO THE POLICY?

09:35:32  23   A.   NORMALLY WHEN YOU SUBMIT, THEN THE PROVIDER WILL ADVANCE,

09:35:37  24   BASED ON WHAT EVIDENCE, ADVANCE TO YOU, I BELIEVE AT THAT POINT

09:35:43  25   THEY ADVANCE 75 PERCENT, ONCE YOU SUBMIT THE APPLICATION, THEY
```

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO

```
09:35:49   1    WILL ADVANCE 750.  SO 10,000 POINT, THEY WILL ADVANCE

09:35:56   2    7,500 POINTS.  AND THAT ALLOWED HIM TO HAVE THOSE POINTS TO

09:36:01   3    COUNT TO THIS PROMOTION.

09:36:04   4    Q.   TWICE?

09:36:07   5    A.   HE SUBMIT TO COMPANY DOUBLE POINTS.

09:36:12   6    Q.   THE SAME POLICY SUBMITTED TO TWO COMPANIES?

09:36:15   7    A.   YES.

09:36:15   8    Q.   ALL RIGHT.

09:36:18   9         AND THEN WOULD BOTH POLICIES BE ISSUED?

09:36:23   10   A.   YES.

09:36:25   11   Q.   BOTH POLICIES WOULD BE ISSUED?

09:36:27   12   A.   YES.

09:36:27   13   Q.   WOULD THEY HAVE PAID ON BOTH POLICIES?

09:36:32   14   A.   I DON'T BELIEVE SO.  THEY PAY BEFORE THEY ISSUE.

09:36:40   15   Q.   BUT IN ANY EVENT, WHAT TYPICALLY HAPPENED TO THOSE

09:36:43   16   POLICIES?

09:36:44   17           MR. DAVIDSON:  CALLS FOR SPECULATION.

09:36:45   18           THE COURT:  WHAT TYPICALLY HAPPENED TO THOSE

09:36:48   19   POLICIES?  THAT QUESTION MAKES NO SENSE TO ME.

09:36:51   20           MR. SISCO:  WELL, YOU HAVE TWO POLICIES ON ONE PERSON

09:36:54   21   TO 2 DIFFERENT COMPANIES.

09:36:55   22      DO BOTH OF THOSE POLICIES GO INTO EFFECT?

09:36:58   23           THE WITNESS:  YES.  AS LONG AS THE CUSTOMER CAN PAY,

09:37:03   24   THEN THOSE TWO PROCEED.  BUT IF THEY CANNOT AFFORD TO PAY, THEN

09:37:08   25   THEY WILL GET TURNED BACK.  AND THEY GET TURNED BACK ON THE
```

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO       460

| | | |
|---|---|---|
| 09:37:13 | 1 | MONEY, BUT THE POINT, HE ALREADY GOT IT. |
| 09:37:15 | 2 | Q.   THE POINTS TO GO TOWARD HIS PRODUCTION PROMOTION? |
| 09:37:20 | 3 | A.   YES. |
| 09:37:21 | 4 | MR. DAVIDSON:  LEADING QUESTION. |
| 09:37:22 | 5 | THE COURT:  YES.  SUSTAINED. |
| 09:37:29 | 6 | STRIKE THE ANSWER TO THAT LAST LEADING QUESTION. |
| 09:37:38 | 7 | BY MR. SISCO: |
| 09:37:38 | 8 | Q.   IF THE CUSTOMER DIDN'T PAY, THE POLICY WOULD BE CANCELLED; |
| 09:37:46 | 9 | IS THAT CORRECT? |
| 09:37:46 | 10 | A.   YES. |
| 09:37:46 | 11 | Q.   AND WHAT WOULD HAPPEN TO THE POINTS THAT GENERATED FROM |
| 09:37:50 | 12 | THE WRITING OF THAT POLICY? |
| 09:37:52 | 13 | A.   THE MONEY WOULD BE TURNED BACK, BUT THE POINTS HE ALREADY |
| 09:37:56 | 14 | GOT IT. |
| 09:37:57 | 15 | Q.   OKAY.  NOW, DID THIS HAPPEN ONLY ONCE? |
| 09:38:04 | 16 | A.   IT HAPPENED SEVERAL TIME WITH HIM AND WITH HIS TEAM |
| 09:38:09 | 17 | MEMBER. |
| 09:38:12 | 18 | Q.   OKAY.  ALL RIGHT.  THEN DID YOU SHOW THIS EVIDENCE TO |
| 09:38:17 | 19 | MR. GERLICHER? |
| 09:38:18 | 20 | A.   THOSE ARE THE PAPERS THAT I SHOWED TO PHIL GERLICHER AT |
| 09:38:21 | 21 | THE HOME OFFICE. |
| 09:38:22 | 22 | Q.   OKAY.  AND WHAT WAS HIS RESPONSE TO THAT PAPERWORK? |
| 09:38:26 | 23 | A.   AFTER I LOOK AT A COUPLE CUSTOMER, HE SAID THAT IS ENOUGH, |
| 09:38:34 | 24 | AND HE LOOK AT IT TOO.  HE LOOK AT THE PAPER HIMSELF.  AND THAT |
| 09:38:45 | 25 | IF IT'S REAL, THEN THAT'S GROUNDS FOR TERMINATION. |

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO

| | | |
|---|---|---|
| 09:38:49 | 1 | Q.   WAS THAI THAO TERMINATED? |
| 09:38:51 | 2 | A.   YEAH. |
| 09:38:53 | 3 | Q.   WAS THAI THAO TERMINATED? |
| 09:38:54 | 4 | A.   YES. |
| 09:38:55 | 5 | Q.   THAI THAO WAS TERMINATED? |
| 09:38:58 | 6 | A.   NO.  PHIL GERLICHER SAID IF THE INFORMATION THAT I SHOW TO |
| 09:39:04 | 7 | HIM IS TRUE, THEN THAT'S GROUND FOR TERMINATION.  BUT THAI THAO |
| 09:39:09 | 8 | IS NOT TERMINATED YET. |
| 09:39:11 | 9 | Q.   ALL RIGHT.  THAT WOULD HAVE BEEN MY NEXT QUESTION.  WAS |
| 09:39:14 | 10 | THAI THAO TERMINATED. |
| 09:39:16 | 11 |      OKAY.  DID MR. GERLICHER DO ANYTHING ABOUT THAI THAO'S, |
| 09:39:21 | 12 | THE POLICIES THAT HE HAD SUBMITTED? |
| 09:39:23 | 13 |          MR. DAVIDSON:  VAGUE AND AMBIGUOUS. |
| 09:39:24 | 14 |          THE COURT:  SUSTAINED.  YOU HAVE TO TIGHTEN THAT |
| 09:39:29 | 15 | QUESTION UP. |
| 09:39:29 | 16 | BY MR. SISCO: |
| 09:39:31 | 17 | Q.   DID YOU HAVE -- DID YOU GET ANY RESPONSE FROM |
| 09:39:36 | 18 | MR. GERLICHER IN YOUR RESPONSE TO YOUR PRESENTING HIM WITH |
| 09:39:39 | 19 | THESE ISSUES IN THE PAPERWORK? |
| 09:39:41 | 20 | A.   YES.  PHIL DID ORGANIZE ONLY FOR THE WHOLE COMPANY TO GO |
| 09:39:51 | 21 | THROUGH THE QUALITY OF THE POLICY.  BUT INSTEAD, HE ASKED |
| 09:39:59 | 22 | SOMEBODY ELSE TO HELP, TO DO THAT AUDITING, THEN HE PUT |
| 09:40:05 | 23 | THAI THAO'S WIFE, MEE-CHE, AND HE PUT PEOPLE THAT IS GOING TO |
| 09:40:11 | 24 | AUDIT. |
| 09:40:13 | 25 | Q.   OKAY.  AND -- I UNDERSTAND THAT WHAT YOU SAID THAT THEY |

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO        462

| | | |
|---|---|---|
| 09:40:20 | 1 | DID AN AUDIT ON THAI THAO'S POINTS? |
| 09:40:23 | 2 | A.   ON THE WHOLE COMPANY. |
| 09:40:24 | 3 | Q.   ON THE WHOLE COMPANY.  ALL RIGHT. |
| 09:40:26 | 4 |      AND THEN AS A RESULT OF THAT AUDIT, DID ANYTHING HAPPEN |
| 09:40:29 | 5 | WITH RESPECT TO THAI THAO? |
| 09:40:30 | 6 | A.   WE NEVER HEARD SOMETHING BACK EXCEPT A LETTER THAT SAY |
| 09:40:34 | 7 | THAT -- SENT OUT TO THE WHOLE COMPANY THAT EVERYBODY HELP TO |
| 09:40:41 | 8 | MAKE SURE THEY DO THE BUSINESS AND STAY IN THE COMPLIANCE. |
| 09:40:46 | 9 | Q.   DID YOU HEAR FROM MR. GERLICHER AGAIN REGARDING THE STATUS |
| 09:40:53 | 10 | OF THAI THAO AND YOUR COMPLAINT? |
| 09:40:55 | 11 | A.   HE REPEATEDLY INSIST THAT I PROMOTE THAI THAO. |
| 09:41:02 | 12 | Q.   HOW DID HE DO THAT? |
| 09:41:03 | 13 | A.   BY SENDING ME THE E-MAIL AND SAYING THAT IF I DON'T |
| 09:41:07 | 14 | PROMOTE HIM THEN -- I DON'T RECALL THE EXACT LETTER HE USED, |
| 09:41:17 | 15 | BUT HE WANT ME TO PROMOTE THAI THAO, IN WHATEVER WAY. |
| 09:41:23 | 16 | Q.   AND HOW DID YOU FEEL ABOUT THAT? |
| 09:41:26 | 17 | A.   I DON'T FEEL GOOD AT ALL.  I FEEL LIKE HE SHOULD NEVER GET |
| 09:41:31 | 18 | INVOLVED TO SOMETHING THAT HE DID NOT START WITH. |
| 09:41:37 | 19 |      TO START TO BUILD A TEAM IS MY JOB.  I'M GOOD AT THAT AND |
| 09:41:41 | 20 | I BUILD MY TEAM.  I USE MY MONEY TO GO OUT THERE, FLY |
| 09:41:46 | 21 | EVERYWHERE TO BUILD THAI THAO'S TEAM. |
| 09:41:49 | 22 |      AND I SUPPOSE THAT WHEN THE TIME COMES, IF HE REALLY |
| 09:41:55 | 23 | QUALIFY, THEN HE WILL GET A PROMOTION.  BUT HE SHOULD NEVER GET |
| 09:42:02 | 24 | INVOLVED, BUT HE DID ANYWAY. |
| 09:42:03 | 25 | Q.   ALL RIGHT.  AND HOW DID HE GET INVOLVED? |

| 09:42:06 | 1 | A.   BY SAYING THAT I MUST PROMOTE THAI THAO. |
| 09:42:14 | 2 | Q.   DID HE -- TO YOUR KNOWLEDGE, DID HE HAVE ANY CONTACT WITH |
| 09:42:17 | 3 | THAI THAO? |
| 09:42:18 | 4 | A.   YES. |
| 09:42:18 | 5 | MR. DAVIDSON:  CALLS FOR SPECULATION -- WITHDRAWN. |
| 09:42:22 | 6 | THE COURT:  OVERRULED. |
| 09:42:25 | 7 | THE WITNESS:  YES. |
| 09:42:26 | 8 | BY MR. SISCO: |
| 09:42:26 | 9 | Q.   AND WHAT WAS THAT CONTACT, TO THE BEST OF YOUR KNOWLEDGE? |
| 09:42:29 | 10 | A.   THEY MEET SEVERAL TIME.  PHIL TOLD ME NOT TO TELL |
| 09:42:36 | 11 | THAI THAO, THAT HE WILL DEAL WITH HIM AND MEE-CHA, THAT BECAUSE |
| 09:42:41 | 12 | ONE DAY WHEN WE GO TO THE HOME OFFICE WE STAY -- WHEN WE GO TO |
| 09:42:46 | 13 | THE LEADERSHIP MEETING, WE STAY AT PHIL'S HOUSE.  I HAVE A |
| 09:42:49 | 14 | CHANCE TO SIT DOWN AND TALK WITH THAI UNTIL 3:00 IN THE |
| 09:42:53 | 15 | MORNING.  WE TRY TO SETTLE OUR OWN INTERNAL DIFFERENCES, AND |
| 09:42:57 | 16 | THAI WAS HAPPY, BUT HE STATED THAT -- HE STATED HIS WIFE IS NOT |
| 09:43:02 | 17 | HAPPY, SO IF I CAN GO AND TALK TO HIS WIFE. |
| 09:43:05 | 18 | I SAID NO PROBLEM, I'M FLYING INTO FRESNO AND TALK WITH |
| 09:43:09 | 19 | HIS WIFE MEE-CHA.  BUT WHEN I GO BACK TO ST. PAUL, FOUR OR |
| 09:43:15 | 20 | FIVE DAYS, AND THEN THAI SAID HIS WIFE DON'T WANT TO SEE ME |
| 09:43:19 | 21 | ANYMORE BECAUSE PHIL WANT TO BE THE ONE WHO MAY BE BETWEEN THAI |
| 09:43:24 | 22 | AND ME.  AND HE NEVER DO THAT BEFORE. |
| 09:43:29 | 23 | Q.   OKAY.  IF MR. GERLICHER SUCCEEDED IN GETTING HIS WAY, AND |
| 09:43:37 | 24 | THAI THAO WAS PROMOTED, WHAT EFFECT WOULD THAT HAVE ON YOU? |
| 09:43:40 | 25 | MR. DAVIDSON:  ARGUMENTATIVE. |

464

```
09:43:41   1              THE COURT:  OVERRULED.

09:43:44   2              THE WITNESS:  IT NEVER HAD HAPPENED.  AND YOU --

09:43:51   3    THAI THAO PROMOTION GO THROUGH, THEN I LOSE MY -- AROUND

09:44:00   4    600,000 PER YEAR.  BUT PHIL DID NOT LOSE NOTHING.

09:44:04   5    BY MR. SISCO:

09:44:05   6    Q.   SO DOES MR. GERLICHER GAIN ANYTHING BY PROMOTING

09:44:09   7    THAI THAO?

09:44:10   8    A.   HE DON'T GAIN NOTHING, BUT HE WILL GAIN MORE POWER, HE

09:44:16   9    WILL GAIN MORE INFORMATION.  HE CAN DIVIDE MY TEAM WHICH I

09:44:23  10    BUILT.

09:44:24  11         I HAVE A TEAM TO BE UNIFIED.  AND IF HE CAN DIVIDE MY

09:44:29  12    TEAM, THEN WE CANNOT BUILD THE THINGS THAT WE CAME TO DO.

09:44:37  13    Q.   OKAY.  DID MR. GERLICHER ORDER THAI THAO'S DOWNLINE TEAM

09:44:47  14    TO GO AROUND YOU IN THE PRODUCTION PROCESS?

09:44:50  15              MR. DAVIDSON:  LEADING QUESTION.

09:44:51  16              THE COURT:  SUSTAINED.

09:44:57  17    BY MR. SISCO:

09:44:58  18    Q.   DID MR. GERLICHER HAVE CONTACT WITH THAI'S DOWNLINE TEAM?

09:45:08  19              MR. DAVIDSON:  CALLS FOR SPECULATION.  LACKING

09:45:10  20    FOUNDATION.

09:45:11  21              THE COURT:  IF HE KNOWS.

09:45:12  22              MR. SISCO:  IF YOU KNOW.

09:45:14  23              THE WITNESS:  I'M NOT AWARE OF IT.

09:45:15  24         IF HE CALL, IF HE'S DOWNLINE OR NOT.  BUT I KNOW FOR SURE

09:45:19  25    THAT MICHAEL HARDIN --
```

09:45:21  1          THE COURT:  WAIT.  NOW YOU ARE GETTING BEYOND THE

09:45:23  2   QUESTION.

09:45:23  3   BY MR. SISCO:

09:45:23  4   Q.   THAT WAS GOING TO BE MY NEXT QUESTION.

09:45:25  5        DID MICHAEL HARDIN CONTACT ANY OF THAI THAO'S TEAM?

09:45:30  6   A.   YES.

09:45:31  7          THE COURT:  EVER?

09:45:32  8   BY MR. SISCO:

09:45:33  9   Q.   DURING THIS PERIOD OF THE DISPUTE, DID MICHAEL HARDIN EVER

09:45:36  10  CONTACT ANY OF THAI THAO'S TEAM?

09:45:38  11          THE WITNESS:  YES.

09:45:40  12          MR. DAVIDSON:  LACKS FOUNDATION.

09:45:41  13          THE COURT:  AGAIN, I THINK YOU MEAN TO ASK ABOUT, DID

09:45:43  14  HE CONTACT MEMBERS OF MR. MOUA'S TEAM ABOUT THE PROMOTION OF

09:45:48  15  THAI THAO.

09:45:50  16      I MEAN, THERE MAY BE A HUNDRED REASONS WHY HE MIGHT

09:45:53  17  CONTACT THE TEAM.

09:45:54  18          MR. SISCO:  WELL, THAT'S WHAT I WOULD GET TO, BUT ALL

09:46:03  19  RIGHT.

09:46:04  20  Q.   DID MR. HARDIN ORDER ANY OF THAI THAO'S TEAM, WHICH ARE

09:46:13  21  YOUR DOWNLINE PEOPLE, TO DEAL DIRECTLY WITH THAI THAO?

09:46:19  22          MR. DAVIDSON:  LACKS FOUNDATION.

09:46:23  23          THE COURT:  WOULDN'T THEY NORMALLY DEAL WITH

09:46:27  24  THAI THAO?

09:46:27  25          MR. SISCO:  BUT THEY WOULD -- IT WOULD GO THROUGH --

09:46:32  1    NOT WITHOUT GOING THROUGH MR. MOUA, BECAUSE MR. MOUA IS THE

09:46:36  2    HEAD OF THE TEAM.

09:46:37  3            THE COURT:  YOU ARE CONFUSING ME BECAUSE I THOUGHT

09:46:40  4    THIS STARTED AT THE BOTTOM AND WORKED UP, AND YOU WOULD

09:46:43  5    NORMALLY COMMUNICATE WITH THE LEVEL ABOVE YOU, NOT AT THE VERY

09:46:46  6    TOP LEVEL.  AM I MISTAKEN?

09:46:49  7            MR. SISCO:  LET'S ASK MR. MOUA.

09:46:52  8    Q.  DOES THAI THAO'S TEAM, DO THEY HAVE ANY RELATIONSHIP TO

09:47:01  9    YOU?

09:47:02  10           MR. DAVIDSON:  VAGUE AND AMBIGUOUS.

09:47:04  11           THE COURT:  SUSTAINED.

09:47:06  12           THE WITNESS:  YES.  WE HAVE --

09:47:08  13           MR. SISCO:  NO.  DON'T ANSWER THE QUESTION.

09:47:10  14           THE COURT:  DON'T ANSWER IT.  MR. SISCO HAS TO ASK A

09:47:13  15   PROPER QUESTION TO GET THE ANSWER.

09:47:15  16   BY MR. SISCO:

09:47:24  17   Q.  AT SOME POINT, DID YOU LEARN THAT MR. HARDIN HAD TOLD

09:47:29  18   THAI THAO'S TEAM THAT YOU WERE NO LONGER IN THE LINE?

09:47:36  19           MR. DAVIDSON:  LEADING.

09:47:38  20           THE COURT:  OVERRULED.

09:47:44  21   BY MR. SISCO:

09:47:44  22   Q.  YOU CAN GO AHEAD AND ANSWER IT.

09:47:46  23   A.  YES.  AT SOME POINT MICHAEL HARDIN, HE DID NOT SAY THAT

09:47:51  24   I'M NO LONGER THERE, BUT HE TOLD THE TEAM THAT THAI WOULD BE

09:47:57  25   THE FUTURE, THAI WOULD BE THE FUTURE FOR OUR HIERARCHY, AND FOR

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO                467

```
09:48:03   1    HIS TEAM TO FOLLOW HIM, TO FOLLOW HIS LEADERSHIP.  IF THEY

09:48:07   2    DON'T, THEY MIGHT NOT BE PROTECTED.

09:48:10   3              MR. DAVIDSON:  MOVE TO STRIKE AFTER "YES."

09:48:14   4              THE COURT:  SUSTAINED.  STRIKE THE ANSWER THAT

09:48:18   5    FOLLOWED THE "YES."

09:48:20   6    BY MR. SISCO:

09:48:21   7    Q.   AND WHAT WERE THEY TOLD WOULD BE THE PENALTY IF THEY

09:48:25   8    DIDN'T ACT AS THOUGH THAI THAO WERE THEIR LEADER?

09:48:30   9              MR. DAVIDSON:  CALLS FOR HEARSAY.

09:48:34  10              THE COURT:  WELL YOU HAVEN'T ESTABLISHED -- HE HAS TO

09:48:38  11    ESTABLISH HOW HE KNOWS THIS.  WHERE'S THE FOUNDATION?

09:48:41  12              MR. SISCO:  OKAY.

09:48:42  13    Q.   HOW DO YOU KNOW, MR. MOUA, THAT THAI THAO'S TEAM MEMBERS

09:48:48  14    WERE CONTACTED BY MR. HARDIN?

09:48:50  15    A.   HE CALLED HARDIN.  THAT LOU LEE AND DOWNLINE, BECAUSE

09:49:02  16    PALAI LEE AND HERSELF, SHE'S ALSO SHE CALLED PALAI AND TELL

09:49:06  17    PALAI TO TELL HER TO FOLLOW THAI.

09:49:09  18         AND PALAI HAPPENED TO LET US KNOW, AND THEY TALK ABOUT

09:49:13  19    30 MINUTES ABOUT THAT.  AND MICHAEL TELL PALAI THAT THIS CALL

09:49:17  20    NEVER EXISTS.

09:49:20  21              MR. DAVIDSON:  MOVE TO STRIKE AS HEARSAY AND

09:49:22  22    NONRESPONSIVE.

09:49:24  23              THE COURT:  SUSTAINED.

09:49:32  24    BY MR. SISCO:

09:49:32  25    Q.   WAS THIS ISSUE EVER RESOLVED BETWEEN YOU AND MR. GERLICHER
```

09:49:35  1    AS TO THAI THAO'S PROMOTION?

09:49:37  2    A.    NO.

09:49:38  3    Q.    OKAY.  DID YOU ULTIMATELY PROMOTE THAI THAO?

09:49:44  4    A.    YES.

09:49:45  5    Q.    AND WHY DID YOU DO THAT?

09:49:47  6    A.    I FELT LIKE IF I -- I WANT TO WORK IN THE COMPANY, IT'S

09:49:51  7    NOT GOOD IDEA TO GO AGAINST THE OWNER.  I FEEL LIKE WE CANNOT

09:50:00  8    WORK IN HARMONY IF THE OWNER AND YOU ARE NOT ON THE SAME SIDE.

09:50:06  9    Q.    AND WHEN DID YOU PROMOTE HIM?

09:50:13  10          I'M PROBABLY NOT SAYING THAT RIGHT.  YOU MADE HIM -- YOU

09:50:17  11   ALLOWED HIM TO BECOME AN EQUAL OF YOURS; IS THAT A BETTER WAY

09:50:21  12   TO SAY IT?

09:50:23  13   A.    YES, I PROMOTE HIM RIGHT BEFORE WE GO TO THE EUROPE TRIP.

09:50:27  14   Q.    WAS THAT A CRUISE?

09:50:29  15   A.    YES, THAT'S A CRUISE.

09:50:30  16   Q.    OKAY.  AND -- ALL RIGHT.

09:50:33  17          AND HOW DID YOU FEEL ABOUT YOUR RELATIONSHIP WITH FFS

09:50:40  18   DURING THAT PERIOD OF TIME?

09:50:44  19          MR. DAVIDSON:  VAGUE AND AMBIGUOUS.

09:50:44  20          THE COURT:  WHAT PERIOD OF TIME?

09:50:46  21          MR. SISCO:  THE PERIOD OF TIME THAT HE PROMOTED

09:50:49  22   THAI THAO AND THEY WENT ON THE CRUISE.

09:50:54  23          MR. DAVIDSON:  VAGUE AND AMBIGUOUS.

09:50:57  24          THE COURT:  OKAY.  OVERRULED.

09:51:04  25          THE WITNESS:  I FEEL LIKE THE HOME OFFICE FROM

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO                    469

```
09:51:06   1    EVERYBODY, EVERYTHING CHANGED.  I NEVER HAD THE SAME

09:51:10   2    RELATIONSHIP WITH THE PEOPLE, WITH THE STAFF, LIKE

09:51:16   3    MICHAEL HARDIN, LIKE THE HOME OFFICE ITSELF.

09:51:23   4        WHEN I CALL THEM, THEY TRY TO AVOID ME.  THEY DON'T WANT

09:51:26   5    TO TALK TO ME, BUT I GO TO HOME OFFICE, THEY DON'T LIKE TO SAY

09:51:31   6    HI ANYMORE, IT'S NOT LIKE BEFORE THAT EVERYBODY ARE VERY EXITED

09:51:35   7    TO TALK TO ME.

09:51:38   8    Q.   OKAY.  AND ON THIS CRUISE, WHO ATTENDED THAT CRUISE?

09:51:47   9    A.   I THINK THAT EVERY QUALIFIER EXCEPT THAI, AND MEE-CHA THEY

09:51:54  10    ATTENDED THAT CRUISE.

09:51:55  11    Q.   WELL, WHAT SORT OF -- ALL 28,000 PEOPLE AT FFS ATTEND?

09:52:04  12        OKAY.  SO WHAT I'M ASKING IS WERE THERE PARTICULAR LEVELS

09:52:09  13    OF AGENTS THAT WERE INVITED TO GO ON THE CRUISE?

09:52:12  14    A.   YES.  THERE'S A CONTEST THAT FFS CONTROL, AND EVERY YEAR

09:52:18  15    WE COUNT THE WHOLE YEAR, WHOEVER MEET THOSE CRITERIA, THEN THEY

09:52:23  16    CAN GO TO THE CRUISE.

09:52:25  17    Q.   OKAY.  AND WAS THAI THAO'S TEAM INVITED TO THE CRUISE?

09:52:31  18        MR. DAVIDSON:  CALLS FOR SPECULATION.

09:52:35  19        THE COURT:  WELL, HE JUST SAID THOSE WHO MEET THE

09:52:39  20    CRITERIA.  HE ALSO SAID THOSE WHO QUALIFY.  SO THAT SUGGESTED

09:52:43  21    IT WASN'T EVERYBODY.

09:52:45  22        SO YOUR QUESTION IS A LITTLE VAGUE.

09:52:49  23    BY MR. SISCO:

09:52:50  24    Q.   DID THAI THAO -- DID THAI THAO'S UPPER LEVEL PEOPLE

09:52:56  25    INVITED TO GO ON THE CRUISE?
```

| | | |
|---|---|---|
| 09:52:58 | 1 | A.  YES. |
| 09:52:58 | 2 | Q.  AND DID THEY GO? |
| 09:53:00 | 3 | A.  EVERYBODY GO EXCEPT THAI AND MEE-CHA. |
| 09:53:09 | 4 | Q.  DO YOU KNOW WHY THEY DIDN'T GO? |
| 09:53:10 | 5 | A.  I DON'T. |
| 09:53:11 | 6 | Q.  DO YOU KNOW WHETHER OR NOT MR. GERLICHER HAD A SEPARATE |
| 09:53:16 | 7 | MEETING WITH THAI THAO'S TEAM? |
| 09:53:21 | 8 | MR. DAVIDSON:  I'M SORRY, WHAT WAS THE QUESTION? |
| 09:53:23 | 9 | THE COURT:  YOU MEAN ON THE CRUISE. |
| 09:53:25 | 10 | MR. SISCO:  ON THE CRUISE. |
| 09:53:25 | 11 | THE COURT:  OKAY. |
| 09:53:26 | 12 | THE WITNESS:  YES, FOR THE FIRST TIME THAT WE GO TO |
| 09:53:30 | 13 | THE COMPANY TRIP, IT'S VERY STRANGE.  EVERYTHING IS ORGANIZED |
| 09:53:35 | 14 | SEPARATELY.  THAI THAO'S TEAM HAVE TO GO TO ONE PARTY, ANDRE |
| 09:53:43 | 15 | MOUA'S TEAM HAVE TO GO TO DIFFERENT NIGHT PARTY.  YOU ARE FREE |
| 09:53:46 | 16 | TO GO TO IT, BUT THEY ARE -- THEY ARE GOING TO THEIR GROUP OF |
| 09:53:53 | 17 | PEOPLE. |
| 09:53:53 | 18 | AND THAT'S FOR THE FIRST TIME THAT WE SEE IN OUR COMPANY |
| 09:53:57 | 19 | THAT WE GO TO THE TRIP AND WE ARE SO DIVIDED. |
| 09:54:03 | 20 | Q.  DID YOU HAVE ANY CONTACT WITH MR. GERLICHER ON THE CRUISE? |
| 09:54:07 | 21 | A.  YES. |
| 09:54:08 | 22 | Q.  AND WHEN DID YOU CONTACT HIM? |
| 09:54:13 | 23 | THE COURT:  WELL, HE DIDN'T SAY HE CONTACTED HIM.  HE |
| 09:54:16 | 24 | SAID THERE WAS CONTACT. |
| 09:54:20 | 25 | THE WITNESS:  THE FIRST NIGHT, PHIL INVITE HIS FAMILY |

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO                                471

| | | |
|---|---|---|
| 09:54:24 | 1 | AND MY FAMILY, WE HAVE DINNER TOGETHER.  AND WE HAD ALSO THE |
| 09:54:31 | 2 | CEREMONY THAT WE TOOK PICTURE ALSO TOGETHER, ME AND PHIL AND |
| 09:54:36 | 3 | MAI AND ALL THE PEOPLE THERE, THEY TAKE PICTURE FOR THE |
| 09:54:42 | 4 | PROMOTION FOR THE NEXT TRIP ALSO.  SO WE TOOK PICTURE TOGETHER. |
| 09:54:50 | 5 | BY MR. SISCO: |
| 09:54:51 | 6 | Q.   OKAY.  WAS THERE A CONTACT AFTER THAT? |
| 09:54:53 | 7 | A.   NO. |
| 09:54:54 | 8 | Q.   WHY NOT? |
| 09:54:58 | 9 | MR. DAVIDSON:  CALLS FOR SPECULATION. |
| 09:54:59 | 10 | THE COURT:  IT CERTAINLY DOES.  SUSTAINED. |
| 09:55:01 | 11 | BY MR. SISCO: |
| 09:55:01 | 12 | Q.   DID YOU TRY TO CONTACT MR. GERLICHER? |
| 09:55:06 | 13 | A.   USUALLY IT'S NOT MY JOB TO CONTACT HIM, IT'S USUALLY HIM |
| 09:55:12 | 14 | WHEN HE WANTED TO SEE ME, DO HE WANT ME TO DO SOMETHING, DOES |
| 09:55:16 | 15 | HE HAVE AN ORDER TO GIVE, BUT HE DID NOT CONTACT ME EITHER. |
| 09:55:22 | 16 | Q.   HE DID NOT CONTACT YOU? |
| 09:55:23 | 17 | A.   NO. |
| 09:55:23 | 18 | Q.   DID HE CALL YOU AND YOU AVOIDED HIS CALLS OR ANYTHING OF |
| 09:55:29 | 19 | THAT NATURE? |
| 09:55:29 | 20 | A.   NO. |
| 09:55:30 | 21 | Q.   OKAY.  WHAT WAS THE DATE THAT YOU RETURNED FROM THE |
| 09:55:41 | 22 | CRUISE, IF YOU CAN RECALL? |
| 09:55:43 | 23 | A.   I DON'T RECALL EXACTLY THE DATE, YEAH. |
| 09:55:45 | 24 | Q.   WAS IT EARLY MAY? |
| 09:55:47 | 25 | A.   YES, RIGHT AFTER THE CRUISE WE GO FOR TWO MORE DAYS IN |

09:55:52  1    ROME THEN WE COME RIGHT BACK.

09:55:54  2    Q.   OKAY.  SO WE ARE UP TO EARLY MAY NOW?

09:56:01  3    A.   YES.

09:56:02  4    Q.   OKAY.  AGAIN, YOU HAD AGREED TO -- YOU TESTIFIED THAT YOU

09:56:12  5    AGREED TO ALLOW THAI THAO TO BE MADE AN EQUAL OF YOURS, BUT HOW

09:56:19  6    WERE YOU FEELING ABOUT YOUR RELATIONSHIP WITH FFS AT THAT TIME?

09:56:23  7         THE COURT:  AT WHAT TIME?

09:56:25  8         MR. DAVIDSON:  ARGUMENTATIVE.

09:56:26  9         MR. SISCO:  AT THE TIME THAT YOU RETURNED FROM THE

09:56:28 10    CRUISE.

09:56:31 11         THE COURT:  OKAY.

09:56:34 12         THE WITNESS:  I DIDN'T FEEL GOOD AT ALL.  I DON'T

09:56:37 13    FEEL RIGHT.  I DON'T FEEL GOOD.  I FEEL LIKE SOMETHING GO WRONG

09:56:41 14    FOR ME.  IF I HELP TO BUILD SOMEBODY UP AND GET PROMOTE

09:56:46 15    PREMATURELY, THEN ALL MY JOB THAT I FOCUS TO BUILD SOMEBODY

09:56:51 16    WOULD BE WASTED AGAIN AND AGAIN.  THEN I FEEL LIKE FFS IS NO

09:57:01 17    LONGER A PLACE FOR ME TO BUILD A FUTURE.

09:57:03 18    Q.   DID YOU CONSIDER RESIGNING FROM FFS?

09:57:07 19    A.   I DON'T, BECAUSE $2 MILLION INCOME IS NOT EASY TO CONSIDER

09:57:16 20    LEAVING.  IT'S TOO MUCH MONEY INVOLVED, AND I NEVER HAD THAT

09:57:20 21    KIND OF INCOME BEFORE MY ENTIRE LIFE.  AND IT'S VERY TOUGH.  SO

09:57:26 22    I EVEN CANNOT SLEEP, I CANNOT EAT BECAUSE THAT OPTION TO ME IS

09:57:36 23    OUT.

09:57:37 24    Q.   WELL, IF -- AT SOME POINT YOU RESIGNED; IS THAT CORRECT?

09:57:49 25    A.   YES.  ON MAY 10TH WHEN I WOKE UP IN THE MORNING --

| | | |
|---|---|---|
| 09:57:54 | 1 | Q. OKAY. I JUST WANTED THAT. |
| 09:57:58 | 2 | WHEN DID YOU FIRST THINK ABOUT RESIGNING FROM FFS? |
| 09:58:05 | 3 | A. MAY 10TH. WHEN I WAKE UP AT 6:00, I CANNOT SLEEP, SO I |
| 09:58:11 | 4 | THINK THAT IT'S -- I HAVE TO DO SOMETHING. SO I WAKE MAI LEE |
| 09:58:25 | 5 | UP AND I SAID I WANT TO RESIGN. |
| 09:58:26 | 6 | Q. LET'S FILL IN SOME HOLES FIRST. |
| 09:58:29 | 7 | ARE YOU FAMILIAR WITH THE COMPANY CALLED FEG? |
| 09:58:33 | 8 | A. YES. |
| 09:58:33 | 9 | Q. WHEN DID YOU FIRST KNOW ABOUT FEG? |
| 09:58:38 | 10 | A. AS A PROFESSIONAL NETWORK, I KIND OF KNOW THE MARKET. I |
| 09:58:42 | 11 | KIND OF KNOW EVERYBODY. EXCEPT I DON'T KNOW THE PEOPLE BEHIND |
| 09:58:46 | 12 | THE COMPANY, BUT THE COMPANY ITSELF, I KNOW. I KNOW COMPANIES |
| 09:58:51 | 13 | LIKE HUBERT HUMPHREY, A COMPANIES THAT HGI, I KNOW OF PFI, I |
| 09:58:57 | 14 | KNOW OF WME, AND PRIMERICA, AND I KNOW AOA. I KNOW ALL THOSE |
| 09:59:06 | 15 | COMPANIES THAT ARE OUR COMPETITOR. |
| 09:59:09 | 16 | Q. OKAY. DID YOU EVER CONTACT FEG? |
| 09:59:15 | 17 | A. NOT UNTIL I DECIDE TO DO SOME RESEARCH, AND I NOT ONLY |
| 09:59:21 | 18 | CONTACT FEG, I CONTACT ALSO HGI. I TALKED TO HUBERT HUMPHREY, |
| 09:59:26 | 19 | I CONTACT ALSO WME, I ALSO TALKED TO JERRY PERKINS THAT HE WANT |
| 09:59:36 | 20 | TO BUILD ANOTHER COMPANY. HE'S THE GUY THAT AGREED TO WORK AT |
| 09:59:39 | 21 | FFS THAT HE RESIGNED FROM FFS ALSO. SO HE WANT TO BUILD A NEW |
| 09:59:44 | 22 | COMPANY, SO I TALKED TO HIM. AND I TALKED TO ALSO TO SYNCIS |
| 09:59:57 | 23 | COMPANY -- I TALKED TO SYNCIS ALSO. |
| 10:00:00 | 24 | THE COURT: OKAY. HOLD ON A MINUTE, MR. MOUA. |
| 10:00:02 | 25 | THE QUESTION WAS, DID YOU EVER CONTACT FEG? AND YOU |

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO                474

| | | |
|---|---|---|
| 10:00:06 | 1 | ANSWERED THAT RIGHT AWAY.  AND THEN YOU WENT ON. |
| 10:00:09 | 2 | SO I DON'T WANT YOU TO ANSWER MORE THAN THE QUESTION ASKED |
| 10:00:13 | 3 | FOR. |
| 10:00:14 | 4 | IF THE QUESTION IS, "DID YOU CONTACT FEG," THE ANSWER |
| 10:00:17 | 5 | WOULD BE EITHER A YES OR A NO.  THEN WE WILL LET MR. SISCO ASK |
| 10:00:22 | 6 | ANOTHER QUESTION. |
| 10:00:23 | 7 | SO I'M GOING TO STRIKE THAT TESTIMONY YOU JUST GAVE, OTHER |
| 10:00:27 | 8 | THAN THE VERY FIRST SENTENCE. |
| 10:00:29 | 9 | BY MR. SISCO: |
| 10:00:29 | 10 | Q.  OKAY.  YOU MENTIONED YOU DID RESEARCH.  WHAT SORT OF |
| 10:00:34 | 11 | RESEARCH DID YOU DO? |
| 10:00:38 | 12 | A.  I GO ONLINE AND LOOK AT THE PLANS OF THE DIFFERENT |
| 10:00:44 | 13 | COMPANIES THAT I KNOW. |
| 10:00:45 | 14 | Q.  AND THAT'S HOW YOU CAME ABOUT ALL THOSE OTHER COMPANIES. |
| 10:00:48 | 15 | BUT LET'S GO BACK TO THE ORIGINAL QUESTION. |
| 10:00:51 | 16 | DID YOU CONTACT FEG? |
| 10:00:53 | 17 | A.  YES. |
| 10:00:54 | 18 | Q.  OKAY.  DID YOU CONTACT OTHER COMPANIES? |
| 10:00:57 | 19 | A.  YES. |
| 10:00:57 | 20 | Q.  WHAT OTHER COMPANIES DID YOU CONTACT? |
| 10:01:02 | 21 | A.  WME, HGI, SYNCIS, AOA. |
| 10:01:14 | 22 | Q.  AND ARE ALL THESE COMPANIES THAT YOU COULD, IF YOU WANTED |
| 10:01:19 | 23 | TO, GO TO WORK FOR THEM? |
| 10:01:23 | 24 | A.  YES. |
| 10:01:24 | 25 | Q.  OKAY.  WHEN YOU CONTACTED FEG, HOW DID YOU MAKE THAT |

DIRECT EXAMINATION OF MR. MOUA BY MR. SISCO

10:10:23  1      UPLINE AND DOWNLINE TEAMS?

10:10:27  2      A.   NOT DURING THOSE TWO TIMES, NO.

10:10:29  3      Q.   OKAY.  APPROXIMATELY HOW LONG DID THE MEETING LAST?

10:10:37  4      A.   AROUND ONE HOUR, ONE HOUR AND A HALF.

10:10:42  5      Q.   OKAY.  WHEN THE MEETING WAS CONCLUDED AND YOU LEFT, HAD

10:10:51  6      YOU MADE A COMMITMENT TO THEM OR THEY TO YOU?

10:10:56  7      A.   NO COMMITMENT HAS BEEN MADE AT THOSE MEETING.

10:11:04  8      Q.   I FAILED TO ASK YOU BEFORE, YOU SAID THAT BY YOUR

10:11:07  9      RESEARCH, YOU FOUND ALL OF THESE OTHER COMPANIES.  DID YOU TALK

10:11:10  10     TO THOSE COMPANIES BEFORE YOU MET WITH FEG OR AFTER?

10:11:15  11     A.   PRETTY MUCH EVERYTHING AT THE SAME TIME.

10:11:17  12     Q.   AT THE SAME TIME.  OKAY.

10:11:20  13          AFTER YOU MET WITH THE PEOPLE AT FEG, DID YOU TALK TO ANY

10:11:22  14     OTHER COMPANIES?

10:11:24  15     A.   I TALK TO LES CHALET AND SYNCIS.  I TALKED TO HUBERT

10:11:30  16     HUMPHREY AND HGI.

10:11:33  17     Q.   AND THIS WAS AFTER YOU MET WITH FEG?

10:11:36  18     A.   YES.

10:11:37  19     Q.   OKAY.  NOW WE CAN GET TO THE SATURDAY MORNING.

10:12:03  20          YOU TESTIFIED THAT YOU SUBMITTED YOUR RESIGNATION; IS THAT

10:12:09  21     CORRECT?

10:12:09  22     A.   YES.

10:12:09  23     Q.   OKAY.  HOW DID YOU DO THAT?

10:12:12  24     A.   I ASKED MIKE TO TYPE THE RESIGNATION FOR ME AND SEND OUT

10:12:21  25     TO FFS.

| 11:52:44 | 1 | Q.   AND YOU WERE AN AGENT? |
| 11:52:46 | 2 | A.   YES. |
| 11:52:47 | 3 | Q.   WE'VE HEARD DISTINCTIONS BETWEEN LICENSED AGENTS AND |
| 11:52:51 | 4 | UNLICENSED AGENTS? |
| 11:52:53 | 5 | A.   THAT'S RIGHT. |
| 11:52:53 | 6 | Q.   AND WHAT WERE YOU? |
| 11:52:54 | 7 | A.   I'M A LICENSED AGENT. |
| 11:52:56 | 8 | Q.   YOU DO HAVE A LICENSE? |
| 11:52:58 | 9 | A.   YES. |
| 11:52:58 | 10 | Q.   OKAY.  DO YOU SELL INSURANCE POLICIES? |
| 11:53:01 | 11 | A.   IN THE PAST, YES. |
| 11:53:02 | 12 | Q.   WHEN WAS THE LAST TIME YOU SOLD ANYTHING? |
| 11:53:06 | 13 | A.   MANY YEARS AGO. |
| 11:53:07 | 14 | Q.   OKAY.  SO SINCE THEN, YOU MORE OR LESS HAVE JUST BEEN |
| 11:53:10 | 15 | WORKING WITH AND ASSISTING MR. MOUA? |
| 11:53:13 | 16 | A.   YES.  THE LAST POLICY I WROTE WAS FOR GILLES AT FFS, AND I |
| 11:53:23 | 17 | BELIEVE THAT WAS IN 2010 OR SOMETHING, THAT'S PROBABLY THE LAST |
| 11:53:26 | 18 | POLICY I WROTE. |
| 11:53:27 | 19 | Q.   AND WORKING WITH MR. MOUA, DID YOU HAVE OCCASION TO KNOW |
| 11:53:42 | 20 | ABOUT A DISPUTE WITH FFS OVER ONE OF MR. MOUA'S DOWNLINE TEAM |
| 11:53:51 | 21 | MEMBERS? |
| 11:53:54 | 22 | A.   YES.  IF YOU ARE TALKING ABOUT THAI THAO -- |
| 11:53:57 | 23 | Q.   WE WILL. |
| 11:53:58 | 24 | A.   WELL, YEAH.  BECAUSE EVERYONE KEEPS SAYING WE HAVE A |
| 11:54:02 | 25 | DISPUTE WITH HIM.  BUT THE TRUTH IS WE -- THE DISPUTE WE HAVE |

DIRECT EXAMINATION OF MS. LEE BY MR. SISCO          532

```
11:54:06   1    IS WITH PHIL GERLICHER, NOT THAI.
11:54:08   2    Q.    AND WHAT WAS THE DISPUTE THAT YOU HAD WITH PHIL GERLICHER?
11:54:12   3    A.    OKAY.  THERE'S SO MANY THINGS, I DON'T KNOW WHERE TO
11:54:16   4    BEGIN, BUT I WILL TRY.
11:54:19   5              THE COURT:  WELL, WHY DON'T YOU LIST THEM RATHER THAN
11:54:22   6    GIVE US A NARRATIVE, AND THEN MR. SISCO CAN COME BACK AND ASK
11:54:25   7    YOU ABOUT EACH ONE.
11:54:27   8              THE WITNESS:  OKAY.  ALL RIGHT.
11:54:30   9              SO THE DISPUTE WITH GERLICHER WAS, IT STARTED IN OCTOBER
11:54:35  10    WHEN WE RECEIVED A TEXT, OCTOBER 2013, WHEN GILLES RECEIVED A
11:54:41  11    TEXT FROM HIM THAT HE HAD JUST GOTTEN BACK FROM NEW YORK WITH
11:54:46  12    HIS WIFE, AND HE WANTED TO GET TOGETHER WITH GILLES TO TALK
11:54:50  13    ABOUT THAI THAO, A PROMOTION TO EFC, THAT'S THE HIGHEST LEVEL
11:54:56  14    IN THE COMPANY.
11:54:57  15              SO OF COURSE WE WERE CONFUSED.  SO I CALLED PHIL
11:55:00  16    PERSONALLY AND I SAID, PHIL, WHAT ARE YOU TALKING ABOUT
11:55:05  17    PROMOTING THAI THAO TO EFC, HE DIDN'T QUALIFY.
11:55:10  18              THEN HE SAID, WELL, YEAH, THE POINT, HE QUALIFIED, BECAUSE
11:55:19  19    IN FFS PROMOTIONAL GUIDELINES, HE WOULD HAVE TO HIT, I BELIEVE
11:55:23  20    AT THAT TIME, 1.2 MILLION, PLUS HE HAVE TO HAVE EIGHT DIRECT
11:55:27  21    PLACES UNDER HIM.  AND IT HAS TO BE A ROLLING THREE MONTHS TO
11:55:30  22    HIT THAT PRODUCTION.  HIM AND HIS WHOLE ORGANIZATION.
11:55:34  23              SO WHEN WE RECEIVED A TEXT, AND THAT WAS IN OCTOBER, SO
11:55:37  24    PHIL SAID OH, HE HIT IT.  AND WE LOOKED AT THE BULLETIN, AND
11:55:41  25    EVEN THOUGH THE NUMBERS SHOW, I BELIEVE AT THAT TIME, FROM
```

11:55:45  1   SEPTEMBER, AUGUST, AND JULY, SO IT WAS A ROLLING THREE MONTHS.

11:55:56  2        THEN I LOOKED INTO THE DETAILS AND I NOTICED THAT FFS HAS

11:56:02  3   ADDED IN AN EXTRA WEEK IN SEPTEMBER.  SO I'M LIKE, WHERE DID

11:56:08  4   THIS COME FROM?  AND THEN WHEN I CALLED PHIL, AND I BELIEVE IT

11:56:12  5   WAS MICHAEL HARDIN AND PHIL, THERE WAS -- THEY SAID THAT WE

11:56:17  6   CAME FROM AN AUDIT THAT THE COMPANY DID, THAT THEY MIS PAID ALL

11:56:25  7   THE AGENTS AND THEY DIDN'T PAY US PROPERLY.

11:56:28  8        SO THEY DID AN AUDIT AND THEY ADDED ALL THOSE POINTS

11:56:33  9   TOGETHER.  AND THEN THEY PAID IT ALL THAT ONE WEEK IN

11:56:40  10  SEPTEMBER.

11:56:40  11       SO I'M LIKE, WELL, THAT DOESN'T MAKE SENSE THAT YOU WOULD

11:56:43  12  ADD THREE YEARS OF PRODUCTION AND PUT IT IN ONE WEEK IN

11:56:48  13  SEPTEMBER.  THAT'S NOT FAIR TO THE FIELD.  YOU KNOW, I MEAN, IF

11:56:53  14  YOU COULD DO THAT AND GET A PROMOTION, WOULDN'T EVERYONE DO

11:56:56  15  THAT?

11:56:56  16       SO ANYWAY, PHIL, THE FOLLOWING WEEK WE WERE INVITED TO A

11:57:02  17  FALL MEETING, USUALLY HE DOES ONE ONCE A YEAR AT THE HOME

11:57:07  18  OFFICE.  SO WE WENT THERE AND HE SAID, WE WILL TALK ABOUT IT

11:57:11  19  WHEN YOU GET OVER HERE.

11:57:12  20       SO WE GO, YEAH, WE WOULD LIKE TO DO THAT BECAUSE WE WANT

11:57:16  21  TO LOOK FURTHER INTO THIS.  AND BESIDES, WE JUST SPOKE WITH

11:57:21  22  THAI THE LAST TWO WEEKS AND HE NEVER TALKED ABOUT WANTING TO BE

11:57:25  23  PROMOTED.  HE NEVER TALKED ABOUT HIS QUALIFICATION OR ANYTHING.

11:57:28  24  SO WHY IS IT SUDDENLY COMING FROM YOU, PHIL.

11:57:35  25       SO ANYWAY, BY THE TIME WE GOT TO THE HOME OFFICE --

11:57:38  1    Q.  OKAY.  MS. LEE, I WANT TO EARN MY MONEY, SO LET -- YOU ARE

11:57:44  2    KIND OF GOING INTO WHAT MR. DAVIDSON WOULD CALL A "NARRATIVE"

11:57:48  3    AND YOU NEED TO BREAK IT UP A LITTLE BIT AND LET ME ASK YOU A

11:57:52  4    QUESTION AND THEN RESPOND TO THE QUESTION.

11:57:57  5        SO WHAT WAS THE FIRST -- I BELIEVE YOU TESTIFIED THAT THE

11:58:00  6    FIRST INDICATION THAT THERE WAS AN ISSUE WAS WHEN GILLES MOUA

11:58:09  7    RECEIVED A TEXT, OR NOT A TEXT, BUT AN E-MAIL FROM PHIL

11:58:13  8    GERLICHER --

11:58:16  9    A.  TEXT.

11:58:17  10   Q.  IT WAS A TEXT.  ASKING HIM TO PROMOTE THAI THAO; IS THAT

11:58:20  11   CORRECT?

11:58:20  12   A.  YES.

11:58:21  13   Q.  WHAT WAS YOUR RESPONSE TO THAT TEXT?

11:58:24  14   A.  I CALLED HIM.

11:58:26  15        THE COURT:  NOW -- YOU WANT TO KNOW WHAT SHE DID

11:58:30  16   NEXT?

11:58:31  17        MR. SISCO:  YES.

11:58:32  18        THE COURT:  I WASN'T CLEAR WHEN YOU SAID "RESPONSE"

11:58:34  19   WHAT YOU MEANT BY IT.

11:58:35  20     GO AHEAD.  ALL RIGHT.  SHE CALLED HIM.

11:58:37  21        THE WITNESS:  I CALLED HIM TO DISPUTE HIS TEXT.

11:58:41  22   BY MR. SISCO:

11:58:42  23   Q.  OKAY.  AND THEN I BELIEVE YOU SAID THAT YOU ACTUALLY WENT

11:58:48  24   TO A PRODUCTION MEETING AND MET WITH MR. GERLICHER?

11:58:50  25   A.  YES, THE FOLLOWING, I BELIEVE IT WAS THE FOLLOWING WEEK,

| | | |
|---|---|---|
| 11:58:54 | 1 | WE HAD A MEETING AT THE HOME OFFICE.  WE WENT THERE AND WE TOLD |
| 11:58:59 | 2 | HIM WE WERE GOING TO GO ASK TALK ABOUT THAT PRODUCTION. |
| 11:59:04 | 3 | BECAUSE HE'S AN OWNER OF OUR COMPANY, HE DOESN'T DO EVERYDAY |
| 11:59:08 | 4 | THINGS WITH OUR PEOPLE, SO HE DOESN'T UNDERSTAND THOSE |
| 11:59:10 | 5 | PRODUCTIONS, SO HE RELIED ON HIS EMPLOYEES, MICHAEL HARDIN. |
| 11:59:15 | 6 | MR. DAVIDSON:  MOVE TO STRIKE EVERYTHING AFTER WHAT |
| 11:59:18 | 7 | SHE DID NEXT. |
| 11:59:19 | 8 | THE COURT:  YEAH.  SHE DOES TEND TO RAMBLE. |
| 11:59:24 | 9 | TRY TO LIMIT YOUR ANSWER TO WHAT THE QUESTION ASKS AND NOT |
| 11:59:27 | 10 | USE THAT AS A JUMP OFF POINT FOR FURTHER TESTIMONY. |
| 11:59:33 | 11 | THE WITNESS:  OKAY. |
| 11:59:34 | 12 | MR. SISCO:  WHERE DO I START? |
| 11:59:46 | 13 | THE COURT:  THE NEXT THING IS SHE WENT TO A MEETING |
| 11:59:50 | 14 | AT THE HOME OFFICE, THAT'S THE NEXT THING. |
| 11:59:55 | 15 | MR. SISCO:  AT THE HOME OFFICE.  OKAY. |
| 11:59:57 | 16 | Q.  DO YOU RECALL WHAT THE DATE OF THAT MEETING WAS OR AT |
| 11:59:59 | 17 | LEAST THE MONTH? |
| 12:00:01 | 18 | A.  IT WAS IN OCTOBER. |
| 12:00:03 | 19 | Q.  STILL IN OCTOBER? |
| 12:00:04 | 20 | A.  UH-HUH. |
| 12:00:05 | 21 | Q.  JUST SHORTLY AFTER THE -- |
| 12:00:06 | 22 | A.  YES, AFTER THE SIXTH, SO LIKE A WEEK AFTER. |
| 12:00:11 | 23 | Q.  AND WHILE YOU WERE THERE DID YOU HAVE A MEETING WITH |
| 12:00:13 | 24 | MR. GERLICHER AND MR. HARDIN? |
| 12:00:14 | 25 | A.  YES, BECAUSE PHIL TOLD US, OH -- |

| 12:00:17 | 1 | THE COURT:  THE ANSWER IS YES. |
| 12:00:19 | 2 | THE WITNESS:  OH, SORRY. |
| 12:00:20 | 3 | BY MR. SISCO: |
| 12:00:20 | 4 | Q.   AND WHAT OCCURRED AT THAT MEETING? |
| 12:00:22 | 5 | A.   SO WE MET WITH MICHAEL HARDIN THE NEXT MORNING AFTER WE |
| 12:00:28 | 6 | ARRIVED AT THE HOME OFFICE.  WE MET IN HIS OFFICE AND WE WENT |
| 12:00:34 | 7 | OVER THE POINTS TO LOOK AT THAI THAO'S PROMOTION, THE POINTS, |
| 12:00:38 | 8 | WHERE THEY ALL CAME FROM. |
| 12:00:39 | 9 | SO WE LOOKED AT IT AND THEN WE SAID OKAY, SO WHY DID YOU |
| 12:00:44 | 10 | ADD THREE YEARS OF PRODUCTION, AND THEY ADD THE PRODUCTION TO |
| 12:00:48 | 11 | ADD ON TO HIS REGULAR THREE MONTHS PRODUCTION.  THAT'S TOO MUCH |
| 12:00:52 | 12 | TO ADD ON. |
| 12:00:53 | 13 | SO HE AGREED, HE GOES OH, YEAH, THAT'S TRUE.  AND THEN |
| 12:00:58 | 14 | THEY LOOK AT THAT AND HE DOESN'T HAVE DIRECT, WHAT THEY CALL, |
| 12:01:06 | 15 | R&D GUYS THAT DIRECT TO HIM.  YOU HAVE TO HAVE BOTH. |
| 12:01:08 | 16 | SO HE GOES, THAT'S TRUE TOO. |
| 12:01:11 | 17 | SO PHIL STUCK HIS HEAD IN THE DOOR, PROBABLY LIKE AFTER WE |
| 12:01:16 | 18 | WERE TALKING TO MICHAEL FOR A WHILE, AND THEN PHIL ASKED |
| 12:01:18 | 19 | MICHAEL, DID HE QUALIFY?  AND MICHAEL LOOKED AT HIM AND SHOOK |
| 12:01:23 | 20 | HIS HEAD AND SAID NO, THEN PHIL LEFT. |
| 12:01:25 | 21 | Q.   OKAY.  AND THEN WHAT DID YOU DO AFTER THAT? |
| 12:01:29 | 22 | A.   SO GILLES KIND OF TALKED TO MICHAEL AND CONFRONTED HIM A |
| 12:01:32 | 23 | LITTLE BIT.  HE GOES, YOU ARE THE HOME OFFICE, WHY WOULD YOU DO |
| 12:01:36 | 24 | THINGS LIKE THIS? |
| 12:01:37 | 25 | MR. DAVIDSON:  STRIKE AS HEARSAY. |

DIRECT EXAMINATION OF MS. LEE BY MR. SISCO

```
12:01:40   1                  THE COURT:  SUSTAINED.

12:01:41   2                  MR. SISCO:  YOUR HONOR, MICHAEL HARDIN IS AN EMPLOYEE

12:01:46   3      REPRESENTATIVE OF FFS.

12:01:49   4                  THE COURT:  I DON'T DISAGREE WITH THAT, BUT SHE'S

12:01:51   5      SAYING WHAT SHE SAID.

12:01:53   6                  MR. DAVIDSON:  SHE'S SAYING WHAT MR. MOUA SAID, WHO

12:01:57   7      WAS JUST ON THE STAND.

12:01:59   8                  MR. SISCO:  ALL RIGHT.  OKAY.  THAT'S FINE THEN.

12:02:06   9      Q.   SO AS FAR AS YOU AND MR. MOUA ARE CONCERNED, THE MEETING

12:02:21  10      WAS OVER AT THAT POINT; IS THAT CORRECT?

12:02:23  11      A.   WELL, YEAH, THAT WAS JUST THE FIRST DAY.  AND THEN --

12:02:27  12                  MR. DAVIDSON:  MOVE TO STRIKE AS NONRESPONSIVE.

12:02:29  13                  THE COURT:  SUSTAINED.  STRIKE THAT ANSWER.

12:02:31  14          JUST ANSWER THE QUESTION.

12:02:32  15      BY MR. SISCO:

12:02:33  16      Q.   WHAT WAS -- AFTER THAT MEETING WITH MR. HARDIN AND BRIEFLY

12:02:37  17      WITH MR. GERLICHER, WHEN WAS THE NEXT TIME YOU CONTACTED FFS?

12:02:43  18          OR LET ME ASK IT THIS WAY, WAS THERE A CONTACT WITH FFS

12:02:47  19      FOLLOWING THAT MEETING AT THE HOME OFFICE?

12:02:52  20                  MR. DAVIDSON:  VAGUE AND AMBIGUOUS.

12:02:52  21                  THE COURT:  YOU MEAN ABOUT THAI THAO.

12:02:55  22                  MR. SISCO:  ABOUT THAI THAO?

12:02:58  23                  THE WITNESS:  YEAH.  SO IT WAS LIKE A THREE-DAY

12:03:01  24      LEADERSHIP WITH PHIL GERLICHER.  SO THAI ARRIVED, AND THEN A

12:03:05  25      FEW OF OUR OTHER KEY LEADERS ARRIVED AND WE HAD THE FFS
```

```
12:03:10   1   LEADERSHIP MEETING.

12:03:11   2        AND WHILE WE WERE THERE, WE BROUGHT IT UP TO THAI.  WE HAD

12:03:15   3   A MEETING WITH THAI.  AND WE ASKED HIM AND HE SAID, NO, GILLES,

12:03:28   4   I LOVE YOU LIKE A FATHER, I WANT TO KEEP THE MARGIN, I WOULD DO

12:03:33   5   ANYTHING FOR YOU.

12:03:33   6        AND TWO PEOPLE WERE THERE TOO, LUIS WAS AT THE TABLE AND

12:03:39   7   DERRICK --

12:03:40   8             THE COURT:  THIS IS RAMBLING ON AGAIN, MS. LEE.

12:03:45   9             MR. DAVIDSON:  PART OF IT IS HEARSAY, TOO.

12:03:47  10   BY MR. SISCO:

12:03:47  11   Q.  AFTER THAT, DID YOU HAVE ANY FURTHER CONTACT WITH

12:03:49  12   MR. HARDIN OR MR. GERLICHER WHILE YOU WERE THERE AT THE HOME

12:03:55  13   OFFICE?

12:03:55  14   A.  YEAH.  WE HUNG OUT WITH PHIL FOR THE NEXT TWO OR

12:03:59  15   THREE DAYS, AND THEN HE ASKED US NOT TO TALK TO THAI ABOUT

12:04:02  16   THAT -- THAT TO LET HIM TO WORK IT OUT WITH THAI, LET HIM TALK

12:04:10  17   TO THAI.

12:04:10  18        AND THEN HE DROPPED US OFF AT THE AIRPORT.  IT WAS DURING

12:04:14  19   THE RIDE TO THE AIRPORT THAT HE ASKED ME AND GILLES NOT TO TALK

12:04:16  20   TO THAI ABOUT THE PROMOTION ANYMORE, TO LET HIM HANDLE IT.

12:04:20  21   Q.  OKAY.  AND THEN WHAT WAS THE NEXT -- WAS THERE ANOTHER

12:04:22  22   CONTACT WITH MR. GERLICHER REGARDING THE THAI THAO DISPUTE?

12:04:27  23   A.  SO IT WAS IN --

12:04:29  24             THE COURT:  THAT WOULD BE YES OR NO.

12:04:31  25   BY MR. SISCO:
```

DIRECT EXAMINATION OF MS. LEE BY MR. SISCO                                   539

| | |
|---|---|
| 12:04:32 | 1 |
| 12:04:33 | 2 |
| 12:04:34 | 3 |
| 12:04:34 | 4 |
| 12:04:36 | 5 |
| 12:04:39 | 6 |
| 12:04:44 | 7 |
| 12:04:49 | 8 |
| 12:04:53 | 9 |
| 12:04:53 | 10 |
| 12:04:54 | 11 |
| 12:04:57 | 12 |
| 12:05:01 | 13 |
| 12:05:06 | 14 |
| 12:05:12 | 15 |
| 12:05:19 | 16 |
| 12:05:21 | 17 |
| 12:05:25 | 18 |
| 12:05:29 | 19 |
| 12:05:36 | 20 |
| 12:05:38 | 21 |
| 12:05:42 | 22 |
| 12:05:47 | 23 |
| 12:05:51 | 24 |
| 12:05:59 | 25 |

Q.   JUST YES OR NO.

WAS THERE ANOTHER CONTACT?

A.   YES.

Q.   AND WHEN WAS THAT NEXT CONTACT?

A.   THE NEXT CONTACT WAS IN NOVEMBER WHEN PHIL GERLICHER

INVITED US TO GO BACK TO THE HOME OFFICE.  JUST THIS TIME, JUST

GILLES AND I, THAI AND HIS WIFE, AND PHIL AND HIS WIFE.

Q.   OKAY.  AND DID YOU HAVE A MEETING SOLELY TO DISCUSS THE

DISPUTE?

A.   THAT'S CORRECT.

Q.   AND WHAT OCCURRED AT THAT MEETING?

A.   SO BECAUSE WE KNEW WE WERE GOING TO TALK ABOUT THAI'S

PROMOTIONS, WE LOOKED -- WHEN WE GOT BACK HOME, WE LOOKED INTO

THE WEBSITE AND HOW THOSE POINTS CAME ABOUT, AND THEN WE FOUND

SO MANY UNETHICAL BUSINESS THAT WENT ON IN THOSE THREE MONTHS,

AND WE BROUGHT IT TO PHIL'S ATTENTION.

Q.   OKAY.  WHAT DO YOU MEAN BY UNETHICAL BUSINESS?

A.   OKAY.  SO THERE WERE SO MANY BAD BUSINESS.  LIKE, THEY

WOULD WRITE FOR ONE CLIENT, THEY WOULD WRITE TO TWO INSURANCE

COMPANIES.

SO THEIR AGENTS, THAI THAO AND HIS AGENT, WOULD WRITE --

LET'S SAY I WAS WRITING A POLICY TO KEN.  I WOULD PUT KEN SISCO

FOR LIFE INSURANCE OF THE SOUTHWEST FOR A MILLION DOLLARS.  AND

THEN I WOULD PUT KEN M. SISCO FOR AMCO, AND THEN I WOULD CHANGE

THE LAST DIGIT OF THE SOCIAL SECURITY NUMBER ON THE OTHER ONE.

DIRECT EXAMINATION OF MS. LEE BY MR. SISCO                    540

```
12:06:04   1        SO THEN I WOULD SUBMIT THAT IN, AND THEN IF IT GETS --

12:06:07   2   ONCE YOU SUBMIT IT, IT WOULD MAKE THE PRODUCTION POINTS RIGHT

12:06:09   3   AWAY.  AND THAT'S HOW THEY WOULD ACCUMULATE A LOT OF POINTS.

12:06:13   4        SO NOT JUST ONE AGENT WAS DOING THIS, THERE WAS LIKE SO

12:06:17   5   MANY OF THAI THAO'S AGENTS WAS DOING THAT.  SO I -- WE PRINTED

12:06:21   6   THOSE AND WE TOOK IT TO THE HOME OFFICE WITH US, AND I SAID, I

12:06:25   7   WANT YOU TO LOOK AT THESE BECAUSE THIS IS NOT RIGHT.  I MEAN,

12:06:29   8   WE CAN'T DO BUSINESS LIKE THIS.

12:06:30   9   Q.   OKAY.  AND DID MR. GERLICHER TAKE THOSE FROM YOU?

12:06:33  10   A.   YES, HE TOOK THEM FROM ME.  HE TOOK SOME OF THEM FROM ME

12:06:39  11   AND THEN HE SAID THAT, TO NOT --

12:06:43  12           MR. DAVIDSON:  NONRESPONSIVE.

12:06:44  13           THE COURT:  WELL, THERE'S NO QUESTION PENDING.  HE

12:06:47  14   TOOK THEM FROM YOU.

12:06:48  15           THE WITNESS:  YES.

12:06:48  16   BY MR. SISCO:

12:06:48  17   Q.   AND DID HE SAY ANYTHING ABOUT THE DOCUMENTS AS HE TOOK

12:06:52  18   THEM FROM YOU?

12:06:53  19   A.   YEAH, HE SAID THAT HE WOULD DO AN AUDIT ON IT.  AND THAT

12:06:58  20   IF IT WAS TRUE, THEN THAT WAS GROUNDS FOR TERMINATION.

12:07:01  21   Q.   DID HE DO AN AUDIT?

12:07:04  22   A.   I DON'T KNOW.  TO THIS DAY, I NEVER HEARD ANYTHING BACK

12:07:07  23   FROM THAT AUDIT.

12:07:08  24   Q.   OKAY.  DID YOU HAVE ANY FURTHER CONTACT WITH MR. GERLICHER

12:07:16  25   ABOUT THAI THAO'S PROMOTION?
```

DIRECT EXAMINATION OF MS. LEE BY MR. SISCO

```
12:07:18   1    A.   YES.

12:07:18   2    Q.   WHEN WAS THAT?

12:07:20   3    A.   JUST, LET ME SEE, SO THAT WAS NOVEMBER.  THEN FROM THERE

12:07:28   4    ON, IT'S JUST E-MAILS, AND YOU GUYS HAVE -- YOU SHOULD HAVE ALL

12:07:33   5    THE E-MAILS.  BUT MAINLY THROUGH E-MAIL.

12:07:36   6        THEN BY DECEMBER IT WAS STARTING TO ERUPT AND

12:07:41   7    MICHAEL HARDIN WOULD START CALLING THAI THAO'S CHAMPIONS CLUB,

12:07:45   8    THOSE ARE PEOPLE THAT MAKE OVER 100,000 AND UP, FROM HIS

12:07:50   9    TEAM --

12:07:50  10            MR. DAVIDSON:  CALLS FOR HEARSAY AND ALSO

12:07:52  11    NONRESPONSIVE.

12:07:52  12            THE COURT:  SUSTAINED.  STRIKE THAT TESTIMONY.

12:07:56  13            MR. SISCO:  OKAY.

12:07:56  14    Q.   DID YOU, AT SOME POINT, BECOME AWARE THAT MICHAEL HARDIN

12:08:01  15    WAS CONTACTING MEMBERS OF THAI THAO'S TEAM?

12:08:05  16    A.   YES.

12:08:05  17            MR. DAVIDSON:  LEADING QUESTION.

12:08:07  18            THE COURT:  IT IS LEADING.  SUSTAINED.

12:08:15  19    BY MR. SISCO:

12:08:16  20    Q.   WERE YOU CONCERNED ABOUT THE WAY MR. GERLICHER AND

12:08:19  21    MICHAEL HARDIN WAS HANDLING THE DISPUTE BETWEEN YOURSELF AND

12:08:24  22    THAI THAO?

12:08:25  23    A.   YES.

12:08:26  24    Q.   WHY WERE YOU CONCERNED?

12:08:28  25    A.   WELL, BECAUSE PHIL GERLICHER WOULD SAY SOMETHING TO US AND
```

DIRECT EXAMINATION OF MS. LEE BY MR. SISCO

| | |
|---|---|
| 12:08:32 | 1 | THEN HE WOULD DISAPPEAR FOR DAYS, AND THEN EVERYTHING THAT HE |
| 12:08:37 | 2 | SAYS TO US, HE DOESN'T COME THROUGH. |
| 12:08:41 | 3 | SO IT'S JUST STARTING TO MAKE US NOT TRUST HIM. |
| 12:08:44 | 4 | Q.   AT SOME POINT DID YOU LEARN THAT MICHAEL HARDIN HAD BEEN |
| 12:08:50 | 5 | CONTACTING DOWNLINE PEOPLE OF THAI THAO? |
| 12:08:54 | 6 | MR. DAVIDSON:  STILL LEADING. |
| 12:08:55 | 7 | THE WITNESS:  YES. |
| 12:08:56 | 8 | THE COURT:  IT IS.  IT'S THE SAME QUESTION. |
| 12:08:57 | 9 | SUSTAINED. |
| 12:08:58 | 10 | MR. SISCO:  I WILL MOVE ON THEN. |
| 12:09:13 | 11 | Q.   YOU WERE ALSO MR. GILLES'S LIFE PARTNER; IS THAT CORRECT? |
| 12:09:21 | 12 | A.   YES. |
| 12:09:22 | 13 | Q.   AND SO DO YOU AND HE DISCUSS YOUR AFFAIRS AND WHAT'S GOING |
| 12:09:28 | 14 | ON IN YOUR LIVES, GENERALLY? |
| 12:09:30 | 15 | A.   YEAH. |
| 12:09:30 | 16 | Q.   AND SPECIFICALLY WITH RESPECT TO YOUR BUSINESS DEALINGS, |
| 12:09:37 | 17 | WHICH YOU TESTIFIED THAT YOU ASSISTED HIM IN? |
| 12:09:39 | 18 | A.   YES. |
| 12:09:40 | 19 | Q.   OKAY.  DID YOU AND GILLES MOUA DISCUSS THE THAI THAO |
| 12:09:48 | 20 | DISPUTE? |
| 12:09:48 | 21 | A.   YES. |
| 12:09:49 | 22 | Q.   AND FROM YOUR OBSERVATIONS, HOW DID IT AFFECT MR. MOUA? |
| 12:09:53 | 23 | A.   GILLES IS A VERY PATIENT AND POSITIVE PERSON, AND WHEN |
| 12:10:00 | 24 | THIS CAME UP, ESPECIALLY IT CAME FROM PHIL, AND PHIL TELLS |
| 12:10:05 | 25 | GILLES AND I THAT HE IS OUR FRIEND, LET HIM HANDLE IT.  AND |

```
12:10:11   1    THEN HE WOULD GO TO THAI THAO AND DIDN'T HANDLE IT.

12:10:17   2         I SEE THE CHANGES IN GILLES BECAUSE IT'S JUST, YOU KNOW,

12:10:22   3    HE WOULD RATHER BE FOCUSSING ON HIS WORK.  HE'S KIND OF LIKE A

12:10:26   4    WORKAHOLIC.  BUT THEN WHEN WE KEEP BRINGING THESE THINGS UP TO

12:10:31   5    HIM AND WHEN HE'S BEING TOLD THAT CERTAIN THINGS IS GOING TO

12:10:35   6    HAPPEN THIS WAY AND IT DOESN'T COME TRUE, IT WAS JUST A VERY

12:10:39   7    STRESSFUL TIME.

12:10:39   8         MR. DAVIDSON:  I WOULD STRIKE EVERYTHING BUT "IT WAS

12:10:41   9    STRESSFUL."

12:10:42  10         THE COURT:  WELL, THAT'S RESPONSIVE TO HOW WAS HE

12:10:44  11    HANDLING IT, I THINK.

12:10:47  12         OVERRULED.

12:10:48  13    BY MR. SISCO:

12:10:49  14    Q.   DURING THIS TIME THAT HE WAS UNDER THIS STRESS, WAS HE

12:10:54  15    WONDERING WHAT TO DO ABOUT IT?

12:10:57  16         MR. DAVIDSON:  CALLS FOR SPECULATION.

12:11:02  17         THE COURT:  I WILL SUSTAIN THAT.

12:11:04  18    BY MR. SISCO:

12:11:05  19    Q.   DID YOU AND MR. MOUA DISCUSS THE POSSIBILITY THAT MR. MOUA

12:11:15  20    MIGHT LEAVE FFS?

12:11:21  21    A.   YES.

12:11:22  22    Q.   WHEN DID YOU FIRST DISCUSS THAT?

12:11:24  23    A.   AFTER WE MET WITH PHIL GERLICHER AND DEBBIE GERLICHER AND

12:11:29  24    THAI THAO AT THE HOME OFFICE IN NOVEMBER, AFTER WE WENT TO MEET

12:11:33  25    AND GAVE THE -- HE CALLED A MEETING, PHIL GERLICHER INVITED
```

DIRECT EXAMINATION OF MS. LEE BY MR. SISCO                544

```
12:11:42   1    THAI AND GILLES BOTH BECAUSE HE WAS GOING TO MEDIATE.  SO WE

12:11:46   2    HAD A MEETING TOGETHER AT THE HOME OFFICE.

12:11:50   3    Q.   OKAY.  AND DID -- AS A RESULT OF THAT, DID YOU BEGIN TO

12:11:59   4    LOOK AROUND FOR SOME PLACE ELSE TO GO?

12:12:02   5    A.   NOT AFTER THAT, BUT IF I COULD CONTINUE, THEN THAT WAS IN

12:12:08   6    NOVEMBER.

12:12:08   7         THEN BY DECEMBER, THINGS WERE NOT GETTING ANY BETTER

12:12:12   8    THROUGH ALL THOSE E-MAILS THAT YOU SEE, AND ALSO A PHONE CALL

12:12:21   9    THAT THE AGENTS RECEIVE FROM THE HOME OFFICE, WHICH THEY MAY

12:12:23  10    HAVE NEVER INTERFERED CALLING OUR PEOPLE BEFORE, AND THEN NOW

12:12:28  11    MICHAEL HARDIN IS STARTING TO CALL THEM.

12:12:32  12         THEN WE WENT INTO THE JUMP START.  EVERY JANUARY, FFS PUT

12:12:38  13    ON A JUMP START, AND IT WAS IN ANAHEIM, AND THAT'S WHEN THEY

12:12:42  14    SPLIT THAI THAO'S TEAM FROM THE REST OF OUR ORGANIZATION, AND

12:12:50  15    THAT'S WHEN IT BECAME VERY ALARMING.  AND THAT'S THE FIRST

12:12:54  16    MEETING WE HAD EVER GONE TO THAT, THAT I DID THAT IN EIGHT

12:12:57  17    YEARS, SEVEN YEARS, THAT WE WERE WITH THEM.

12:12:59  18    Q.   AND WHEN WAS THAT?

12:13:00  19    A.   THAT WAS THE FIRST WEEK OF JANUARY OF 2014.

12:13:05  20    Q.   OKAY.  ARE YOU FAMILIAR WITH -- WELL, YOU WORK NOW FOR

12:13:13  21    FEG; IS THAT CORRECT?

12:13:13  22    A.   UH-HUH.

12:13:14  23    Q.   WHEN DID YOU FIRST BECOME FAMILIAR WITH FEG?

12:13:16  24    A.   WE HAVE ALWAYS KNOWN ABOUT FEG.  FEG HAD ALWAYS BEEN

12:13:21  25    THERE.  WE HAVE KNOWN ABOUT THEM SINCE, I BELIEVE IT WAS 2007,
```

12:13:25  1    2005.

12:13:27  2    Q.   OKAY.  DID YOU EVER CONTACT FEG FOR THE PURPOSE OF

12:13:31  3    DETERMINING WHETHER YOU MIGHT WANT TO GO WORK WITH THEM?

12:13:35  4    A.   YES.  I DID.  I'M THE ONE THAT CALMED FEG.

12:13:39  5    Q.   AND WHEN WAS THAT?

12:13:40  6    A.   I BELIEVE IT WAS SOME TIME IN DECEMBER, THE END OF

12:13:44  7    DECEMBER OR SOMETHING LIKE THAT.

12:13:45  8    Q.   SO IT WAS BEFORE THE JUMP START --

12:13:47  9    A.   YES.

12:13:48  10   Q.   -- CONFERENCE.

12:13:53  11        SO APPARENTLY THAT, THE JUMP START WAS NOT THE FIRST TIME

12:13:56  12   THAT YOU CONSIDERED LEAVING FFS; IS THAT TRUE?

12:14:03  13        MR. DAVIDSON:  ASKED AND ANSWERED.

12:14:04  14        THE COURT:  SUSTAINED.  IT'S ALSO LEADING.

12:14:06  15   BY MR. SISCO:

12:14:06  16   Q.   OKAY.  ALL RIGHT.  YOU MENTIONED THAT YOU CALLED FEG.

12:14:10  17   A.   YES.

12:14:11  18   Q.   WHAT WAS THE PURPOSE OF THAT CALL?

12:14:12  19   A.   I DON'T JUST CALL FEG, I CALLED MANY OTHER COMPANIES TOO.

12:14:16  20   Q.   WHAT OTHER COMPANIES DID YOU CALL?

12:14:18  21   A.   I'VE CALLED A COMPANY ERS, I CALLED SYNCIS, I TALKED TO

12:14:30  22   SYNCIS, I TALKED TO FREEDOM EQUITY GROUP, I TALKED TO -- LET ME

12:14:35  23   SEE -- OR I JUST DID THE RESEARCH ON WORLD FINANCIAL GROUP'S

12:14:39  24   COMP PLAN, AND ALSO PFA, WHICH IS PREMIERE FINANCIAL.  THEY DO

12:14:44  25   THE SAME THING THAT WE DO.

12:14:47  1    Q.   OKAY.  WHAT WAS THE PURPOSE OF CALLING ALL THOSE GROUPS?

12:14:50  2    A.   JUST TO SEE WHAT OUR OPTION WAS, TO SEE THE DIFFERENCE IN

12:14:56  3    THEIR PAY SYSTEM TO SEE THE STRUCTURE, THE CULTURE, WHO THE

12:14:59  4    OWNERSHIP WAS.

12:15:00  5    Q.   OKAY.  AND WHEN YOU DID CONTACT FEG, DO YOU RECALL WHO YOU

12:15:05  6    TALKED TO?

12:15:06  7    A.   YES.

12:15:06  8    Q.   WHO WAS IT?

12:15:08  9    A.   WELL, I CALLED, I LOOKED AT THEIR WEBSITE AND I SAW RON

12:15:16  10   BLOOMINGKEMPER ON THERE AND I SAW RON PETRINOVICH AND I SAW

12:15:20  11   WILLIAM ST. CLAIR, I SAW THREE GUYS ON THERE.

12:15:23  12        AND AT THE TIME, I DIDN'T KNOW WHO WAS WHO AND WHO TO TALK

12:15:25  13   TO, SO I JUST CALLED RON BLOOMINGKEMPER FIRST.  BUT THEN HE

12:15:30  14   DIDN'T PICK UP, SO I JUST LEFT A MESSAGE, THIS IS MAI, I'M

12:15:33  15   INTERESTED IN KNOWING MORE ABOUT YOUR COMPANY, CAN YOU PLEASE

12:15:36  16   GIVE ME A CALL BACK.  SO I JUST LEFT A MESSAGE.

12:15:38  17        HE DIDN'T CALL, SO AFTER THAT --

12:15:42  18   Q.   DID SOMEBODY ELSE CALL YOU BACK?

12:15:44  19   A.   I CALLED TWO NUMBERS RIGHT AWAY.  AND THE NEXT NUMBER I

12:15:47  20   CALLED WAS RON PETRINOVICH, AND I LEFT HIM A MESSAGE.

12:15:50  21        THEN PROBABLY A FEW HOURS LATER I WAS AT THE GROCERY STORE

12:15:54  22   WHEN RON PETRINOVICH CALLED ME BACK.

12:15:57  23   Q.   OKAY.  AND WHAT WAS -- DID YOU HAVE A CONVERSATION WITH

12:16:00  24   MR. PETRINOVICH?

12:16:01  25   A.   YES.

DIRECT EXAMINATION OF MS. LEE BY MR. SISCO

12:20:32  1    COMPOSITION PLAN WAS.

12:20:36  2    Q.   AT THE TIME, YOU MEAN?

12:20:37  3    A.   YES.

12:20:38  4    Q.   OKAY.

12:20:43  5            THE COURT:  IS THIS A GOOD TIME TO TAKE A BREAK?

12:20:46  6            MR. SISCO:  THAT'S FINE WITH ME.

12:20:48  7            THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, WE WILL

12:20:51  8    TAKE OUR SECOND BREAK.

12:20:53  9        PLEASE REMEMBER MY ADMONITION NOT TO DISCUSS THE CASE WITH

12:20:56  10   ANYBODY OR LET ANYBODY DISCUSS IT WITH YOU, NOT TO DO ANY

12:21:01  11   RESEARCH ABOUT IT OR RECEIVE ANY RESEARCH OR INFORMATION ABOUT

12:21:03  12   IT, AND NOT TO FORM ANY OPINIONS ABOUT IT OR ANY PART OF IT

12:21:07  13   UNTIL IT'S ULTIMATELY AND FINALLY SUBMITTED TO YOU.

12:21:09  14       SEE YOU IN ABOUT TEN MINUTES.

12:21:11  15       (RECESS FROM 12:21 P.M. UNTIL 12:32 P.M.)

12:33:01  16           THE COURT:  COUNSEL ARE PRESENT, THE JURY IS PRESENT.

12:33:07  17   YOU MAY CONTINUE, MR. SISCO.

12:33:09  18           MR. SISCO:  THANK YOU, YOUR HONOR.

12:33:11  19   Q.   MS. LEE, DURING THIS TIME BETWEEN JANUARY OF 2014 AND MAY

12:33:24  20   OF 2014, TO YOUR KNOWLEDGE, HAD MR. MOUA MADE ANY DECISION ONE

12:33:33  21   WAY OR THE OTHER TO LEAVE FFS?

12:33:37  22   A.   NO.

12:33:39  23   Q.   WERE YOU STILL CONTACTING OTHER INSURANCE AGENCIES?

12:33:43  24   A.   YES.  AND I BELIEVE THEY CALLED ME TOO, YEAH.

12:33:48  25   Q.   THE OTHER INSURANCE AGENCIES DID?

DIRECT EXAMINATION OF MR. JONES BY MR. SISCO

09:40:17  1    A.   I GUESS HE WAS REPORTING IT TO US ABOUT A VIDEO THAT WAS

09:40:21  2    REPORTED TO HIM THAT FREEDOM EQUITY GROUP WAS USING SOME OF OUR

09:40:26  3    TRADEMARK AND COPYRIGHTED MATERIAL.

09:40:29  4    Q.   AND WHAT'S THE DATE ON THIS E-MAIL THAT HE SENT FROM

09:40:34  5    HIMSELF TO YOU AND MICHAEL HARDIN?

09:40:38  6    A.   MAY 23RD, 2013.

09:40:41  7    Q.   OKAY.

09:40:41  8         MR. DAVIDSON:  I HAVE NO FURTHER QUESTIONS.

09:40:45  9         MR. SISCO:  I HAVE NOTHING FURTHER, YOUR HONOR.

09:40:47  10        THE COURT:  ARE YOU FINISHED?

09:40:49  11        MR. SISCO:  I'M FINISHED.

09:40:50  12        THE COURT:  YOU CAN STEP DOWN, MR. GERLICHER.

09:40:59  13   WHO IS NEXT?

09:41:01  14        MR. SISCO:  I WILL CALL MICHAEL JONES, YOUR HONOR.

09:42:25  15        THE COURT:  MR. JONES, YOU ARE STILL UNDER OATH.

09:42:28  16        THE WITNESS:  YES, SIR.

09:42:44  17                    **DIRECT EXAMINATION**

09:42:45  18   BY MR. SISCO:

09:42:45  19   Q.   GOOD MORNING, MR. JONES.

09:42:46  20   A.   GOOD MORNING, SIR.

09:42:48  21   Q.   MR. JONES, WHAT IS YOUR OCCUPATION?

09:42:50  22   A.   I'M AN ACTUARY.

09:42:53  23   Q.   AND COULD YOU EXPLAIN TO THE JURY WHAT ACTUARY IS?

09:42:57  24   A.   YES.  WE ARE THE ONES THAT SIGN OFF ON SOLVENCY OF

09:43:06  25   INSURANCE COMPANIES.  WE ALSO DEVELOP INSURANCE PRODUCTS THAT

DIRECT EXAMINATION OF MR. JONES BY MR. SISCO          649

09:57:41  1    OF THE FILINGS IN THE CASE SO FAR.

09:57:43  2    Q.   OKAY.   YOU MENTIONED LIBRA STUDIES AND GUIDELINES, WOULD

09:57:54  3    YOU EXPLAIN TO THE JURY WHAT YOU ARE REFERRING TO WHEN YOU SAY

09:57:56  4    THAT?

09:57:57  5    A.   YES, SIR.

09:58:01  6         JUST LIKE ATTORNEYS DO RESEARCH ON CASES AND GO TO OTHER

09:58:04  7    PLACES FOR DATA, WHAT YOU HAVE FOR LIBRA AND THE SOCIETY OF

09:58:09  8    ACTUARIES, ARE ALL THE INSURANCE COMPANIES, OR MOST OF THEM,

09:58:13  9    SUPPLY EXPERIENCED DATA TO THESE ORGANIZATIONS.   AND THEY ALSO

09:58:19  10   INCORPORATE THE DATA FROM THE SOCIAL SECURITY ADMINISTRATION

09:58:27  11   BECAUSE THAT, ESSENTIALLY, SHOWS DEATH RECORDS.   IT ALSO HAS

09:58:30  12   INFORMATION FROM THE SEC THAT SHOWS HOW PEOPLE -- WHAT ARE

09:58:36  13   CAUSES OF DEATH.

09:58:39  14        SO WE DO A LOT OF ANALYSIS FROM DATA.   WE USE STATISTICS

09:58:43  15   PROBABLY MORE THAN ANY OTHER PROFESSION.

09:58:46  16   Q.   ALL RIGHT.

09:58:57  17        HAVE YOU, ON THE BASIS OF THE MATERIALS THAT YOU JUST

09:58:59  18   MENTIONED AND MR. COBB'S REPORT, FORMED AN OPINION AS TO

09:59:03  19   WHETHER FIRST FINANCIAL SECURITY WAS -- SUSTAINED DAMAGES AS A

09:59:09  20   RESULT OF ACTIONS OF FREEDOM EQUITY GROUP?

09:59:13  21   A.   YES, SIR.

09:59:18  22   Q.   AND WHAT IS THAT OPINION?

09:59:19  23   A.   THEY HAVE ABSOLUTELY NO DAMAGES.

09:59:27  24   Q.   AND WHAT DO YOU BASE THAT OPINION?

09:59:29  25   A.   I BASED IT ON THE ACTUARIAL STATISTICS.   I BASED IT ON THE

09:59:35   1    FACT THAT MR. GILLES, IN HIS MINNESOTA CASE, WALKED AWAY FROM

09:59:38   2    $10 MILLION OF DAMAGES THAT HE SUFFERED, WHICH IS GOING TO

09:59:45   3    FIRST FINANCIAL SECURITY, WHICH MORE THAN EXCEEDS THE LOSSES

09:59:49   4    THAT THEY INCUR BECAUSE OF THE DEPARTURE OF MR. GILLES AND HIS

09:59:54   5    AGENTS.

09:59:55   6         I THINK THOSE LOSSES ARE IN THE THREE, $4 MILLION RANGE,

10:00:00   7    WHEREAS MR. GILLES WALKED AWAY FROM 10 MILLION, ALMOST

10:00:04   8    $10 MILLION OF DAMAGES.  AGAINST MY ADVICE, BUT HE DID.

10:00:10   9    Q.   OKAY.  IN READING MR. COBB'S -- WE WILL WORK PRIMARILY

10:00:19   10   FROM THE UPDATED REPORT THAT MR. COBB ISSUED, DID YOU FIND

10:00:26   11   ANYTHING TO CRITICIZE IN THAT REPORT?

10:00:28   12   A.   YES, I THINK HE DID SOME GOOD JOB IN TERMS OF PROJECTING

10:00:33   13   WHAT THEY LOST FROM FUTURE NEW BUSINESS, BUT WHERE HE FALLS

10:00:40   14   SHORT AND SHOULD HAVE GOTTEN SOME HELP, BECAUSE IT'S OUTSIDE

10:00:44   15   HIS CORE COMPETENCY, IS ON THE SECTION OF RETAINED COMMISSIONS,

10:00:50   16   ESPECIALLY CLAIMING THAT YOU CANNOT PROJECT THOSE OUT, YOU HAVE

10:00:57   17   TO JUST TAKE WHAT THE ACTUAL IS.

10:01:01   18        IF THE INSURANCE COMPANY DOES, THEY WOULD GO BANKRUPT AND

10:01:08   19   TOTALLY OUT OF BUSINESS.

10:01:09   20   Q.   AND HOW DID YOU -- HOW WOULD YOU APPROACH IN ANALYZING --

10:01:18   21   LET'S FOCUS ON RESIDUALS FOR THE MOMENT.  HOW WOULD YOU

10:01:22   22   APPROACH AN ANALYSIS OF FUTURE RESIDUALS AS IT AFFECTS THIS

10:01:27   23   CASE?

10:01:27   24   A.   I'M GOING TO EXPLAIN THEM FOR AND YOU THE ATTORNEY AND THE

10:01:35   25   REST OF YOU.

DIRECT EXAMINATION OF MR. JONES BY MR. SISCO

10:01:38  1      SO THERE ARE THINGS, FOR EXAMPLE, THE INSURANCE INDUSTRY

10:01:42  2  HAS BEEN AROUND FOR HUNDREDS, PROBABLY 200 YEARS.  WE RETAIN --

10:01:48  3  WE HAVE MORE DATA THAN PROBABLY MOST PROFESSIONS.

10:01:55  4      SO WHAT WE TYPICALLY DO, IN LAYMAN'S TERM, YOU WOULD SAY

10:02:00  5  LOOK AT A MILLION POLICIES ISSUED IN THE YEAR 1970.  SO YOU

10:02:05  6  WOULD SAY, OF THOSE MILLION POLICIES ISSUED IN 1970, HOW MANY

10:02:11  7  OF THESE POLICIES WERE TERMINATING IN '71, '72, '73 ALL THE WAY

10:02:18  8  UP TO YEAR 2000 FOR A 30-YEAR PERIOD.  SO THAT'S THE TOTAL.  WE

10:02:26  9  KNOW THAT.

10:02:27  10     THEN YOU LOOK AT A MILLION POLICIES, I'M JUST USING

10:02:29  11  MILLION AS A ROUND NUMBER, ISSUED IN 1971.  YOU WOULD THEN SEE

10:02:35  12  HOW MANY OF THOSE POLICIES TERMINATE IN '72, '73, '74, ALL THE

10:02:39  13  WAY UP TO 2001.  YOU DO THIS FOR 10, 15 YEARS.

10:02:44  14     SO YOU HAVE VARIOUS 30-YEAR STUDY OF WHAT THE HISTORY IS.

10:02:52  15  AND JUST WHAT WE KNOW, WHAT WE KNOW IN THE INSURANCE INDUSTRY,

10:02:56  16  BECAUSE IT'S SUCH A LARGE VOLUME, IT'S VERY STATISTICALLY

10:03:02  17  CREDIBLE.  YOU HAVE ABOUT 600,000 OF THESE POLICIES THAT

10:03:06  18  DISAPPEAR OFF THE BOOKS, THEY TERMINATE, PEOPLE DIE, PEOPLE GET

10:03:10  19  DIVORCED AND DECIDE TO GET RID OF THE POLICY, CHILDREN GROW AND

10:03:16  20  NO LONGER NEED IT.  BUT YOU HAVE ABOUT 400,000 OF THOSE MILLION

10:03:21  21  POLICIES, ALMOST 40 PERCENT.

10:03:24  22     AND THOSE POLICIES, THOSE POLICY OWNER TENDS TO BE VERY

10:03:28  23  COMPLACENT, THEY DON'T TAKE ANY ACTION, THEY JUST STAY THERE.

10:03:37  24  AND EVEN SOME OF THESE CASES, THE BENEFICIARY FOR WHOM THEY

10:03:41  25  BOUGHT THESE POLICIES FOR HAVE DIED BEFORE THEM, AND IN A LOT

DIRECT EXAMINATION OF MR. JONES BY MR. SISCO

10:03:45  1    OF CASES, THESE POLICIES MATURE AND THERE'S NO ONE TO COLLECT

10:03:50  2    ANY OF THOSE PROCEEDS.

10:03:52  3         THE INSURANCE COMPANY HAS TENS OF BILLIONS OF DOLLARS

10:03:56  4    SITTING IN ESCROW UNCOLLECTED BECAUSE OF ALL OF THIS.  THIS

10:04:03  5    TIES IN WITH WHAT MS. MEG JONES SAID IN HER DECLARATION THAT

10:04:08  6    POLICIES PAY RENEWALS UP TO 40 TO 50 YEARS, IT'S A TRUE

10:04:12  7    STATEMENT.

10:04:15  8    Q.   OKAY.  LET ME GET ANOTHER QUESTION IN HERE.

10:04:19  9         MR. COBB TESTIFIED THAT IT'S TOO DIFFICULT AND TOO

10:04:22  10   SPECULATIVE TO PROJECT OUT RENEWALS OVER ANY LENGTH OF TIME AT

10:04:30  11   ALL, ACTUALLY, WAS HIS TESTIMONY?

10:04:32  12   A.   YES, I'M GETTING TO THAT.  IF YOU WILL ALLOW ME.

10:04:36  13            MR. DAVIDSON:  I WOULD JUST OBJECT THAT THAT

10:04:39  14   MISCHARACTERIZES THE TESTIMONY.

10:04:40  15            THE COURT:  HOLD ON.  I'M NOT SURE, I THINK IT MIGHT.

10:04:45  16   I WILL SUSTAIN THE OBJECTION, BUT MOVE FORWARD.

10:04:50  17            THE WITNESS:  OKAY.  SO I JUST DESCRIBED TO YOU HOW

10:04:53  18   WE LOOK BACK AT PREVIOUS 30 YEARS HISTORY AND SEE HOW THE

10:04:58  19   BUSINESS RUN OFF THE BOOKS.

10:04:59  20        SO WHAT YOU DO NOW TO GO FORWARD, YOU ASSUME THAT WHAT

10:05:02  21   HAPPENED FORWARD IS GOING TO REPEAT ITSELF IN THE FUTURE.  SO

10:05:09  22   YOU USE THOSE SAME RUNOFF PROJECTION TO PROJECT FOR THE FUTURE

10:05:15  23   30-YEAR PERIOD.

10:05:16  24        AND THAT'S HOW, IN LAYMAN'S TERM, YOU COME UP WITH THE

10:05:20  25   PROJECTION FOR 30 YEARS.

10:13:56   1                THE WITNESS:  THAT'S CORRECT.

10:13:58   2                THE COURT:  AND --

10:13:59   3                THE WITNESS:  THAT'S CORRECT.

10:14:01   4                THE COURT:  SEE, THAT'S SPECULATION.  AND IT GETS

10:14:06   5       INTO INSURANCE COMPANY PRACTICES.  HE'S SAYING WELL, IT

10:14:09   6       COULDN'T POSSIBLY BE THAT NUMBER BECAUSE IF IT WERE THEN

10:14:12   7       SOMEBODY ELSE WOULD HAVE HAPPENED.

10:14:14   8            THAT'S NOT POKING AT MR. COBB'S DAMAGE CALCULATIONS,

10:14:19   9       THAT'S POKING AT THE DATA THAT HE GOT.

10:14:22  10            NOW IF HE HAD OBTAINED DATA OR IF YOU HAD OBTAINED DATA

10:14:26  11       FROM THE COMPANY AND YOU COULD POINT WHERE THERE WERE BAD

10:14:30  12       NUMBERS, THAT WOULD BE DIFFERENT.

10:14:31  13            SO I'M SUSTAINING THE OBJECTION TO THAT TESTIMONY AND

10:14:33  14       STRIKING IT.

10:14:34  15            PROCEED.

10:14:41  16       BY MR. SISCO:

10:14:41  17       Q.   WHAT WOULD YOU EXPECT A REASONABLE AMOUNT OF RENEWABLES BE

10:14:45  18       FOR THAT PERIOD?

10:14:46  19                MR. DAVIDSON:  LACK OF FOUNDATION AND VAGUE AND

10:14:49  20       AMBIGUOUS.

10:14:49  21                THE COURT:  OVERRULED.

10:14:51  22                THE WITNESS:  OKAY.  IF THE FIRST 17 MONTHS, THE

10:14:54  23       RENEWALS GENERATED IS $2.2 MILLION, BASED ON THOSE 30 YEARS

10:15:03  24       STUDY I JUST OUTLINED FOR YOU, WHICH WE USE FOR OUR FUTURE

10:15:07  25       PROTECTION, THESE BUSINESSES WERE OFF 4 TO 5 PERCENT PER YEAR.

10:15:11   1          SO A REASONABLE NUMBER WOULD HAVE BEEN CLOSE TO $2 MILLION

10:15:14   2   FOR THAT SECOND 17-MONTH PERIOD.  SO THAT FIGURE SHOULD HAVE

10:15:18   3   BEEN CLOSE TO 4 MILLION.

10:15:24   4          AND WHAT IT DOES SHOW IS THAT WITHIN 3 TO 5 YEARS, THE

10:15:27   5   DAMAGES THAT FFS IS CLAIMING WOULD BE TOTALLY WIPED OUT JUST BY

10:15:32   6   THE RENEWALS THAT THEY HAVE RETAINED.  SO THEY HAVE NO DAMAGES.

10:15:38   7          AND GILLES WALKED AWAY FROM $10 MILLION IN THE MINNESOTA

10:15:42   8   CASE.

10:15:48   9   Q.   OKAY.  MR. COBB ALSO TESTIFIED THAT IT WOULD BE VERY, VERY

10:15:52   10   DIFFICULT TO DETERMINE WHAT THE RESIDUALS WOULD BE BECAUSE

10:16:01   11   THERE HAD BEEN NO STUDIES ON THE HMONG COMMUNITY TO BASE A

10:16:08   12   PROJECTION ON.

10:16:10   13          DO YOU HAVE AN OPINION AS TO THAT STATEMENT?

10:16:20   14   A.   YES, SIR.

10:16:20   15   Q.   WHAT IS THAT OPINION?

10:16:22   16   A.   SIR, THIS IS A WONDERFUL COUNTRY, BUT 50, 60 YEARS AGO,

10:16:27   17   THE INSURANCE GET AWAY FROM DOING STUDIES BASED ON RACE AND

10:16:31   18   ETHNICITY.

10:16:34   19          60 YEARS AGO, SIR, YOU COULD HAVE CALLED THE INSURANCE

10:16:37   20   STUDY AND TELL THEM THAT YOU ARE A WHITE MAN AND YOUR RATE

10:16:42   21   WOULD HAVE BEEN VERY, VERY ATTRACTIVE.  AND YOU COULD HAVE TOLD

10:16:46   22   THEM THAT YOU HAVE A GOOD LOOKING BLACK FRIEND, BUT HIS RATES

10:16:52   23   WOULD, EVEN THOUGH HE MIGHT BE MORE HEALTHY THAN YOU, WOULD BE

10:16:58   24   SIGNIFICANTLY HIGHER.

10:16:59   25          AS A RESULT, THOSE PRACTICES HAS BEEN PROHIBITED IN THE

CROSS-EXAMINATION OF MR. PETRINOVICH BY MR. DAVIDSON

```
11:28:12  1              THE COURT:  HE KNEW IT WAS EVENTUALLY PUT IN PLACE.
11:28:16  2     I AGREE WITH YOU.  PERIOD.
11:28:21  3              MR. SISCO:  THANK YOU.
11:28:22  4          AND I HAVE NO FURTHER QUESTIONS.
11:28:25  5              THE COURT:  CROSS?
11:28:27  6              MR. DAVIDSON:  YES, PLEASE.
11:28:28  7                       CROSS-EXAMINATION
11:28:29  8     BY MR. DAVIDSON:
11:28:33  9     Q.   WHEN WAS THE DECISION MADE TO CHARGE THE FEE?
11:28:38  10    A.   I THINK I JUST SAID I DON'T RECALL ALL THE DATES, IT'S
11:28:42  11    SOMETHING THAT WE TALKED ABOUT FOR SEVERAL YEARS THAT I WAS A
11:28:46  12    PROPONENT OF.
11:28:48  13    Q.   SO YOU DON'T REMEMBER, EVEN THOUGH YOU HAVE BEEN FIGHTING
11:28:51  14    FOR IT FOR SEVERAL YEARS, WHETHER IT WAS PUT INTO PLACE?
11:28:54  15    A.   NO, SIR.
11:28:55  16    Q.   DID YOU TESTIFY AT DEPOSITION THAT YOU DELETE EVERYTHING
11:28:58  17    AFTER YOU READ IT?
11:29:00  18    A.   NO, I DON'T BELIEVE I DID, BUT I DON'T.
11:29:03  19    Q.   SO YOUR TESTIMONY APRIL 15TH WAS:
11:29:11  20              "QUESTION:  WHEN YOU GET AN E-MAIL, DO YOU DO
11:29:14  21    ANYTHING TO THE E-MAIL, DO YOU FORWARD IT TO SOMEBODY, DO YOU
11:29:17  22    PUT IT IN ELECTRONIC FOLDER ON YOUR COMPUTER, DO YOU JUST LEAVE
11:29:20  23    IT IN YOUR IN ONCE AFTER YOU ARE DONE READING IT?
11:29:25  24              "ANSWER:  I DELETE EVERYTHING AFTER I'M DONE READING
11:29:28  25    IT."
```

CROSS-EXAMINATION OF MR. PETRINOVICH BY MR. DAVIDSON

11:35:53  1    A.   I THINK I SAW IT DURING MY DEPOSITION.

11:35:56  2    Q.   DID YOU SEE IT BEFORE YOUR DEPOSITION?

11:35:59  3    A.   I COULD HAVE.  I GET THOUSANDS OF E-MAILS, SO I DON'T

11:36:03  4    RECALL, BUT I COULD HAVE.

11:36:06  5    Q.   AND ISN'T IT TRUE THAT DURING YOUR DEPOSITION, YOU

11:36:10  6    TESTIFIED THAT YOU TURNED EVERYTHING OVER TO MIKE JONES?

11:36:16  7    A.   WHAT I DID --

11:36:18  8    Q.   WHAT DID YOU TESTIFY, DID YOU TESTIFY THAT YOU TURNED

11:36:20  9    EVERYTHING OVER TO MIKE JONES?

11:36:22  10   A.   WHAT DO YOU MEAN WHEN YOU SAY "EVERYTHING?"

11:36:24  11   Q.   WELL, I CAN ACTUALLY JUST QUOTE THE TESTIMONY, IF YOU

11:36:29  12   PREFER.

11:36:48  13         "QUESTION:  WELL, DID YOU EVER COMMUNICATE WITH

11:36:57  14   ANYBODY ON THIS ISSUE, NO E-MAILS WHATSOEVER?

11:37:03  15         "ANSWER:  I TURNED EVERYTHING OVER TO MIKE JONES AND

11:37:05  16   HE DOES THAT."

11:37:08  17        I JUST REALIZE THAT'S NOT FAIR BECAUSE I HAVEN'T GIVEN YOU

11:37:11  18   THE CONTEXT.

11:37:12  19         "QUESTION:  DO YOU SEE THE CENTER OF THE PAGE WHERE

11:37:14  20   IT SAYS PRODUCTION?"  THIS IS ASKING ABOUT REQUESTS FOR

11:37:19  21   PRODUCTION.

11:37:19  22         "ANSWER:  YES, SIR.

11:37:20  23         "QUESTION:  AND IT REQUIRES YOU TO BRING DOCUMENTS

11:37:22  24   WITH YOU TODAY; DO YOU SEE THAT?

11:37:25  25         "ANSWER:  YES, SIR.

11:38:34  1      RETRIEVED; IS THAT CORRECT?

11:38:36  2      A.   I TOOK MY COMPUTER, I JUST SAID A LITTLE WHILE EARLIER, I

11:38:41  3      TOOK IT TO A COMPUTER STORE.  I ACTUALLY HAD MY ASSISTANT

11:38:45  4      MICHAEL TAKE IT TO A COMPUTER STORE AND THEY SAID IT WAS TOAST.

11:38:49  5      THEY SAID IT WAS GONE.

11:38:50  6      Q.   YOU ACTUALLY TESTIFIED THAT YOU HAD DROPPED IT OFF EARLIER

11:38:53  7      THAT DAY FOR RECYCLING; ISN'T THAT RIGHT?

11:38:56  8      A.   NO.  NOT THAT I RECALL.

11:38:59  9      Q.   YOU ALSO WERE ASKED WHETHER YOU HAD TAKEN ANY EFFORTS TO

11:39:03  10     HAVE THE DATA RETRIEVED, CORRECT?

11:39:08  11     A.   I TOOK IT TO THE COMPUTER STORE TO TRY TO GET IT FIXED AND

11:39:11  12     THEY COULDN'T.  THAT'S MY ANSWER.

11:39:12  13     Q.   THAT WAS THE GEEK SQUAD, RIGHT?

11:39:15  14     A.   I DON'T KNOW WHERE MICHAEL TOOK IT.

11:39:15  15     Q.   SO THE QUESTION IS:

11:39:22  16          "QUESTION:  OKAY.  WHY DIDN'T YOU BRING THOSE TODAY."

11:39:28  17          THESE ARE THE E-MAILS WE WERE JUST TALKING ABOUT TODAY.

11:39:32  18          "ANSWER:  MY COMPUTER, LAST FLIGHT I TOOK CRASHED, SO

11:39:56  19     I TOOK IT TO GEEK SQUAD AND THEY SAID THEY COULDN'T FIX IT.  SO

11:40:00  20     THEY DO WHATEVER THEY DO WITH IT.

11:40:02  21          "QUESTION:  WELL, WHAT DID THEY DO WITH IT?  DID THEY

11:40:06  22     GIVE IT BACK TO YOU, FOR EXAMPLE, OR DID THEY KEEP IT?

11:40:09  23          "ANSWER:  I SIGNED SOMETHING WHERE THEY COULD

11:40:12  24     PROPERLY TAKE CARE OF IT, WHATEVER THEY DO."

11:40:23  25          AND IT GOES ON.

DIRECT EXAMINATION OF MR. ST. CLAIR BY MR. SISCO

| | | |
|---|---|---|
| 11:40:24 | 1 | "QUESTION:  DO YOU HAVE THE DOCUMENT YOU SIGNED? |
| 11:40:26 | 2 | "ANSWER:  THE WHAT? |
| 11:40:28 | 3 | "QUESTION:  THE DOCUMENT YOU SIGNED GIVING THEM |
| 11:40:31 | 4 | AUTHORIZATION TO RECYCLE? |
| 11:40:33 | 5 | "ANSWER:  NO, BUT I COULD GET IT FOR YOU TODAY, YEAH. |
| 11:40:39 | 6 | "QUESTION:  OKAY.  WHEN YOU WENT TO GET IT, WHEN DID |
| 11:40:43 | 7 | THAT HAPPEN, ROUGHLY? |
| 11:40:45 | 8 | "ANSWER:  THIS MORNING, THEY RECYCLED IT." |
| 11:40:55 | 9 | MR. DAVIDSON:  NO FURTHER QUESTIONS. |
| 11:40:56 | 10 | THE COURT:  ANY REDIRECT? |
| 11:40:57 | 11 | MR. SISCO:  NO, YOUR HONOR. |
| 11:40:58 | 12 | THE COURT:  YOU CAN STEP DOWN, MR. PETRINOVICH. |
| 11:41:04 | 13 | CALL YOUR NEXT WITNESS. |
| 11:41:07 | 14 | MR. SISCO:  IT WILL BE WILLIAM ST. CLAIR. |
| 11:41:37 | 15 | **(DEFENDANT'S WITNESS, WILLIAM ST. CLAIR, WAS SWORN.)** |
| 11:41:37 | 16 | THE WITNESS:  I DO. |
| 11:41:41 | 17 | THE CLERK:  STATE AND SPELL YOUR NAME FOR THE RECORD. |
| 11:41:46 | 18 | THE WITNESS:  WILLIAM ST. CLAIR.  W-I-L-L-I-A-M, |
| 11:41:53 | 19 | S-T-C-L-A-I-R. |
| 11:42:08 | 20 | **DIRECT EXAMINATION** |
| 11:42:08 | 21 | BY MR. SISCO: |
| 11:42:09 | 22 | Q.   MR. ST. CLAIR, WHAT IS YOUR OCCUPATION? |
| 11:42:10 | 23 | A.   PRESIDENT OF FREEDOM EQUITY GROUP. |
| 11:42:11 | 24 | Q.   OKAY.  AND HOW LONG HAVE YOU WORKED FOR FREEDOM EQUITY |
| 11:42:16 | 25 | GROUP? |

**CLOSING ARGUMENTS BY MR. DAVIDSON**

08:42:56  1

08:42:58  2      GOOD MORNING.

08:43:01  3          THE PRIMARY DIFFERENCE BETWEEN MY CLIENT'S CASE AND THE

08:43:06  4  DEFENDANT'S CASE IS THAT OUR CASE HAS ACTUAL INDEPENDENTLY

08:43:14  5  VERIFIABLE EVIDENCE, WHEREAS THE DEFENDANT'S HAS STORIES.

08:43:21  6          AND I WILL GET INTO MORE DETAIL IN A MOMENT, BUT I WANTED

08:43:25  7  TO HIGHLIGHT THREE KEY PIECES OF EVIDENCE THAT, IF YOU TAKE

08:43:32  8  NOTHING ELSE AWAY FROM THIS CLOSING, THAT YOU REMEMBER.

08:43:37  9          THE FIRST IS THAT MIKE JONES DRAFTED THE RESIGNATION

08:43:44  10  LETTER FOR MR. MOUA ON MAY 9, 2014, THE DAY BEFORE MR. MOUA AND

08:43:52  11  HIS TEAM LEFT FIRST FINANCIAL SECURITY.

08:43:55  12          NOW YOU MAY REMEMBER THAT HE DENIED HAVING DRAFTED IT.

08:44:01  13  AND THEN I SHOWED HIM THE ELECTRONIC VERSION OF THAT E-MAIL

08:44:06  14  WHICH SHOWED HE HAD DRAFTED IT.  YOU CAN CONSIDER THE FACT THAT

08:44:10  15  HE HAD DENIED IT AND THEN THAT WAS UNDERMINED BY THE ACTUAL

08:44:13  16  DATA BEHIND THE E-MAIL.

08:44:21  17          THE SECOND IS THAT WWW.FEGBUILDERS.COM, WAS REGISTERED

08:44:26  18  ON MAY 2ND, 2014, 8 DAYS BEFORE MR. MOUA'S TEAM LEFT FIRST

08:44:32  19  FINANCIAL SECURITY.  AND EIGHT DAYS BEFORE MR. MOUA AND MS. LEE

08:44:38  20  TESTIFIED THAT THEY KNEW THAT MR. MOUA WAS LEAVING.

08:44:44  21          AND AS YOU HEARD, FEG BUILDERS IS THE GROUP THAT

08:44:48  22  MR. MOUA AND HIS TEAM JOINED, AND FEG BUILDERS.COM IS THE

08:44:56  23  WEBSITE TO WHICH MR. MOUA TESTIFIED HE LOGGED IN, AND THAT IS

08:45:03  24  THE DOMAIN NAME FROM WHICH MR. MOUA'S WELCOME E-MAIL, WHICH WE

08:45:09  25  WILL LOOK AT IN A MINUTE, WAS SENT.

08:45:12  1        AND THAT WAS ALL IN THE TIME WHEN MR. MOUA AND HIS TEAM

08:45:20  2   WERE ON THE DREAM TEST NATION CRUISE WHERE YOU HEARD FROM

08:45:26  3   MR. VONGKHAMSENE THAT MR. MOUA HELD A MEETING WHEN HE TALKED OF

08:45:31  4   DOING SOMETHING REVOLUTIONARY.

08:45:37  5        AND DURING THE MEETING WHERE MS. KHAMMANIVONG STATED HE

08:45:41  6   STARTED AND ENDED HIS MEETINGS WITH THE MESSAGE THAT TOGETHER

08:45:47  7   LAOTIANS WILL LIVE, DIVIDED LAOTIANS WILL DIE.  AND BEHIND THE

08:45:52  8   SCENES, FEG WAS REGISTERING A DOMAIN NAME FOR HIM TO BRING HIS

08:45:56  9   TEAM.

08:45:57  10       AND THE THIRD PIECE OF TESTIMONY IS THAT MR. MOUA IS

08:46:03  11  LINKED DIRECTLY TO FEG AS OPPOSED TO HAVING A RECRUITER.  YOU

08:46:11  12  MIGHT REMEMBER THE TESTIMONY WHERE I ASKED MR. MOUA, SO WHOSE

08:46:15  13  RECRUITER CODE DID YOU PUT IN WHEN YOU JOINED FEG?

08:46:19  14       AS YOU MIGHT RECALL, THAT'S REQUIRED ON THE WEBSITE IN

08:46:22  15  ORDER TO SIGN SOMEONE UP.  SO YOU HAVE TO PUT IN WHO RECRUITED

08:46:26  16  YOU.  AND HIS ANSWER WAS, OH, I DIDN'T HAVE AN UP-LINE, I WAS

08:46:30  17  LINKED DIRECTLY TO FEG.

08:46:38  18       AND AS MR. PETRINOVICH TESTIFIED, THAT SORT OF

08:46:40  19  ARRANGEMENT HAS TO BE MADE IN ADVANCE.  IT'S THE KIND OF THING

08:46:43  20  WHERE IF THE COMPANY IS GOING TO BE LINKED DIRECTLY TO SOMEONE

08:46:47  21  WHO IS COMING TO THEM, THEY NEED TO DISCUSS THAT IN ADVANCE IN

08:46:50  22  ORDER TO HAVE A DIRECT LINK BETWEEN THE PERSON COMING INTO THE

08:46:54  23  COMPANY WITHOUT AN ONLINE AGENT.

08:47:00  24       SO THOSE ARE THREE PIECES OF INDEPENDENTLY VERIFIABLE

08:47:03  25  EVIDENCE, AS OPPOSED TO STORIES THAT DEFENDANTS HAVE TOLD ABOUT

08:53:06   1      MR. MOUA AND MS. LEE SIGNED, MS. JONES TESTIFIED THAT YOU CAN

08:53:14   2      TELL FROM THE STAMP ON EACH OF THEM WHO SIGNED THEM AND WHEN.

08:53:21   3          AND YOU MIGHT REMEMBER THAT SHE READ AT LENGTH, SEVERAL OF

08:53:24   4      THE PROVISIONS OF THOSE CONTRACTS THAT ARE PERTINENT TO THIS

08:53:27   5      CASE, INCLUDING, AND THESE ARE ALL FOUND IN SECTION 3 --

08:53:37   6      SECTION C, IN PARTS THREE AND SOME OTHER SECTIONS THAT I CAN

08:53:42   7      SHOW YOU, CONCERNING NON-SOLICITATION AND NON REPLACEMENT OF

08:53:50   8      CUSTOMERS.

08:53:53   9          SO FOR THE FIRST ITEM ON THIS VERDICT FORM, YOU SHOULD

08:54:00   10      CHECK YES.

08:54:04   11          SO THEN THE QUESTION BECOMES, DID FREEDOM EQUITY GROUP

08:54:08   12      KNOW THE CONTRACT?  AND WE HAVE EVIDENCE THAT IN FACT, THEY

08:54:14   13      DID.

08:54:16   14          FOR ONE THING, MR. JONES TESTIFIED THAT HE PROVIDED THE

08:54:20   15      NON-SOLICITATION FORM.  THERE WOULD BE NO NEED FOR A

08:54:25   16      NON-SOLICITATION FORM IF IT WEREN'T TRUE THAT FEG KNEW THAT

08:54:32   17      THERE WAS A CONTRACT INVOLVED.

08:54:46   18          AND FURTHERMORE, HERE'S A SUMMARY TO ASSIST WITH ALL

08:54:50   19      THESE POINTS, FURTHERMORE MR. JONES TESTIFIED THAT HE ACTUALLY

08:54:55   20      CUSTOMIZED THE FORM.

08:54:57   21          IF YOU RECALL, HIS TESTIMONY WAS THAT HE HAD USED THE FORM

08:54:59   22      BEFORE TO RECRUIT TEAM MEMBERS FROM OTHER COMPANIES.  HE SAID

08:55:05   23      HE HAD USED THE FORM ON ABOUT TEN OCCASIONS FOR PURPOSES OF

08:55:13   24      RECRUITING IN THE PAST.  GRANTED, HE SAID IT WAS NOT FOR FEG,

08:55:17   25      BUT HE HAD USED THIS FORM BEFORE.  AND AT FIRST HE TESTIFIED

08:55:20  1      THAT HE DIDN'T CUSTOMIZE THE FORM OR HADN'T RECALLED HAVING

08:55:30  2      DONE SO.

08:55:31  3           BUT I READ HIS TESTIMONY FROM HIS DEPOSITION, WHICH WAS

08:55:35  4      SEVERAL MONTHS AFTER THE CASE WAS FILED IN MINNESOTA, AND IN

08:55:37  5      FACT, HE DID TESTIFY THAT HE ACTUALLY CUSTOMIZED THE FORM.

08:55:45  6           IF YOU REMEMBER, IT SAID HE OR SHE HAD LEFT THEIR FORMER

08:55:52  7      FIRM OR HE OR SHE WAS CONTACTED ABOUT WHAT HE OR SHE WAS DOING

08:55:56  8      NOW AT HIS OR HER NEW FIRM, BUT THEN HE CUSTOMIZED IT JUST TO

08:56:01  9      SAY HE, MEANING MR. MOUA.

08:56:12 10           MR. GERLICHER TESTIFIED THAT NON-SOLICITATION CONTRACTS

08:56:19 11      ARE STANDARD IN THE INDUSTRY, AND HE EXPLAINED WHY.  IF YOU

08:56:23 12      CREATE A TEAM OF PEOPLE AND YOU TRAIN THEM AND YOU INVEST

08:56:26 13      RESOURCES, YOU'VE ESSENTIALLY CREATED A TEAM THAT A COMPETITOR

08:56:31 14      CAN SIMPLY TAKE, A READY MADE SALES TEAM, AND UNFAIRLY COMPETE

08:56:41 15      WITH THOSE COMPANIES.

08:56:44 16           AND THERE WAS NO TESTIMONY TO THE CONTRARY THAT DISPUTED

08:56:47 17      MR. GERLICHER'S ACCOUNT OF WHAT SORT OF THE INDUSTRY PRACTICE

08:56:50 18      IS AMONG MEMBERS OF THE INSURANCE MARKETING INDUSTRY.

08:56:58 19           NOW THE RESIGNATION LETTER THAT JONES DRAFTED ACTUALLY

08:57:03 20      REFERS TO THE CONTRACT.  AND THIS IS THE LETTER THAT WAS

08:57:09 21      DRAFTED MAY 9TH.  WHAT I'M GOING TO SHOW YOU, EXHIBIT 5 IN THE

08:57:16 22      BINDER, IS NOT NECESSARILY FROM MAY 9TH, BUT IT SAYS, I CAN

08:57:27 23      OBJECT AND WILL NOT DISCUSS WHAT I'M DOING NEXT WITH YOU AS I

08:57:31 24      DO WANT TO VIOLATE CONTRACT I HAVE WITH FFS.  NEITHER DO I WANT

08:57:37 25      THE APPEARANCE OF DOING SO IN ANY WAY THAT COULD LEAD TO SUCH

| | |
|---|---|
| 09:01:58 1 | SO THIS IS WHERE THINGS GET A LITTLE MORE DETAILED.  AS |
| 09:02:11 2 | YOU HEARD, FEG IN JANUARY OF 2014, BY THAT POINT THEY KNEW THAT |
| 09:02:21 3 | HE HAD A LARGE TEAM.  AND THERE WAS NO DISPUTE ABOUT THAT. |
| 09:02:27 4 | MR. JONES TESTIFIED THAT THAT WAS THE CASE.  IN FACT, THAT'S |
| 09:02:31 5 | THE REASON HE GAVE THE NON-SOLICITATION FORM. |
| 09:02:41 6 | FEG CREATED A NEW STRUCTURE FOR HIM AND HIS TEAM, FEG |
| 09:02:45 7 | BUILDERS.  AND AS YOU HEARD, THAT WAS ESTABLISHED AT LEAST |
| 09:02:52 8 | EIGHT DAYS BEFORE MR. MOUA LEFT.  THEY WAIVED THE ENROLLMENT |
| 09:03:02 9 | FEE, AS YOU HEARD. |
| 09:03:04 10 | NOW THERE WAS TESTIMONY ABOUT WHETHER THERE WAS A FEE IN |
| 09:03:08 11 | PLACE AT THE TIME, BUT WHEN PRESSED, MR. PETRINOVICH, DESPITE |
| 09:03:16 12 | THE FACT THAT HE HAD BEEN WORKING FOR YEARS TO TRY TO GET THE |
| 09:03:19 13 | FEE, COULD NOT IDENTIFY WHETHER THAT FEE WAS IMPLEMENTED. |
| 09:03:24 14 | AND THAT, COMBINED WITH THE FACT THAT MS. KHAMMANIVONG |
| 09:03:30 15 | AND MR. VONGKHAMSENE TESTIFIED THAT THEY WERE TOLD THAT THE FEE |
| 09:03:40 16 | WOULD BE WAIVED, YOU SHOULD INFER THAT THE REASON IT WAS WAIVED |
| 09:03:43 17 | OR THE REASON IT DIDN'T EXIST YET, WAS IN ORDER TO ENCOURAGE |
| 09:03:47 18 | PEOPLE FROM MOUA'S TEAM, TO ENROLL AT FEG, OTHERWISE THEY WOULD |
| 09:03:56 19 | HAVE TO PAY $125, AND THEY MIGHT START ASKING QUESTIONS WHY |
| 09:04:00 20 | THEY WOULD HAVE TO PAY AGAIN WHEN THEY'VE BEEN AT FFS AND |
| 09:04:04 21 | HAVEN'T HAD TO PAY A FEE SINCE THEY ENROLLED. |
| 09:04:08 22 | FEG, THROUGH MR. JONES, SUPPLIED THE NON-SOLICITATION |
| 09:04:13 23 | DOCUMENT, AND DRAFTED A RESIGNATION LETTER.  MR. JONES ASSISTED |
| 09:04:18 24 | IN COORDINATING THE MINNESOTA LAWSUIT, IN WHICH THERE HAD BEEN |
| 09:04:23 25 | AN INJUNCTION.  YOU HEARD MR. MOUA TESTIFY ABOUT THAT. |

09:04:26  1        MR. MOUA HAD BEEN ENJOINED OR PREVENTED FROM, BY THE

09:04:31  2   COURT, BY AN ORDER, FROM RECRUITING MEMBERS OF FFS'S SALES

09:04:40  3   FORCE.  WELL, WHY MIGHT THIS MATTER TO FEG?  IT MEANS THAT

09:04:44  4   THERE ARE FEWER PEOPLE WHO COULD BE SELLING UNDER MR. MOUA.

09:04:50  5        AND WHY MIGHT THAT MATTER TO MR. JONES?  WELL, BECAUSE

09:04:53  6   FEG SELLS MR. JONES'S PRODUCT.  AND AS HE TESTIFIED, HE MAKES

09:04:57  7   MONEY FROM THE SALE OF HIS PRODUCT AT FEG.

09:05:03  8        FEG FAILED TO PRESERVE ITS TEXT MESSAGES, AND AS YOU WILL

09:05:08  9   HEAR, YOU MAY, BUT NEED NOT INFER THAT THOSE DELETED TEXT

09:05:14  10  MESSAGES CONTAINED INFORMATION THAT WOULD HAVE HELPED FIRST

09:05:19  11  FINANCIAL PROVE THAT FREEDOM EQUITY GROUP INTENTIONALLY

09:05:21  12  ENCOURAGED MR. MOUA, MS. LEE, AND THEIR DOWN-LINE TEAM TO LEAVE

09:05:27  13  FIRST FINANCIAL AND JOIN FEG.

09:05:29  14       NOW YOU WILL HEAR THAT THAT'S ACTUALLY AN INSTRUCTION YOU

09:05:33  15  WILL RECEIVE.  YOU MAY MAKE THAT INFERENCE.  AND I WISH I HAD

09:05:38  16  MORE TO SHOW YOU IN THAT RESPECT, BUT I CAN'T BECAUSE THE TEXT

09:05:42  17  MESSAGES WERE DELETED.

09:05:45  18       THERE'S UNDISPUTED TESTIMONY FROM MR. GERLICHER AND

09:05:49  19  MS. JONES THAT A MASS DEPARTURE SUCH AS WHAT OCCURRED HERE,

09:05:55  20  FORCES A CHOICE FOR AGENTS.  AND YOU HEARD THIS FIRST HAND FROM

09:06:01  21  MS. KHAMMANIVONG AND MR. VONGKHAMSENE, WHERE THEY HAD TO CHOOSE

09:06:05  22  BETWEEN -- I MEAN, YOU HEARD WHAT BEA WENT THROUGH WHERE SHE

09:06:12  23  WAS SITTING AT A KITCHEN TABLE FOR 25, 30 MINUTES FIGURING OUT

09:06:17  24  WHETHER TO SIGN THE NON-SOLICITATION AGREEMENT.  AND HER CHOICE

09:06:20  25  WAS, ABIDE BY THE CONTRACT, WHERE SHE AGREED THAT SHE WOULDN'T

09:08:27  1    OR SO, 45 PEOPLE HAD RESIGNED FROM GILLES MOUA'S TOP TIER.

09:08:36  2         BUT THOSE HAD -- THEY ALL HAD COME HIERARCHICALLY.  AND

09:08:41  3    THAT'S CONSISTENT WITH BEA'S TESTIMONY THAT OVER THE COURSE OF

09:08:46  4    THE DAY, AND SHE WAS THERE THE WHOLE DAY, AS YOU MIGHT

09:08:48  5    REMEMBER, SHE GOT THERE AT AROUND 9:55 A.M. AND SHE LEFT AT

09:08:58  6    6:00 P.M. SO SHE WAS ABLE TO OBSERVE THIS.  THAT THE WAVES OF

09:09:01  7    PEOPLE ARRIVING AT MR. MOUA'S HOUSE AND MS. LEE'S HOUSE, THAT

09:09:05  8    THEY WERE IN ORDER OF ROUGHLY THE HIERARCHY.

09:09:11  9         AS YOU MAY REMEMBER, EXHIBIT 20, MS. VORASANE TEXTED

09:09:20  10   MR. VONGKHAMSENE.

09:09:31  11        IT'S A TWO-PAGE TEXT, THIS WILL BE EXHIBIT 20 IN YOUR

09:09:35  12   BINDER.  APPARENTLY THE BEST I CAN DO WITH THE ZOOM.  SHE SAID

09:09:42  13   DON'T GO TO ANDRE'S OFFICE, AND THEN ASKS, CAN YOU COME TO

09:09:52  14   GILLES'S HOME QUIETLY.

09:09:55  15        NOW, AT FIRST SHE HAD TESTIFIED THAT SHE DIDN'T TEXT OR

09:09:59  16   CALL ANYONE, AND THEN WHEN MR. SISCO QUESTIONED HER ON

09:10:07  17   REDIRECT, SHE SAID, WELL, WHAT I MEANT BY "QUIETLY" WAS DON'T

09:10:14  18   BRING THOSE THREE RECRUITS.

09:10:23  19        MR. VONGKHAMSENE TESTIFIED, HOWEVER, THAT HE HAD NEVER

09:10:26  20   HEARD MS. VORASANE USE THE WORD QUIETLY BEFORE.  AND HER

09:10:35  21   EXPLANATION OF WHY IT MATTERED WAS WE DIDN'T WANT TO FLOOD

09:10:41  22   MR. MOUA'S HOUSE WITH ALL THESE PEOPLE, ONLY THE TOP PEOPLE

09:10:44  23   WERE INVITED TO HIS HOUSE.

09:10:45  24        YOU SHOULD FIND THAT TESTIMONY IMPLAUSIBLE.  GIVEN THE

09:10:50  25   CONTEXT OF WHAT WAS HAPPENING AND GIVEN MS. VORASANE'S

| | |
|---|---|
| 09:10:53 | 1 |

TESTIMONY THAT MR. MOUA HAD ALREADY RESIGNED BY THE TIME SHE
SENT THIS TEXT MESSAGE, YOU SHOULD DISCOUNT HER TESTIMONY THAT
QUIETLY SHE PLIANT SHE WAS REFERRING TO THESE THREE PEOPLE.
WHAT SHE REALLY MEANT WAS THEY WERE TRYING TO DO THIS IN ORDER.
SHE DIDN'T WANT OTHER PEOPLE SHOWING UP AT THE HOUSE AND
MESSING THAT UP.

     I'M NOT GOING TO TRY THE VIDEO BECAUSE WE SAW WHAT
HAPPENED THE LAST, BUT YOU MAY RECALL A VIDEO CLIP IN WHICH
MR. MOUA SAID WHEN WE FIRST JOINED FEG IN MAY OF 2014, I ASKED
YOU TO BELIEVE ME AND COMMIT TO FEG, AND YOU TRUSTED ME.

     NOW HE SAID THAT NOT IN COURT, NOT IN THE CONTEXT OF
TRYING TO HELP HIS CURRENT COMPANY AND NOT IN THE CASE OF
TRYING TO DEFEND AGAINST A LAWSUIT, BUT AS AN HONEST STATEMENT,
AN EXPRESSION OF APPRECIATION WHEN HE WAS RECEIVING THE MVP
AWARD AT THE 2016 FEG CONVENTION.

     HE THANKED THEM FOR FOLLOWING HIM.  YOU SHOULD REMEMBER
THAT.  MS. KHAMMANIVONG TESTIFIED THAT MR. MOUA PRESENTED A
POWERPOINT WITH SLIDES INCLUDING THE FEG LOGO.  AND SHE GIVEN
TOLD YOU THERE WERE ABOUT TEN SLIDES, SHE GOT INTO SPECIFICS
ABOUT WHAT WAS DISCUSSED AND THERE WAS NEVER ANY EVIDENCE
REBUTTING IT.

     AND FINALLY, ACCORDING TO FEG'S CONTRACT, WELL, LET ME
BACK UP.  MR. MOUA JOINED ON MAY 10TH AT AROUND 11:45 A.M., AS
WE SAW FROM THE WELCOME MESSAGE THAT HE RECEIVED.

     ACCORDING TO FEG'S CONTRACT, SO THE FEG CONTRACT IS IN

11:31:02  1      WITH WAS THE CHOICE OF LOSING HER TEAM AND HER LIVELIHOOD OR

11:31:10  2      DECIDING THAT SHE WANTED TO ABIDE BY THE CONTRACT THAT SHE HAD

11:31:13  3      SIGNED.

11:31:14  4          THAT'S THE CHOICE SHE WAS FACING.  AND TO MINIMIZE THAT,

11:31:19  5      LOSE SIGHT OF WHAT WAS HAPPENING THERE, TO MINIMIZE WHAT BEA

11:31:24  6      TESTIFIED TO, TO WHAT SAVENG TESTIFIED TO, YOU SAW THE FERVOR

11:31:30  7      IN HIS VOICE AS HE DESCRIBED WHAT THIS MEANT FOR SOMEONE WHO

11:31:35  8      HAD BUILT A TEAM.  FOR HIM, IT WAS A TEAM OF 350 PEOPLE THAT HE

11:31:39  9      WAS SET TO GO SEE IN PHILADELPHIA THAT HE WAS GOING TO HAVE TO

11:31:43  10     EXPLAIN, SO I WENT TO ANOTHER FIRM.

11:31:48  11         YOU KNOW, HE WAS FACED WITH THAT CHOICE.  THAT'S WHAT

11:31:53  12     THAT WAS ABOUT, NOT SIMPLY, OH, I WILL NEED TO LEAVE THE HOUSE.

11:31:58  13     THEY HAD FLOWN THERE FROM AROUND THE COUNTRY.

11:32:02  14         AND IT'S NO COINCIDENCE, BY THE WAY, THAT EVERYONE, TWO

11:32:05  15     MONTHS AGO IN MARCH, HAD BEEN ASKED TO COME TO THIS MEETING

11:32:08  16     THIS WEEKEND, AND EVERYONE JUST HAPPENED TO BE IN FROM OUT OF

11:32:11  17     TOWN, SUCH THAT THEY COULD GO TO GILLES MOUA'S HOUSE.  AND THE

11:32:14  18     TIMING OF THAT LINES UP PERFECTLY WITH THE REGISTRATION OF FEG

11:32:19  19     BUILDERS, AND EVERYTHING ELSE THAT FEG HAD PUT IN PLACE.

11:32:25  20         IF THEY THOUGHT IT WAS JUST GILLES AND MAI LEE COMING

11:32:28  21     OVER, DO YOU THINK THEY WOULD HAVE PUT ALL OF THAT TOGETHER?

11:32:31  22         YOU HEARD NO TESTIMONY FROM ANYONE SAYING THAT WE WERE

11:32:35  23     THRILLED THAT GILLES -- WE WOULD HAVE BEEN THRILLED TO HAVE

11:32:38  24     GILLES COME OVER BY HIMSELF.  YOU DIDN'T HEAR ANYONE SAY THAT,

11:32:42  25     DID YOU?  AND THERE'S A REASON.

11:36:17  1          HE SAID, I ASKED HIM, "YOU ALSO USED A SYSTEM CALLED SALES

11:36:22  2      TRAKR; IS THAT RIGHT?"

11:36:29  3          AND HE SAID, "IT ALLOWS YOU TO EXPORT DATA ABOUT THEIR

11:36:33  4      INDIVIDUALS AND THEIR CONTACT, CORRECT?

11:36:35  5          ""YES."

11:36:35  6          "SO YOU COULD HAVE EXPORTED THE DATA FOR THE CONTRACTORS;

11:36:42  7      ISN'T THAT RIGHT?

11:36:43  8          HE SAID "CORRECT.  WE DON'T HAVE THAT DATA."

11:36:53  9          WE'VE ALSO SORT OF GLOSSED OVER THE FACT THAT MR. MOUA

11:36:56 10      DIDN'T DENY WHAT YOU HEARD MR. BLOOMINGKEMPER SAY -- WELL, I'M

11:37:02 11      NOT GOING TO READ ALL OF THIS, BUT YOU HEARD HIM DENY WHAT

11:37:06 12      MR. BLOOMINGKEMPER SAID IN THAT VIDEO, THAT TWO OR THREE YEARS

11:37:10 13      BEFORE THE CONVENTION TOOK PLACE IN 2016, THAT HE GAVE MR. MOUA

11:37:17 14      A CALL AND SAID, YOU KNOW, HOW WOULD YOU FEEL IF AT THE END OF

11:37:22 15      THE YEAR I ASKED, YOU MADE $3 MILLION AND I ASKED YOU TO GIVE 2

11:37:26 16      MILLION OF IT BACK.  AND HE SAID THAT MR. MOUA LAUGHED AT HIM

11:37:30 17      BUT HIS PARTNER, IN REFERENCE TO MS. LEE, WASN'T LAUGHING.

11:37:35 18          I'M NOT GOING TO TRY TO PLAY THAT VIDEO AGAIN BECAUSE

11:37:37 19      YOU'VE SEEN WHAT HAPPENS WHEN I TRY TO, BUT REMEMBER THAT.

11:37:42 20      WHEN I ASKED MR. MOUA, WAS HE LYING IN THAT VIDEO?  MR. MOUA

11:37:51 21      SAID NO.  AND THEN WHEN I ASKED HIM WAS HE MISTAKEN IN THAT

11:37:57 22      VIDEO, HE SAID HE COULD BE.  HE WOULDN'T ANSWER THE QUESTION AS

11:38:09 23      TO WHETHER HE IT ACTUALLY SPOKEN WITH MR. BLOOMINGKEMPER BACK

11:38:14 24      IN 2012 OR 2013.

11:38:17 25          AND FEG IS PUTTING A LOT ON THE FACT, OR ON THEIR

11:38:21  1    ALLEGATION, THAT IT WAS MAI LEE AND MR. MOUA WHO CALLED THEM

11:38:24  2    AND NOT THE OTHER WAY AROUND.  BUT YOU DIDN'T HEAR ANY

11:38:27  3    TESTIMONY FROM THEIR SIDE CONTRADICTING WHAT WE PLAYED IN THE

11:38:32  4    VIDEO.  AND MR. MOUA HIMSELF WOULDN'T DENY IT EITHER.

11:38:58  5        NOW MR. SISCO HAD RAISED A POINT ABOUT IF SOMEONE

11:39:03  6    CONTACTED YOU AND THEN THEY NEEDED HELP WITH A JOB THAT THEY

11:39:06  7    DIDN'T LIKE AND THEY WANTED TO RESIGN, WOULD IT BE SOLICITATION

11:39:12  8    IF YOU WERE JUST KIND OF HELPING THEM OUT?

11:39:15  9        OF COURSE THE ANSWER IS NO.  BUT IT DEPENDS ON THE

11:39:18  10   CIRCUMSTANCES.  AND HERE THE CIRCUMSTANCES ARE SUCH THAT HE WAS

11:39:22  11   ACTING ON BEHALF OF FEG.  THERE IS NO DISPUTE ABOUT THAT.  I'VE

11:39:27  12   GONE OVER THAT EVIDENCE, I'M NOT GOING TO DO IT AGAIN.

11:39:31  13       BUT, YOU KNOW, IT'S NOT LIKE THEY MET ON THE STREET.

11:39:35  14   IT'S NOT LIKE THEY HAD BEEN FRIENDS BEFORE.  THEY ALL MET EACH

11:39:39  15   OTHER AT A MEETING IN TEXAS.  THAT WAS SPECIFICALLY FOR THE

11:39:42  16   PURPOSE IN SPEAKING WITH MR. MOUA AND MS. LEE ABOUT FEG WHERE

11:39:45  17   THEY DISCUSSED THE COMPENSATION PLAN.

11:39:48  18       THERE'S SOME DISPUTE AS TO WHAT WAS DISCUSSED IN THAT

11:39:51  19   MEETING BUT THEY ALL AGREE THAT THE COMPENSATION PLAN WAS

11:39:55  20   ADDRESSED.

11:39:56  21       THAT'S WHERE MAI LEE MET MIKE JONES, THAT'S WHERE

11:40:00  22   MR. MOUA MET MIKE JONES.  TALKING TO ANYONE AFTER THAT POINT

11:40:05  23   ABOUT LEAVING THE COMPANY, AND ALL THOSE ISSUES, MAKES IT VERY

11:40:10  24   DIFFERENT FROM THE HYPOTHETICAL THAT MR. SISCO POSED, WHERE YOU

11:40:13  25   TALKED TO YOUR FRIEND OR SOMEONE ELSE ABOUT WANTING TO LEAVE A

12:15:03  1          THANK YOU VERY MUCH, YOUR HONOR.

12:15:03  2              THE COURT:  IT'S NOT AT ALL UNUSUAL FOR THE LAWYERS

12:15:05  3     TO WISH TO TALK TO THE JURORS.  OF COURSE, THEY DON'T HAVE TO

12:15:09  4     TALK TO YOU.

12:15:10  5              MR. SISCO:  OF COURSE.

12:15:21  6          AND YOUR HONOR, THANK YOU VERY MUCH FOR YOUR PATIENCE.

12:15:25  7              THE COURT:  YOU'RE WELCOME.

12:15:28  8          (THE PROCEEDINGS WERE CONCLUDED AT 12:15 P.M.)

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25